IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TIME WARNER CABLE INC., | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-387-KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| USA VIDEO TECHNOLOGY CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF MATTHEW S. JORGENSON IN OPPOSITION
TO USA VIDEO TECHNOLOGY CORPORATION'S
MOTION TO DISMISS, STAY OR TRANSFER**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

Jeffrey M. Olson
Samuel N. Tiu
Matthew S. Jorgenson
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
(213) 896-6000

Dated: September 14, 2006

I, MATTHEW S. JORGENSON, hereby declare and state as follows:

1.    I am counsel of record for Plaintiff, Time Warner Cable Inc. ("TWC"). Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify truthfully to them.

2.    Attached as Exhibit A is a true and correct copy of a letter to William J. Raduchel from Paul R. Gupta, dated March 5, 2001.

3.    Attached as Exhibit B is a true and correct copy of a letter to William J. Raduchel from Paul R. Gupta, dated December 8, 2000.

4.    Attached as Exhibit C is a true and correct copy of USA Video Interactive Corp.'s Form 10-Q for the quarterly period ended June 30, 2006 taken from the website of the Securities and Exchange Commission.

5.    Attached as Exhibit D is a true and correct copy of the Certificate of Interest filed by Movielink LLC, in the action styled <u>USA Video Technology v. Movielink LLC</u>, No. 05-1451, in the United States Court of Appeals for the Federal Circuit, dated August 22, 2005.

6.    Attached as Exhibit E is a true and correct copy of Defendant Movielink LLC's Opening Brief in Support of Motion to Transfer Action to the Central District of California, in the action styled <u>USA Video Technology v. Movielink LLC</u>, Civil Action No. 03-368-KAJ, in the United States District Court for the District of Delaware ("the Movielink action"), filed November 4, 2003.

7.    Attached as Exhibit F is a true and correct copy of USA Video Technology Corporation's Answering Brief in Opposition to Defendant Movielink's Motion to Transfer, in the Movielink action, dated November 19, 2003.

8.    Attached as Exhibit G is a true and correct copy of a press release entitled "USVO's Video-on-Demand Patent Case Is Heard by Federal Circuit Court of Appeals," dated June 6, 2006.

9.    Attached as Exhibit H is a true and correct copy of an article entitled "USA Video Takes On Hollywood In Federal Circuit," dated June 7, 2006.

10.    Attached as Exhibit I is a true and correct copy of U.S. Patent No. 4,506,387 (Walter).

11.    Attached as Exhibit J is a true and correct copy of a press release entitled "Cable Companies Sued for Infringing USVO's VOD Patent," dated June 14, 2006.

12.    Attached as Exhibit K is a true and correct copy of a registered mail return receipt postcard re service of Summons and Complaint in the current action.

13.    Attached as Exhibit L is a true and correct copy of Affidavit of Service re Summons and Complaint in the current action, dated July 5, 2006.

14.    Attached as Exhibit M is a true and correct copy of Plaintiff's First Amended Complaint, in the action styled <u>USA Video Technology Corp. v. Time Warner Cable Inc. et al.</u>, Case No. 06-239, in the United States District Court for the Eastern District of Texas ("the Texas action"), filed August 18, 2006.

15.    Attached as Exhibit N is a true and correct copy of Cox Communications, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction or in the Alternative, to Transfer Venue to the District of Delaware and Brief in Support thereof, filed in the Texas action on August 14, 2006.

16.    Attached as Exhibit O is a true and correct copy of USA Video Technology Corp.'s Opposition to Cox Communications, Inc.'s Motion to Dismiss for

2

Lack of Personal Jurisdiction or in the Alternative, to Transfer Venue to the District of Delaware, filed in the Texas action on August 14, 2006.

17.    Attached as Exhibit P is a true and correct copy of The Comcast Defendants' Motion to Transfer to the District of Delaware Pursuant to 28 U.S.C. 1404(a) or, in the Alternative, to Stay the Action, and Brief in Support thereof, filed in the Texas action on August 10, 2006.

18.    Attached as Exhibit Q is a true and correct copy of the Joinder in Motion to Transfer by Defendant Charter Communications, Inc., filed in the Texas action on August 14, 2006.

19.    Attached as Exhibit R is a true and correct copy of Plaintiff USA Video Technology Corp.'s Opposition to Defendant Comcast's Motion to Transfer to the District of Delaware, or, in the Alternative, to Stay the Action, filed in the Texas action on August 22, 2006.

20.    Attached as Exhibit S is a true and correct copy of an Order entered in the action styled Taylor v. Ishida Co., Ltd. on October 30, 2002 in the United States District Court for the Northern District of Texas.

21.    Attached as Exhibit T is a true and correct copy of an Amendment from the prosecution file history of U.S. Patent No. 5,130,792, dated May 22, 1991.

22.    Attached as Exhibit U is a true and correct copy of an Office Action from the prosecution file history of U.S. Patent No. 5,130,792, dated July 31, 1991.

23.    Attached as Exhibit V is a true and correct copy of an Amendment from the prosecution file history of U.S. Patent No. 5,130,792, dated November 7, 1991.

24.    Attached as Exhibit W is a true and correct copy of U.S. Patent No. 5,130,792 (Tindell et al.)

25.    Attached as Exhibit X is a true and correct copy of a document entitled "USA Video Interactive Corporation's Patent No. 5,130,792 Additional Technical Information." I was counsel for record for Movielink LLC while the Movielink action was pending in this Court. To the best of my knowledge, while Exhibits A and B were produced by USA Video Technology Corp. in the Movielink action, Exhibit X was not produced by USA Video Technology Corp. in the Movielink action.

26.    Attached as Exhibit Y is a true and correct copy of the unsigned Declaration of Glen Hardin in Opposition to USVO's Motion to Dismiss, Stay or Transfer. I have been in communication with Mr. Hardin and have confirmed that he intends to sign Exhibit Y but is presently traveling and therefore unable to do so. A signed copy will be filed as soon as it can be obtained.

27.    Attached as Exhibit Z is a true and correct copy of the unsigned Declaration of Andrew T. Block in Opposition to USVO's Motion to Dismiss, Stay or Transfer. I have been in communication with Mr. Block and have confirmed that he intends to sign Exhibit Z but is presently traveling and therefore unable to do so. A signed copy will be filed as soon as it can be obtained.

I declare under penalty of perjury that to the best of my knowledge, information and belief, the foregoing statements are true and correct.

Executed this 7th day of September, 2006 in Los Angeles, California.

MATTHEW S. JORGENSON

# EXHIBIT A

**SULLIVAN & WORCESTER LLP**
ONE POST OFFICE SQUARE
BOSTON, MASSACHUSETTS 02109
(617) 338-2800
FAX NO. 617-338-2880

DIRECT DIAL  617-338-2482
EMAIL: PGUPTA@SANDW.COM

IN WASHINGTON, D.C.
1025 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036
(202) 775-8190
FAX NO. 202-293-2275

IN NEW YORK CITY
767 THIRD AVENUE
NEW YORK, NEW YORK 10017
(212) 486-8200
FAX NO. 212-758-2151

March 5, 2001

William J. Raduchel
Chief Technology Officer
AOL Time Warner, Inc.
22000 AOL Way
Sterling, VA  20166

Re:  USA Video™ Interactive Corp.

Dear Mr. Raduchel:

I write to follow-up on my letter of December 8, 2000 regarding USA Video Interactive Corporation's patented technology.  As I mentioned in my letter, USA Video is the owner of the federally registered patent No. 5,130,792 (the "Patent") that covers a system and method for electronically transferring video programs on demand from a central data facility to a remote location over standard commercial telephone networks, including fiber optic.

To assist you in your evaluation of the Patent and USA Video's offer to enter into licensing discussions with AOL, I have enclosed a write-up containing additional technical information about the Patent's claims and coverage as well as information regarding licensing parameters.  While USA Video does offer tiered licensing fee structures based on revenue and/or assessable volume of digital video distribution, the company will also consider customized licensing agreements that will advance its business initiatives, such as technology partnerships or joint ventures.  Again, we would welcome entering into such discussions and believe that both AOL and USA Video could mutually benefit from an agreement.

We would appreciate your response by March 23, 2001.  In the interim, please visit USA Video's Internet website for additional information at www.usvo.com and contact me directly at (617) 338-2482 if you have any questions.  We look forward to your response.

Sincerely,

Paul R. Gupta

Enclosure

# EXHIBIT B

**SULLIVAN & WORCESTER LLP**
ONE POST OFFICE SQUARE
BOSTON, MASSACHUSETTS 02109
(617) 338-2800
FAX NO. 617-338-2880

IN WASHINGTON, D.C.
1025 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036
(202) 775-8190
FAX NO. 202-293-2275

DIRECT DIAL 617-338-2482
EMAIL: PGUPTA@SANDW.COM

IN NEW YORK CITY
767 THIRD AVENUE
NEW YORK, NEW YORK 10017
(212) 486-8200
FAX NO. 212-758-2151

December 8, 2000

Mr. William J. Raduchel
Chief Technology Officer
America Online, Inc.
22000 AOL Way
Sterling, VA 20166

Re:  USA Video™ Interactive Corporation

Dear Mr. Raduchel:

This firm represents USA Video Interactive Corp. in intellectual property matters.  USA Video is the owner of the federally registered patent No. 5,130,792 (the "Patent") that covers a system and method for electronically transferring video programs on demand from a central location to a remote location over standard commercial telephone networks, including fiber optic. A copy of Patent '792 is enclosed for your review.

USA Video expended a great deal of effort, time and money developing its technology and obtaining the Patent.  In order to protect its substantial investment, USA Video offers other parties a license to its Patent.

It has come to our attention that America Online, Inc. may require a license from USA Video.  We would welcome entering into such discussions with you and would appreciate a response from you by no later than December 22, 2000.  Please contact me directly at (617) 338-2482 to discuss this matter.  We look forward to your response.

Sincerely,

Paul R. Gupta

Enclosure

# EXHIBIT C

10-Q 1 usvoform10qjun2006final.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-Q

QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2006

Commission file number: 0-29651

**USA VIDEO INTERACTIVE CORP.**

*(Exact name of registrant as specified in its charter)*

| **WYOMING** | **06-1576391** |
|---|---|
| *(State or Other Jurisdiction of* | *(I.R.S. Employer Identification No.)* |
| | *Incorporation or Organization)* |

| **8 West Main Street, Niantic, Connecticut** | **06357** |
|---|---|
| *(Address of principal executive offices)* | *(ZIP code)* |

**(860) 739-8030**

*(Registrant's Telephone Number, including Area Code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the *Securities Exchange Act of 1934* during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes |X|     No |_|

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes |_| No |X|

At August 11, 2006, there were 153,823,089 shares of the registrant's common stock outstanding.

**PART I.**

   **FINANCIAL INFORMATION**

**Item 1.**

   **Financial Statements**

**USA VIDEO INTERACTIVE CORP.**

CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
**JUNE 30, 2006**

**(Unaudited)**

**(Stated in US Dollars)**

**USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Stated in US Dollars)**

| | June 30, 2006 (Unaudited) | December 31, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 893 | $ 25,253 |
| Prepaid expenses and other current assets | 9,252 | 9,825 |
| **Total current assets** | 10,145 | 35,078 |
| Property and Equipment - at cost, net | - | - |
| Other Assets, net of accumulated amortization of $22,969 and $21,307, respectively | 33,519 | 35,181 |
| Prepaid rent | 16,208 | 19,340 |
| Deferred Tax Assets, net of valuation allowance of $8,944,000 and $8,824,000, respectively | - | - |
| **Total Assets** | $ 59,872 | $ 89,599 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIENCY** | | |
| Current Liabilities: | | |
| Accounts payable and accrued expenses | $ 358,157 | $ 314,729 |
| Due to related parties | 160 | 160 |
| **Total current liabilities** | 358,317 | 314,889 |
| Commitment and Contingencies | | |
| Stockholders' Deficiency: | | |
| Preferred stock - no par value; authorized 250,000,000 shares, none issued | | |
| Common stock and additional paid-in capital - no par value; authorized 250,000,000 shares, issued and outstanding 149,673,088 and 145,073,088, respectively | 34,312,926 | 34,010,651 |
| Accumulated deficit | (34,611,371) | (34,235,941) |
| **Stockholders' deficiency** | (298,445) | (225,290) |
| **Total Liabilities and Stockholders' Deficiency** | $ 59,872 | $ 89,599 |

3

SEE ACCOMPANYING NOTES

---

**USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Stated in US Dollars)**
**(Unaudited)**

| | For the three months ended | | For the six months ended | |
|---|---|---|---|---|
| | June 30, 2006 | June 30, 2005 | June 30, 2006 | June 30, 2005 |
| Revenue | $         - | $         - | $         - | $     18,800 |
| Expenses: | | | | |
| Cost of sales | - | - | - | 5,000 |
| Research and development | 16,650 | 15,000 | 70,650 | 67,000 |
| Selling, general and administrative | 210,209 | 202,040 | 373,052 | 424,704 |
| Depreciation and amortization | 830 | 830 | 1,662 | 1,662 |
| Total expenses | 227,689 | 217,870 | 445,364 | 498,366 |
| Loss from operations | (227,689) | (217,870) | (445,364) | (479,566) |
| Other income (expense) | | | | |
| Interest income (expense) | 313 | 30 | 512 | 19 |
| Gain on settlement of accounts payable | - | - | 59,422 | - |
| Gain on sale of equipment | - | - | 10,000 | - |
| | 313 | 30 | 69,934 | 19 |
| Net loss | $ (227,376) | $ (217,840) | $ (375,430) | $ (479,547) |
| Net loss per share - basic and diluted | $     (.00) | $     (.00) | $     (.00) | $     (.00) |
| Weighted-average number of common shares outstanding - basic and diluted | 148,767,593 | 133,626,954 | 146,952,094 | 132,593,831 |

4

SEE ACCOMPANYING NOTES

**USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY**
**(Stated in US Dollars)**
**(Unaudited)**

| | Common Stock and Additional Paid in Capital | | Accumulated Deficit | Stockholders' Deficiency |
|---|---|---|---|---|
| | **Shares** | **Amount** | | |
| Balance at December 31, 2005 | 145,073,088 | $ 34,010,651 | $ (34,235,941) | $ (225,290) |
| Issuance of common stock and common stock warrants for cash | 4,500,000 | 270,000 | - | 270,000 |
| Issuance of common stock upon exercise of stock options | 100,000 | 10,000 | - | 10,000 |
| Noncash compensation charges | | 22,275 | - | 22,275 |
| Net loss | | - | (375,430) | (375,430) |
| Balance at June 30, 2006 | 149,673,088 | $ 34,312,926 | $ (34,611,371) | $ (298,445) |

SEE ACCOMPANYING NOTES

**USA VIDEO INTERACTIVE CORP. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Stated in US Dollars)**
**(Unaudited)**

| | For the three months ended | | For the six months ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2006 | June 30, 2005 | June 30, 2006 | June 30, 2005 |
| Cash flows from operating activities: | | | | |
| Net loss | $ (227,376) | $ (217,840) | $ (375,430) | $ (479,547) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | 831 | 831 | 1,662 | 1,662 |
| Gain on settlement of accounts payable | - | - | (59,422) | - |
| Gain on sale of equipment | - | - | (10,000) | - |
| Noncash compensation charge | 22,275 | - | 22,275 | 3,000 |
| Decrease in prepaid expenses and other current assets | 255 | 3,444 | 3,705 | 11,006 |
| Increase (decrease) in accounts payable and accrued expenses | (73,566) | 152,537 | 102,850 | 152,155 |
| Net cash used in operating activities | (277,581) | (61,028) | (314,360) | (311,724) |
| | | | | |
| Cash flows from investing activities: | | | | |
| Proceeds from equipment sales | - | - | 10,000 | - |
| Net cash provided by investing activities | - | - | 10,000 | - |
| | | | | |
| Cash flows from financing activities: | | | | |
| Proceeds from the issuance of common stock and warrants | 270,000 | - | 270,000 | 150,000 |
| Proceeds from the issuance of common stock upon exercise of warrants warrants and options | 5,000 | 63,500 | 10,000 | 158,398 |
| Net cash provided by financing activities | 275,000 | 63,500 | 280,000 | 308,398 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Net increase (decrease) in cash and cash equivalents | | (2,581) | | 2,472 | | (24,360) | (3,326) |
| Cash and cash equivalents at beginning of period | | 3,474 | | 3,543 | | 25,253 | 9,341 |
| Cash and cash equivalents at end of period | $ | 893 | $ | 6,015 | $ | 893 | $ 6,015 |

SEE ACCOMPANYING NOTES

---

**USA VIDEO INTERACTIVE CORP.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**June 30, 2006**
**(Unaudited)**
**(Stated in US Dollars)**

## NOTE A – BASIS OF PRESENTATION

The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Rule 10-01(a)(5) of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of the management, all adjustments (consisting of normal recurring accruals) considered necessary for fair presentation have been included. The results for the interim periods are not necessarily indicative of the results that may be attained for an entire year or any future periods. For further information, refer to the Financial Statements and footnotes thereto in the Company's annual report on Form 10-K for the fiscal year ended December 31, 2005.

## NOTE B – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As shown in the financial statements, the Company has incurred losses of $375,430 for the six month period ended June 30, 2006 and, in addition, the Company incurred losses of $958,250 and $1,403,838 for the years ended December 31, 2005 and 2004, respectively. As of June 30, 2006, the Company had an accumulated deficit of $34,611,371 and a working capital deficit of $348,172. These

conditions raise doubt about the Company's ability to continue as a going concern. The Company's ability to continue as a going concern is dependent upon its ability to generate sufficient cash flow to meet its obligations as they come due which management believes it will be able to do. To date, the Company has funded operations primarily through the issuance of common stock and warrants to outside investors and the Company's management. The Company believes that its operations will generate additional funds and that additional funding from outside investors and the Company's management will continue to be available to the Company when needed. The Company also has certain lawsuits pending which could result in additional liabilities. The financial statements do not include any adjustments relating to the recoverability and classification of recorded assets, or the amounts and classifications of liabilities that might be necessary in the event the Company cannot continue as a going concern.

Basic loss per common share ("EPS") is computed as net loss divided by the weighted-average number of common shares outstanding during the period. Diluted EPS includes the impact of common stock potentially issuable upon the exercise of options and warrants. Potential common stock has been excluded from the computation of diluted net loss per share as their inclusion would be antidilutive.

The assets and liabilities of the Company's foreign subsidiaries are translated into U.S. dollars at current exchange rates, and revenue and expenses are translated at average rates of exchange prevailing during the period. The aggregate effect of translation adjustments is immaterial at June 30, 2006 and 2005.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an Interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in a company's financial statements in accordance with SFAS No. 109, "Accounting for Income Taxes." FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 is effective for fiscal years beginning after December 15, 2006. The Company is currently reviewing this new standard to determine its effects, if any, on our results of operations or financial position.


**NOTE C – COMMON STOCK**

In April 2006, the Company issued 3,825,000 units to investors at a price of $0.060 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $0.087 per share.

In April 2006, the Company issued 675,000 units to employees at a price of $0.060 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $0.087 per share. The Company charged operations approximately $22,275 representing the differential between the fair value and the

purchase price of the common stock and for any differential between the fair value of the common stock underlying the warrants and the exercise price of the warrants.

From January 1, 2006 to June 30, 2006, the Company issued 100,000 shares of common stock upon the exercising of stock options with an exercise price of $.10.


## NOTE D – COMMITMENT AND CONTINGENCIES

The Company is party to a default judgement entered against one of the Company's subsidiaries.  During the year ended December 31, 1995, a claim was made to the Company for the total amount payable under the terms of the lease with the Company's subsidiaries for office space in Dallas, Texas through 2002.  The Company's management is of the opinion that the amount payable under the terms of this judgement is not estimable or determinable at this time and may be substantially mitigated by the landlord renting the property to another party.  The range of possible loss is from $-0- to approximately $500,000.  Any settlement resulting from the resolution of this contingency will be accounted for in the period of settlement when such amounts are estimable or determinable.

On April 10, 2003, the Company announced that a subsidiary had filed a lawsuit in U.S. District Court for the District of Delaware against Movielink LLC.  The Company alleged that Movielink infringed on the Company's patented online video delivery system. On January 28, 2005, that court issued an opinion and order granting summary judgment in favor of Movielink, based on the court's conclusion that the record contained insufficient evidence that the Movielink system "*initiates connections*" (a requirement for infringement of the Company's patent) in light of the Court's construction of the term "*initiates*," and on May 27, 2005, denied the Company's motion for reconsideration. The Company appealed the district court's adverse rulings to the U. S. Court of Appeals for the Federal Circuit, and on June 8, 2006, the appellate court affirmed the rulings of the court below, effectively ending the substantive litigation between the Company and Movielink. On June 16, 2006, Movielink filed in district court a Bill of Costs seeking $20,526 in litigation costs allegedly taxable to the Company; the Company subsequently filed objections with the court asserting that only $108 of the costs sought by Movielink is permissible under applicable provisions of law. The court has not determined the amount of costs finally chargeable to the Company, and consequently a contingent liability exists, which is estimated to be in a range approximately between $108 and $20,526.

On June 13, 2006, USA Video Technology Corp., a wholly-owned subsidiary of the Company, filed suit in the U.S. District Court for the Eastern District of Texas, alleging that its U.S. Patent No. 5,130,792 is infringed by Time Warner, Inc. (NYSE: TWX), Cox Communications, Inc., Charter Communications, Inc. (NasdaqNM: CHTR), Comcast Cable Communications LLC (NasdaqNM: CMCSA), Comcast of Richardson, LP, Comcast of Plano, LP, and Comcast of Dallas, LP, and seeking statutory compensation and a court injunction against further infringement. The defendant companies cited in the

lawsuit operate digital cable systems in which they provide allegedly infringing video-on-demand services to their subscribers. The defend ant companies subsequently filed lawsuits in the U.S. District Court for the District of Delaware, primarily seeking declaratory judgments that the first-filed allegations of patent infringement against them are without merit, and also seeking damages, etc., related to the filing of the lawsuits. At present, proceedings in both courts are ongoing. Consequently, a contingent liability exists to the extent that the outcome of these proceedings is uncertain.

The Company leases its Canadian office space under a non-cancelable operating lease, expiring in March 2009. The minimum rental commitment of this lease is approximately $20,000 annually. The Company leases its United States office under a non-cancelable operating lease, expiring in July 2008. The minimum rental commitment of this lease is approximately $13,200 annually. Rent expense amounted to $23,125 and $21,878 for the six months ended June 30, 2006 and 2005, respectively.

## NOTE E – STOCK BASED COMPENSATION

In December 2004, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 123R (revised 2004), "Share-Based Payment" which revised Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation". This statement supersedes Opinion No. 25, "Accounting for Stock Issued to Employees." The revised statement addresses the accounting for share-based payment transactions with employees and other third parties, eliminates the ability to account for share-based compensation transactions using APB 25 and requires that the compensation costs relating to such transactions be recognized in the statement of operations.

Effective January 1, 2006, the Company adopted FAS No. 123R utilizing the modified prospective method. FAS No.123R requires the recognition of stock-based compensation expense in the financial statements. There is no impact on the basic or diluted earning per share reported on the statement of operations.

Under the modified prospective method, the provisions of FAS No. 123R apply to all awards granted or modified after the date of adoption. In addition, the unrecognized expense of awards not yet vested at the date of adoption, determined under the original provisions of FAS 123, "Accounting for Stock Based Compensation", shall be recognized in net earnings in the periods after the date of adoption. Stock based compensation consists primarily of stock options. Stock options are granted to employees at exercise prices equal to the fair market value of the Company's stock at the dates of grant. Stock options generally vest over three years and have a term of seven years. Compensation expense for stock options is recognized over the period for each separately vesting portion of the stock option award.

The fair value for options issued prior to January 1, 2006 was estimated at the date of grant using a Black-Scholes option-pricing model. The risk free rate was derived from the U.S. Treasury yield curve in effect at the time of the grant. The volatility factor was

determined based historical and other factors. The Black-Scholes option-pricing model was developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, option-pricing models require the input of highly subjective assumptions including the expected stock price volatility. Because the Company's employee stock options have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock options.

A summary of the status of the Company's options and changes for the six months ended June 30 2006 is presented below:

| | Number of Shares | Weighted Average Exercise Price | Remaining life | Aggregate intrinsic Value |
|---|---|---|---|---|
| Outstanding at beginning of period | 12,785,000 | $0.10 | | |
| Granted | -0- | $0.00 | | |
| Exercised | 100,000 | $0.10 | | |
| Cancelled/expired | -0- | $0.00 | | |
| Outstanding at end of period | 12,685,000 | $0.10 | 1.0 years | $0 |
| Options exercisable at end of period | 12,685,000 | | | |

As of June 30, 2006, there was no unrecognized compensation cost related to non-vested stock option awards. All options are fully vested as of June 30, 2006.

In February 2006, the Company adopted a new Stock Options Plan (the "2005 Plan"). The 2005 Plan authorizes the issuance of up to 13,900,000 of the Company's common shares, subject to adjustment under certain circumstances. The Company is listed on the TSX Venture Exchange ("*TSX*") and is subject to a limitation on the number of options a company may have. The 2005 Plan provides for the issuance of both incentive stock options and nonqualified options as those terms are defined in the *Internal Revenue Code of 1986*, as amended (the "*Code*"). The Company's previous option plan will remain in effect until all granted stock options are exercised, expired or canceled. No options have been granted under this plan.

For the 2005 year the Company has elected to apply APB Opinion No. 25, Accounting for Stock Issued to Employees, and related interpretations in accounting for its stock options and has adopted the disclosure-only provisions of Statement of Financial Accounting Standards ("SFAS") No. 123, Accounting for Stock-Based Compensation. If the Company had elected to recognize compensation cost based on the fair value of the

options granted at the grant date as prescribed by SFAS No. 123, the Company's net loss and net loss per common share for the six month period ended June 30, 2005 would have been as follows:

| Six months ended June 30, | | 2005 |
|---|---|---|
| Net loss: | | |
| As reported | $ | (479,547) |
| Add: Stock based compensation expense included in reported net loss | | 3,000 |
| Deduct: Total stock-based compensation expense determined under fair value | | |
| based method for all awards | | (3,000) |
| Pro forma | $ | (479,547) |
| Loss per common share – basic and diluted As reported | $ | (0.01) |
| Pro forma | $ | (0.01) |

## NOTE F – PREPAID RENT

Prepaid rent represents payment made to the landlord at inception of the lease. This amount is being amortized over the life of the lease (5 years).

## NOTE G – SUBSEQUENT EVENTS

In August 2006, the Company issued 3,100,000 units to investors at a price of $0.0575 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $0.087 per share.

In August 2006, the Company issued 1,050,000 units to employees at a price of $0.0575 per unit. Each unit consisted of one share of common stock and one warrant to purchase an additional share of common stock at $0.087 per share. The Company will charge operations for any differential between the fair value and the purchase price of the common stock and for any differential between the fair value of the common stock underlying the warrants and the exercise price of the warrants.

In August, the Company entered into a lease for its US office space under a non-cancelable operating lease, expiring in July 2008. The minimum rental commitment of this lease is approximately $13,200 annually.

12

**Item 2.**

### Management's Discussion and Analysis of Financial Condition and Results of Operations

## CAUTIONARY STATEMENT

This document includes statements that may constitute forward-looking statements made pursuant to the Safe Harbor provisions of the *Private Securities Litigation Reform Act of 1995*. We caution readers regarding certain forward-looking statements in this document, press releases, securities filings, and all other documents and communications. All statements, other than statements of historical fact, including statements regarding industry prospects and future results of operations or financial position, made in this Quarterly Report on Form 10-Q ("*Report*") are forward looking. The words "*believes*," "*anticipates*," "*estimates*," "*expects*," and words of similar import, constitute "*forward-looking statements*." While we believe in the veracity of all statements made herein, forward-looking statements are necessarily based upon a number of estimates and assumptions that, while considered reasonable by us, are inherently subject to significant business, economic and competitive uncertainties and contingencies and known and unknown risks. As a result of such risks, our actual results could differ materially from those expressed in any forward-looking statements made by, or on behalf of, the company. We will not necessarily update information if any forward-looking statement later turns out to be inaccurate. Our actual results could differ materially from those anticipated in these forward-looking statements for many reasons, including risks and uncertainties set forth in our Annual Report on Form 10-K, as well as in other documents we file with the Securities and Exchange Commission ("*SEC*").

The following information has not been audited. You should read this information in conjunction with the unaudited financial statements and related notes to the financial statements included in this report.

## OVERVIEW OF THE COMPANY

USA Video Interactive Corp. designs and markets to business customers streaming video and video-on-demand systems, services and source-to-destination digital media delivery solutions that allow live or recorded digitized and compressed video to be transmitted through Internet, intranet, satellite or wireless connectivity. Our systems, services and

delivery solutions include video content production, content encoding, media asset management, media and application hosting, multi-mode content distribution, transaction data capture and reporting, e-commerce, specialized engineering services, and Internet streaming hardware.

Although we have not generated any significant sales for the year to date, we continue to explore opportunities that will result in new products for new revenue streams, but there can be no assurances that such efforts will be successful.

We hold the patent for Store-and-Forward Video-on-Demand (#5,130,792), filed in 1990 and issued by the United States Patent and Trademark Office on July 14, 1992. It has been cited in at least 200 subsequent U.S. patent documents. We hold similar patents in England, France, Spain, Italy, Germany, Canada, and Japan. We anticipate actively engaging in licensing this patent.

Our Store and Forward Video-on-Demand ("*VoD*") intellectual property potentially reaches several significant segments of the VoD market. Our patented technique covers the transmission of video content over networks faster than *"real time."* VoD is the mechanism by which the delivery of compressed video is managed and, together with compression technology, facilitates the delivery of video to an end user in a timely and interactive fashion.

We have developed a number of specific products and services based on these technologies. These include StreamHQ™, a collection of source-to-destination media delivery services marketed to businesses; EncodeHQ™, a service that digitizes and compresses analog-source video; hardware server and encoder system applications under the brand name Hurricane Mediacaster™; ZMail™, a service that delivers web and rich media content to targeted audiences; mediaClix™, a service that delivers content similar to Zmail but originating from an existing web presence; and MediaSentinel™, a patent-pending digital watermarking technology to deter digital video piracy.

In September 2005 we entered into a formal sales and marketing agreement with First Serve International, LLC ("*First Serve*"), pursuant to which we will jointly market the MediaSentinel Workstation to companies throughout Asia (including Bollywood in India), Europe, and the United States. In support of these efforts, we will collaborate with sales support, marketing and educational programs and materials that make clear the benefits of watermarking to potential customers. Through these efforts, we intend to attract new business and break ground on enforcement of copyright holders.

We were incorporated on April 18, 1986, as *First Commercial Financial Group Inc.* in the Province of Alberta, Canada. In 1989, our name was changed to *Micron Metals Canada Corp.*, which purchased 100% of the outstanding shares of USA Video Inc., a Texas corporation, in order to focus on the digital media business. In 1995, we changed our name to *USA Video Interactive Corp.* and continued our corporate existence to the State of Wyoming. We have five wholly-owned subsidiaries: USA Video (California) Corp., USA Video Corp., Old Lyme Productions Inc., USA Video Technologies, Inc.,

and USVO, Inc. Our executive and corporate offices are located in Old Lyme, Connecticut, and our Canadian offices are located in Vancouver, British Columbia.

**BUSINESS OBJECTIVES:**

We have established the following near-term business objectives:

1. Leverage our digital VoD patent for licensing fees and partnerships in the United States and internationally;

2. Patent and license new technology developed within the corporate research and development program;

3. Attain industry recognition for the superior architectural, functional, and business differentiators of our MediaSentinel™ architecture;

4. Demonstrate proof of concept on a commercial project with MediaSentinel™ architecture;

5. Establish StreamHQ™ as the industry standard in the streaming video and rich media marketplace;

6. Expand StreamHQ™ functionality to provide enhanced support for corporate training and education markets.

**CRITICAL ACCOUNTING POLICIES (AND ESTIMATES)**

Our discussion and analysis of our financial condition and results of operations are based upon our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an ongoing basis, we evaluate these estimates, including those related to customer programs and incentives, bad debts, inventories, investments, intangible assets, income taxes, warranty obligations, impairment or disposal of long-lived assets, contingencies and litigation. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

We consider the following accounting policies to be both those most important to the portrayal of our financial condition and that require the most subjective judgment:

☐ Revenue recognition;

☐ Impairment or disposal of long-lived assets; and

☐ Deferred taxes.

**REVENUE RECOGNITION.** Software revenue and other services are recognized in accordance with the terms of the specific agreement, which is generally upon delivery and when accepted by customer. Maintenance, support and service revenue are recognized ratably over the term of the related agreement.

**IMPAIRMENT OR DISPOSAL OF LONG-LIVED ASSETS.** Long-lived assets are reviewed in accordance with Statement of Financial Accounting Standard ("*SFAS*") 144. Impairment or disposal of long-lived assets losses are recognized in the period the impairment or disposal occurs.

**DEFERRED TAXES.** We record a valuation allowance to reduce deferred tax assets when it is more likely than not that some portion of the amount may not be realized.

**RESULTS OF OPERATIONS**

**Sales**

Sales for the six-month period ended June 30, 2006 were $-0-, compared to revenue of $18,800 for the six-month period ended June 30, 2005. Sales for the three-month period ended June 30, 2006 and June 30, 2005 were $-0-. We discontinued the sale of select services from our prototype StreamHQ™ after customers' satisfaction and proof of concept. We no longer sell the individual functions of StreamHQ™. We intend to continue to develop and expand our StreamHQ™ services business, while pursuing opportunities to sell replicated StreamHQ™ systems to corporations and organizations that prefer systems solutions to services.

**Cost of Sales**

The cost of sales for the six months ended June 30, 2006 was $-0- as compared to $5,000 for the comparable period in 2005. For the three-month period ended June 30, 2006 and June 30, 2005, the cost of sales were $-0-. The decrease in cost of sales during the six months ended June 30, 2006 is directly attributable to the decrease in sales.

**Selling, General and Administrative Expenses**

16

Selling, general and administrative expenses consisted of product marketing expenses, consulting fees, office, professional fees, annual meeting and other expenses to execute the business plan and for our day-to-day operations. Administrative expenses increased in the three months ending June 30, 2006 due to the annual meeting being held earlier in 2006 compared to 2005 and non-cash compensation.

Selling, general and administrative expenses for the three months ended June 30, 2006 increased marginally by $8,169 to $210,209 from $202,040 for the three months ended June 30, 2005. The increase was due to the date of the annual meeting and, as a result the costs, being earlier than last year and non-cash compensation. For the six months ended June 30, 2006 the costs decreased by $51,652 to $373,052 from $424,704 for the comparable period in 2005. The decrease was the result of expenses incurred related to the decrease in our operations.

Expenses for the annual meeting for the three months ended June 30, 2006, increased to $48,141 from $27,500 for the comparable period of 2005. The 2006 Annual Meeting was held June 26, 2006 compared to the 2005 Annual Meeting, which was held September 7, 2005.

Product marketing expense for the three months ended June 30, 2006, decreased to $22,335 from $68,435 for the comparable period in 2005. For the six months ended June 30, 2006 these costs decreased to $75,565 from $84,446 for the comparable period in 2005. The decrease was due to direct marketing to selective possible customers for MediaSentinel™.

Professional expense for the three months ended June 30, 2006, decreased insignificantly to $23,335 from $24,775 for the comparable period of 2005. For the six months ended June 30, 2006 these costs decreased to $45,406 from $158,024 for the comparable period in 2005. We incurred decreased costs in the first quarter of 2006 as a result of the appeal of the patent infringement suit incurred during fiscal 2005.

We have arranged for additional staff and consultants to engage in marketing activities in an effort to identify and assess appropriate market segments, develop business arrangements with prospective partners, create awareness of new products and services, and communicate to the industry and potential customers. Other components of selling, general and administrative expense did not change significantly.

### Research and Development Expenses

Research and development expenses consisted primarily of contractors, compensation, hardware, software, licensing fees, and new product applications for our proprietary MediaSentinel™. Research and development expenses increased to $70,650 for the six months ended June 30, 2006, from $67,000 for the comparable period in 2005 and to $16,650 for the three months ended June 30, 2006 from $15,000 for the comparable period in 2005. The increase was the result of maintaining research and development efforts of MediaSentinel™.

**Non-Cash Compensation Charges**

Non-cash compensation charges for the six months ended June 30, 2006 was $22,275, compared to $3,000 for the comparable period in 2005. The increased amount for the six months ended June 30, 2006 was due to the issuance of common shares and share purchase warrants to our officers, directors and employees at a price and exercise price, respectively, below the market price of the common shares at the time of issuance of the common shares and share purchase warrants. Because the rules of the TSX Venture Exchange require that the offering price for privately placed securities of listed companies be set when the private placement offering is first announced, rather than upon closing, and the market price of the common shares increased between announcement of the offering and closing, the sale price of the common shares and the exercise price of the warrants were below the market price of the common shares on the date of issuance.

**Other Income**

During the six months ended June 30, 2006 we recorded a gain on settlement of accounts payable due to the statute of limitation expiring on $59,422 of payroll taxes and we also sold property and equipment and recorded a gain on sale of $10,000.

**Net Losses**

To date, we have not achieved profitability and, we expect to incur substantial net losses for at least the remainder of 2006. Our net loss for the six months ended June 30, 2006 was $375,430, compared with a net loss of $479,547 for the six months ended June 30, 2005. The decrease in losses is directly related to the reduced professional fees and the gain on settlement of accounts payable and sale of property and equipment.

## LIQUIDITY AND CAPITAL RESOURCES

At June 30, 2006, we had a cash position of $893, compared to $25,253 at December 31, 2005. We anticipate capital requirements of $500,000 for the continued development of our MediaSentinel™ products, $500,000 for commercialization of our MediaSentinel™ products and $250,000 for costs associated with the infringement lawsuit.

We will require additional financing to fund current operations through fiscal 2006. We have historically satisfied our capital needs primarily by issuing equity securities. We will require an additional $1.25 million to $1.75 million to finance operations through fiscal 2006 and we intend to seek such financing through sales of our equity securities. Subsequent to the six months ended June 30, 2006, we raised an aggregate of $238,625 through a private placement of 4,150,000 units at a price of $0.0575 unit.

Assuming the aforementioned $1.25 million to $1.75 million in financing is obtained, we believe that continuing operations for the longer term will be supported through anticipated licensing revenues and through additional sales of our securities. We have no

binding commitments or arrangements for additional financing, and there is no assurance that we will be able to obtain any additional financing on terms acceptable to us, if at all.

## OFF-BALANCE SHEET ARRANGEMENTS

We do not maintain any off-balance sheet transactions, arrangements, or obligations that are reasonably likely to have a material effect on our financial condition, results of operations, liquidity, or capital resources.

## FACTORS THAT MAY AFFECT FUTURE RESULTS OF OPERATIONS

Certain risks and uncertainties could cause actual results to differ materially from the results contemplated by the forward-looking statements contained in this Report. Risks and uncertainties have been set forth in our Annual Report on Form 10-K, as well as in other documents we file with the SEC. These risk factors include the following:

## OUR ABILITY TO CONTINUE AS A GOING CONCERN: WE HAVE INCURRED SUBSTANTIAL LOSSES; WE EXPECT TO INCUR LOSSES IN THE FUTURE, AND MAY NEVER ACHIEVE PROFITABILITY.

To date, we have not been profitable, have not generated significant revenue from operations, and have incurred substantial losses. For the six months ended June 30, 2006, we had a net loss of $375,430. As of June 30, 2006, we had an accumulated deficit of $34,611,371 and a working capital deficit of $348,172. We intend to continue to expend significant financial and management resources on the development of our proposed products and services, and other aspects of our business. As a result, we expect operating losses and negative cash flows to increase for the foreseeable future. Consequently, we will need to generate significant revenues to achieve and maintain profitability. We may be unable to do so. If our revenues grow more slowly than anticipated or if operating expenses increase more than expected, or are not reduced sufficiently, we may never achieve profitability.

## OUR LIMITED OPERATING HISTORY MAKES IT DIFFICULT TO EVALUATE OUR BUSINESS AND PROSPECTS.

Our business and prospects must be considered in light of the many risks, uncertainties, expenses, delays and difficulties frequently encountered by companies in their early stages of development, particularly companies in new and rapidly evolving markets such as streaming media. We cannot be certain that our business strategy will be successful or that we will successfully address these risks.

## IF WE ARE UNABLE TO OBTAIN SUBSTANTIAL ADDITIONAL FINANCING IN THE NEXT FEW MONTHS WE MAY NOT BE ABLE TO MAINTAIN OPERATIONS AT CURRENT LEVELS.

We require substantial additional financing to maintain operations at current levels for fiscal 2006. Financing may not be available when needed on terms favorable to us, or at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to further develop or enhance our products and services, take advantage of future opportunities or respond to competitive pressures, or ultimately, to continue in business.

**CONTINUATION OF THE CURRENT SLUMP IN THE TECHNOLOGY SECTOR WILL ADVERSELY AFFECT DEMAND FOR OUR PRODUCTS AND SERVICES.**

Our sales have been adversely affected by the ongoing slump in the technology industry segment and the continuation of these market conditions can be expected to result in depressed demand for our products and services.

**OUR OPERATING RESULTS IN FUTURE PERIODS ARE EXPECTED TO BE SUBJECT TO SIGNIFICANT FLUCTUATIONS, WHICH WOULD LIKELY AFFECT THE TRADING PRICE OF OUR COMMON SHARES.**

Factors that could cause such fluctuations include our ability to attract and retain customers; the introduction of new video transmission services or products by others; price competition; the continued development of and changes in the streaming media market; our ability to remain competitive in our product and service offerings; our ability to attract new personnel; and potential U.S. and foreign regulation of the Internet. These factors could cause the price of our stock to fall, which may make it difficult for us to raise funds in the future, which funds are essential for us to continue to carry on business.

**WE ARE SUBJECT TO RAPID TECHNOLOGICAL CHANGE, WHICH COULD RENDER OUR PRODUCTS AND SERVICES OBSOLETE.**

Keeping pace with the technological advances may require substantial expenditures and lead-time, particularly with respect to acquiring updated hardware and infrastructure components of its systems. We may require additional financing to fund such acquisitions. Any such financing may not be available on commercially reasonably terms, if at all, when needed.

**IF WE DO NOT CONTINUOUSLY IMPROVE OUR TECHNOLOGY IN A TIMELY MANNER, OUR PRODUCTS COULD BE RENDERED OBSOLETE.**

These changes and developments may render our products and technologies obsolete in the future. As a result, our success depends on our ability to develop or adapt products and services or to acquire new products and services that can compete successfully. If we are unable to continuously upgrade our technology to keep pace with the industry then our products could become obsolete, which would cause our business to fail.

**WE INTEND TO ISSUE ADDITIONAL EQUITY SECURITIES, WHICH MAY DILUTE THE INTERESTS OF CURRENT SHAREHOLDERS OR CARRY RIGHTS OR PREFERENCES SENIOR TO THE COMMON SHARES.**

Accordingly, existing shareholders may experience additional dilution of their percentage ownership interest. In addition, the new equity securities may have rights, preferences or privileges senior to those of existing holders of our common shares.

**COMPLIANCE WITH CHANGING REGULATION OF CORPORATE GOVERNANCE AND PUBLIC DISLCOSURE MAY RESULT IN ADDITIONAL EXPENSES.**

Changing laws, regulations and standards relating to corporate governance and public disclosure, including the *Sarbanes-Oxley Act of 2002*, new SEC regulations and NASDAQ National Market rules, are creating uncertainty for companies such ours. These new or changed laws, regulations and standards are subject to varying interpretations in many cases due to their lack of specificity, and as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies, which could result in continuing uncertainty regarding compliance matter and higher costs necessitated by ongoing revisions to disclosure and governance practices. We are committed to maintaining high standards of corporate governance and public disclosure. As a result, we intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses and a diversion of management time and attention from revenue-generating activities to compliance activities. If our efforts to comply with new or changed laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice, our reputation may be harmed.

**OUR STOCK PRICE IS EXTREMELY VOLATILE.**

The trading price of our common stock has been subject to very wide fluctuations which may continue in the future in response to, among other things, the following:

- signing or not signing new licensees;

- new litigation or developments in current litigation;

- announcements of technological innovations or new products, our licensees or our competitors;

- positive or negative reports by securities analysts as to our expected financial results; and

- developments with respect to patents or proprietary rights and other events or factors.

In addition, the equity markets have experienced volatility that has particularly affected the market prices of equity securities of many high technology companies and that often has been unrelated or disproportionate to the operating performance of such companies. These broad market fluctuations may adversely affect the market price of our common stock.

## OUR BUSINESS MAY SUFFER IF WE CANNOT PROTECT OUR INTELLECTUAL PROPERTY.

We seeks to protect our proprietary rights through a combination of patents, trade secret and trademark laws, confidentiality procedures and contractual provisions with employees and third parties. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our products or obtain and use information that we consider as proprietary. Litigation may be necessary to enforce our intellectual property rights, to protect our trade secrets and to determine the validity and scope of the proprietary rights of others. Any litigation could result in substantial costs and diversion of management and other resources with no assurance of success and could seriously harm our business and operating results.

## THERE IS NO ASSURANCE THAT OUR PATENTS WON'T BE CHALLENGED, INVALIDATED OR CIRCUMVENTED

There can be no assurance that our current or future patents, if any, will not be challenged, invalidated, or circumvented, or that any rights granted thereunder will provide competitive advantages to us. In addition, there can be no assurance that patents will be issued from pending applications, or that claims allowed on any future patents will be sufficiently broad to protect our technology. In addition, the laws of some foreign countries may not permit the protection of our proprietary rights to the same extent as do the laws of the United States. We intend to enforce our proprietary rights through the use of licensing agreements and, when necessary, litigation. Although we believe the protection afforded by our patents, patent applications, and trademarks has value, the rapidly changing technology in the video transmission industry makes our future success dependent primarily on the innovative skills, technological expertise, and management abilities of our employees rather than on patent and trademark protection.

## OUR PRODUCTS MAY INFRINGE THE INTELLECTUAL PROPERTY RIGHTS OF OTHERS, CAUSING US TO INCUR SIGNIFICANT COSTS OR PREVENT US FROM LICENSING OUR PRODUCTS.

Other companies, including our competitors, may have or obtain patents or other proprietary rights that would prevent, limit or interfere with our ability to make, use or license our products. We cannot be certain that our products do not and will not infringe patents or other proprietary rights of others. We may be subject to legal proceedings, including claims of alleged infringement by us of the intellectual property rights of third parties. If a successful claim of infringement is brought against us and we fail to or are unable to license the infringed technology on commercially reasonable terms, our

business and operating results could be significantly harmed. Companies in the technology market are increasingly bringing suits alleging infringement of their proprietary rights, particularly patent rights. Although we are not currently subject to any litigation or claims, any future claims, whether or not valid, could result in substantial costs and diversion of resources with no assurance of success. Intellectual property litigation or claims could force us to do one or more of the following:

☐      cease selling, incorporating or using products or services that incorporate the challenged intellectual property;

☐      obtain a license from the holder of the infringed intellectual property right, which license may not be available on commercially reasonable terms, or at all; or

☐      redesign our products or services.

If we are forced to take any of these actions, our business could be substantially harmed.

**Item 3.**
### Quantitative and Qualitative Disclosures About Market Risk

We believe our exposure to overall foreign currency risk is not material. We do not manage or maintain market risk sensitive instruments for trading or other purposes and are not exposed to the effects of interest rate fluctuations as we do not carry any long-term debt.

We report our operations in US dollars and our currency exposure, although considered by us as immaterial, is primarily between US and Canadian dollars. Exposure to other currency risks is also not material as international transactions are settled in US dollars. Any future financing undertaken by us will be denominated in US dollars. As we increase our marketing efforts, the related expenses will be primarily in US dollars. In addition, 90% of our bank deposits are in US dollars.

**Item 4.**
### Controls and Procedures

Based on their evaluation of the effectiveness of our disclosure controls and procedures as of June 30, 2006, the date of this quarterly report, our undersigned officers have concluded that such disclosure controls and procedures are adequate. There were no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses, subsequent to the date of the most recent evaluation by our undersigned officers of the design and operation of internal controls which could adversely affect our ability to record, process, summarize and report financial data.

23

# PART II.
## OTHER INFORMATION

### Item 1.
#### Legal Proceedings

On April 10, 2003, the Company announced that a subsidiary had filed a lawsuit in U.S. District Court for the District of Delaware against Movielink LLC. The Company alleged that Movielink infringed on the Company's patented online video delivery system. On January 28, 2005, that court issued an opinion and order granting summary judgment in favor of Movielink, based on the court's conclusion that the record contained insufficient evidence that the Movielink system *"initiates connections"* (a requirement for infringement of the Company's patent) in light of the Court's construction of the term *"initiates,"* and on May 27, 2005, denied the Company's motion for reconsideration. The Company appealed the district court's adverse rulings to the U. S. Court of Appeals for the Federal Circuit, and on June 8, 2006, the appellate court aff irmed the rulings of the court below, effectively ending the substantive litigation between the Company and Movielink. On June 16, 2006, Movielink filed in district court a Bill of Costs seeking $20,526 in litigation costs allegedly taxable to the Company; the Company subsequently filed objections with the court asserting that only $108 of the costs sought by Movielink is permissible under applicable provisions of law. The court has not determined the amount of costs finally taxable to the Company, and consequently a contingent liability exists, which is estimated to be in a range approximately between $108 and $20,526.

On June 13, 2006, USA Video Technology Corp., a wholly-owned subsidiary of the Company, filed suit in the U.S. District Court for the Eastern District of Texas, alleging that its U.S. Patent No. 5,130,792 is infringed by Time Warner, Inc. (NYSE: TWX), Cox Communications, Inc., Charter Communications, Inc. (NasdaqNM: CHTR), Comcast Cable Communications LLC (NasdaqNM: CMCSA), Comcast of Richardson, LP, Comcast of Plano, LP, and Comcast of Dallas, LP, and seeking statutory compensation and a court injunction against further infringement. The defendant companies cited in the lawsuit operate digital cable systems in which they provide allegedly infringing video-on-demand services to their subscribers. The defend ant companies subsequently filed lawsuits in the U.S. District Court for the District of Delaware, primarily seeking declaratory judgments that the first-filed allegations of patent infringement against them are without merit, and also seeking damages, etc., related to the filing of the lawsuits. At present, proceedings in both courts are ongoing. Consequently, a contingent liability exists to the extent that the outcome of these proceedings is uncertain.

### Item 2.
#### Changes in Securities and Use of Proceeds

During the quarter ended June 30, 2006, we completed an offering of 4,500,000 at prices of $0.060 per unit for total proceeds of $270,000. Each unit consisted of one share of

common stock and one warrant to acquire one additional share at $0.087 per share, exercisable on or before March 31, 2008.

The offer and sale of the units were exempt from registration pursuant to section 4(2) of the Securities Act, Rule 701 and Rule 506 of Regulation D promulgated thereunder. We limited the manner of the offering and provided disclosure regarding the offering and our company to the investors. Two of our officers and directors, one employee, one additional unaffiliated non-accredited investor, and four additional unaffiliated accredited investors purchased the securities. We believe that a portion of these sales were also exempt under Regulation S under the Securities Act, as such sales were made in offshore transactions to non-U.S. persons.

**Item 3.**

        **Defaults Upon Senior Securities.**

None.

**Item 4.**

        **Submission of Matters to a Vote of Security Holders.**

We held our annual meeting of shareholders on June 26, 2006, in Calgary, Alberta, Canada. At the meeting the shareholders voted to retain Anton Drescher, Edwin Molina, Maurice Loverso and Rowland Perkins as our Directors.

Also at the meeting, the shareholders approved the appointment of Goldstein Golub Kessler LLP as auditors for the year ending December 31, 2006.

| Matter Voted Upon | No. of Votes For | No. of Votes Against | No. of Votes Withheld | Not Voted |
|---|---|---|---|---|
| Election of Directors | 75,332,006 | | 168,037 | |
| Edwin Molina | 75,310,056 | | 189,987 | |
| Anton J. Drescher | 75,354,623 | | 145,420 | |
| Maurice Loverso | 75,344,923 | | 155,120 | |
| Rowland Perkins | | | | |
| Appointment of Goldstein Golub Kessler LLP as auditors | 75,356,633 | 96,477 | 46,933 | 0 |

**Item 5.**

        **Other Information.**

None.

**Item 6.**

**Exhibits and Reports on Form 8-K**

(a)

Exhibit(s)

31.1

Certification of the Chief Executive Officer Pursuant To Rule 13a-14 Or 15d-14 of the *Securities Exchange Act Of 1934,*as adopted pursuant to Section 302 of the *Sarbanes-Oxley Act of 2002*

31.2

Certification of the Chief Financial Officer Pursuant To Rule 13a-14 Or 15d-14 of the *Securities Exchange Act of 1934,*as adopted pursuant to Section 302 of the *Sarbanes-Oxley Act of 2002*

32.1

Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the *Sarbanes-Oxley Act of 2002*

32.2

Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the *Sarbanes-Oxley Act of 2002*

(b)

Reports on Form 8-K

(i)

On June 6th, 2006 we announced that we appeared before the Federal Circuit Court of Appeals in Washington, DC, in its appeal against Movielink LLC, which is jointly owned by Warner Bros. (NYSE: TWX), Paramount Pictures Corporation (NYSE: VIA), Metro-Goldwyn-Mayer (NYSE: SNE), Universal Studios, and Sony Pictures Entertainment (NYSE: SNE). The appeal is from an adverse district court decision last year and relates to the interpretation of certain patent claim elements as applied to Internet-based video download platforms such as Movielink's. Intellectual property law firm Goldstein, Faucett & Prebeg represents USVO in its appeal to the U.S. Court of Appeals for the Federal Circuit, which has nationwide jurisdiction over patent litigation appeals. Chief Judge Michel, with Circuit Judges Plager and Bryson, heard oral arguments today from attorneys representing both parties.

(ii)

On June 8th, 2006, we announced that the U.S. Court of Appeals for the Federal Circuit affirmed, per curiam, the district court's summary judgment ruling against USA Video

Technology Corporation, our wholly owned subsidiary in our litigation with Movielink LLC.

(iii)

On June 14th, 2006 we announced that we filed suit on June 13th in the U.S. District Court for the Eastern District of Texas, alleging that our U.S. Patent No. 5,130,792 is infringed by Time Warner, Inc. (NYSE: TWX), Cox Communications, Inc., Charter Communications, Inc. (NASDAQ: CHTR), Comcast Cable Communications LLC (NASDAQ: CMCSA), Comcast of Richardson, LP, Comcast of Plano, LP, and Comcast of Dallas, LP, and seeking fair compensation and a court injunction against further infringement. The companies cited in the lawsuit operate digital cable systems in which they provide allegedly infringing video-on-demand services to their subscribers.

(iv)

On June 29th, 2006 we announced that at the annual meeting of shareholders held on June 26th, 2006 the reappointment of the current Board of Directors and appointment of auditors were approved by the shareholders

---

## SIGNATURE

Pursuant to the requirements of the *Securities Exchange Act of 1934*, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**USA VIDEO INTERACTIVE CORP.**

**Dated:** August 11th, 2006

By: /s/ *Anton J. Drescher*
-----------------------------------
**Name:** Anton J. Drescher
**Title:** Chief Financial Officer

---

27

**Exhibit 31.1**

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER  PURSUANT TO RULE 13A-14 OR 15D-14 OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE *SARBANES-OXLEY ACT OF 2002*

I, Edwin Molina, certify that:

1.

I have reviewed this quarterly report on Form 10-Q of USA Video Interactive Corp;

2.

Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.

Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

a)

designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entitles, particularly during the period in which this quarterly report is being prepared;

b)

evaluated the effectiveness of the registrant's disclosure controls and procedures as of the date of this quarterly report (the "*Evaluation Date*"); and

c)

presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)

all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

_____

b)

any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.

The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

By: /s/ *Edwin Molina*
-----------------------------------
**Name:** Edwin Molina
**Title:** President and Chief Executive Officer
**Date:** August 11th, 2006

_____

**Exhibit 31.2**

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER  PURSUANT TO RULE 13A-14 OR 15D-14 OF THE SECURITIES EXCHANGE ACT OF 1934, AS**

**ADOPTED PURSUANT TO SECTION 302 OF THE *SARBANES-OXLEY ACT OF 2002***

I, Anton J. Drescher, certify that:

1.

I have reviewed this quarterly report on Form 10-Q of USA Video Interactive Corp;

2.

Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.

Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

a)

designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entitles, particularly during the period in which this quarterly report is being prepared;

b)

evaluated the effectiveness of the registrant's disclosure controls and procedures as of the date of this quarterly report (the "*Evaluation Date*"); and

c)

presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)

30

all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

---

b)

any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.

The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

By: /s/ *Anton J. Drescher*
------------------------------------
**Name:** Anton J. Drescher
**Title:** Secretary and Chief Financial Officer
**Date:** August 11th, 2006

---

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE *SARBANES-OXLEY ACT OF 2002***

In connection with the Quarterly Report of USA Video Interactive Corp. (the "*Company*") on Form 10-Q for the period ended June 30, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "*Report*"), I, Edwin Molina, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the *Sarbanes-Oxley Act of 2002* that:

1.

    this report fully complies with the requirements of Sections 13(a) or 15(d) of the 1934 Act, and

2.

    the information contained in this report fairly presents, in all material respects, the registrant's financial condition and results of operations of the registrant.

                By: /s/ *Edwin Molina*
                -------------------------------------
                **Name:** Edwin Molina
                **Title:** President and Chief Executive Officer
                **Date:** August 11th, 2006

---

**Exhibit 32.2**

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE *SARBANES-OXLEY ACT OF 2002*

In connection with the Quarterly Report of USA Video Interactive Corp. (the "*Company*") on Form 10-Q for the period ended June 30, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "*Report*"), I, Anton J. Drescher, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the *Sarbanes-Oxley Act of 2002* that:

1.

    this report fully complies with the requirements of Sections 13(a) or 15(d) of the 1934 Act, and

2.

    the information contained in this report fairly presents, in all material respects, the registrant's financial condition and results of operations of the registrant.

                By: /s/ *Anton J. Drescher*
                -------------------------------------
                **Name:** Anton J. Drescher

**Title:** Secretary and Chief Financial Officer
**Date:** August 11th, 2006

# EXHIBIT D

REC'VED

AUG 2 4 2005

United States Court of Appeals
For The Federal Circuit

FORM 9.  Certificate of Interest                                              Form 9

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

USA VIDEO TECHNOLOGY            .v.            MOVIELINK LLC

No.  05-1451

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
_____MOVIELINK LLC_____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

MOVIELINK LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Sony Corporation of America; Providence Equity Partners; Texas Pacific Group; Comcast Corporation; DLJ Merchant Banking Partners; Time Warner Inc.; Viacom Inc.; General Electric Company; Vivendi Universal S.A.

4. ☐  There is no such corporation as listed in paragraph 3.

5.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

SIDLEY AUSTIN BROWN & WOOD - Jeffrey M. Olson, Samuel N. Tiu, Matthew S. Jorgenson        ASHBY & GEDDES - Steven J. Balick, John G. Day

_____08/22/05_____
Date

_____
Signature of counsel
Jeffrey M. Olson
Printed name of counsel

---

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **CERTIFICATE OF INTEREST** was served on August 23, 2005 by first class mail delivery as follows:

J. William Koegel, Jr.
David A. Clark
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, D.C.  20036

Richard D. Kirk
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware  19899

Edward W. Goldstein
Corby R. Vowell
GOLDSTEIN & FAUCETT LLP
1177 West Loop South, Suite 400
Houston, Texas  77027

Nancy L. Gregg

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

USA VIDEO TECHNOLOGY )
CORPORATION )
)
Plaintiff, )
) Civil Action No. 03-368-KAJ
v. )
)
MOVIELINK, LLC )
)
Defendant. )
)

## DEFENDANT MOVIELINK, LLC'S OPENING BRIEF IN SUPPORT OF MOTION TO TRANSFER ACTION TO THE CENTRAL DISTRICT OF CALIFORNIA

ASHBY & GEDDES
Steven J. Balick (I.D. #2114 )
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Defendant*
*MOVIELINK, LLC*

*Of Counsel:*

Jeffrey M. Olson
Samuel N. Tiu
SIDLEY AUSTIN BROWN AND WOOD LLP
555 West Fifth Street
Los Angeles, California 90013
(213) 896-6000

Dated: November 4, 2003

# TABLE OF CONTENTS

<u>Page</u>

I.     NATURE AND STAGE OF THE PROCEEDING.................................................. 1

II.    SUMMARY OF ARGUMENT .......................................................................... 2

III.   STATEMENT OF FACTS ............................................................................... 3

     A.    Movielink And Many Third-Party Witnesses Are Located In Los Angeles .......... 3

          1.    Design, Development, and Implementation of the Accused Movielink Online Movie Rental Service Occurred Mostly in Los Angeles ........................................................................................ 4

          2.    Movielink's Marketing, Financial, and Corporate Decisions Are Made In Or Around Los Angeles.............................................. 6

          3.    More Third-Party Witnesses Yet To Be Identified Are Likely Located In Los Angeles .............................................................. 6

     B.    USVO And Its Witnesses Have No Connection To Delaware ............................ 6

IV.   DISCUSSION ................................................................................................ 8

     A.    California Is The Center Of Gravity For This Patent Litigation........................... 10

          1.    The Operative Facts In This Case Occurred In California ...................... 11

          2.    Key Witnesses And Sources Of Proof Are In California ........................ 12

     B.    USVO's Choice Of Forum Deserves Little Deference.......................................... 14

     C.    Transfer To California Will Serve The Interests Of Justice ................................ 16

V.    CONCLUSION.............................................................................................. 18

## TABLE OF AUTHORITIES

Case                                                                              Page(s)

Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.
    11 F.Supp.2d 729 (S.D.N.Y. 1998)................................................ 10, 11, 12, 15

APV North America, Inc. v. Sig Simonazzi North America, Inc.
    2002 U.S. Dist. LEXIS 8120 (D. Del. 2002) ............................................. 14

Ardco Inc. v. Page, Ricker, Felson Marketing, Inc.
    25 U.S.P.Q.2d 1382 (N.D. Ill. 1992) ...................................................... 13

Bordiga v. Directors Guild of America,
    159 F.R.D. 457 (S.D.N.Y. 1995) ............................................................. 8

Boreal Laser, Inc. v. Coherent Inc.
    22 U.S.P.Q.2d 1559 (S.D.N.Y. 1992)...................................................... 11

Brunswick Corp. v. Precor Inc.
    2000 U.S. Dist. LEXIS 22222 (D. Del. 2000) ....................................... 9, 15

Clopay Corp. v. Newell Companies, Inc.
    527 F.Supp. 733 (D. Del. 1981)) ..................................................... 9, 11, 15

Collins v. JC Penny Life Insurance Co.
    2002 U.S. Dist. LEXIS 5676 (N.D. Cal. 2002) ......................................... 14

E.I. Du Pont de Nemours v. Diamond Shamrock
    522 F.Supp. 588 (D. Del. 1981) ............................................................. 10

FUL Inc. v. Unified School District Number 204
    839 F.Supp. 1307 (N.D. Ill. 1993) .......................................................... 16

GTE Wireless, Inc. v. Qualcomm, Inc.
    71 F.Supp.2d 517 (E.D. Va. 1999) ..................................................... 10, 15

Gulf Oil Corp. v. Gilbert
    330 U.S. 501 (1947)............................................................................. 14

Jumara v. State Farm Ins. Co.
    55 F.3d 873 (3d Cir. 1995).................................................................... 14

Laitram Corp. v. Hewlett-Packard Co.
   120 F.Supp.2d 607 (E.D. La. 2000) ................................................................. 10

Laitram Corp. v. Morehouse
   31 U.S.P.Q.2d 1697 (E.D. La. 1994) ................................................................. 9

Lighting World, Inc. v. Birchwood Lighting, Inc.
   2001 WL 1242277 (S.D.N.Y. 2001) ...................................... 10, 11, 12, 15

Magee v. Essex-Tex Corporation
   704 F.Supp. 543 (D.Del. 1988) ................................................................. 9, 17

Mentor Graphics Corp. v. Quickturn Design Systems, Inc.
   77 F.Supp.2d 505 (D. Del. 1999) ......................................................... 14, 16

Osteotech Inc. v. GenSci Regeneration Sciences, Inc.
   6 F.Supp.2d 349 (D.N.J. 1998) ..................................................... 9, 10, 12

Pall Corp. v. Bentley Labs, Inc.
   523 F.Supp. 450 (D. Del. 1981) ......................................................... 10, 16

Ricoh Co., Ltd. v. Honeywell, Inc.
   817 F.Supp. 473 (D.N.J. 1993) ..................................................... 9, 10, 11

Sherwood Medical Company v. IVAC Medical Systems, Inc.
   1996 U.S. Dist. LEXIS 18194 (D. Del. 1996) ................................................ 14

Sports Eye, Inc. v. Daily Racing Form, Inc.
   565 F.Supp. 634 (D. Del. 1983) ......................................................... 15, 16, 17

Technical Concepts L.P. v. Zurn Industries, Inc.
   2002 U.S. Dist. LEXIS 21020 (N.D. Ill. 2002) ............................................ 10

Teknekron Software Systems, Inc. v. Cornell University
   1993 WL 215024 (N.D. Cal. 1993) ................................................................. 9

Unicredito Italiano v. JP Morgan Chase Bank
   2002 U.S. Dist. LEXIS 11535 (D. Del. 2002) ................................................ 14

Wechsler v. Macke International Trade, Inc.
   1999 WL 1261251 (S.D.N.Y. 1999) ................................................................. 8

Defendant, Movielink, LLC ("Movielink"), submits this opening brief in support of its motion to transfer this action to the United States District Court for the Central District of California.

## I.    NATURE AND STAGE OF THE PROCEEDING

Plaintiff, USA Video Technology Corporation ("USVO"), filed this patent infringement action on April 10, 2003, alleging that Movielink is infringing U.S. Patent No. 5,130,792 ("the '792 Patent"). USVO alleges that Movielink's online movie rental service offered through Movielink's web site, www.movielink.com, infringes this patent. USVO provided no advance notice to Movielink of the allegations of the complaint.

Movielink has answered and denied infringement of the '792 Patent. In its First Amended Answer, filed on July 11, 2003, Movielink raised a number of affirmative defenses, including lack of standing, invalidity, non-infringement, unenforceability, waiver, laches, acquiescence, and estoppel, in addition to improper venue.

The initial Rule 16(b) conference occurred on July 16, 2003. At the conference, the Court set the trial for April 4, 2005. Subsequently, Rule 26(a)(1) initial disclosures were exchanged between the parties (on August 25, 2003), but no interparty or third-party discovery has commenced.[1] Following a careful review of all known facts, including the Rule 26(a) submissions, Movielink presents its motion. USVO does not agree that a transfer is warranted.

---

[1] Copies of the Rule 26(a) submissions are attached as Exhibits A and B to the Declaration of Samuel Tiu ("Tiu Decl."). The parties have also had a single teleconference with Magistrate Judge Thynge, for the purpose of scheduling a settlement conference. In view of her substantial case load, the Magistrate Judge scheduled the conference for March 31, 2004. Additionally, the parties have discussed but not resolved the provisions of an umbrella protective order for use in this litigation.

## II.    SUMMARY OF ARGUMENT

Patent litigation should proceed where the case finds its *center of gravity*, not where the patentee happens to sue.    In determining the center of gravity, the place where defendant's allegedly infringing products or services were designed and developed and where their sales and marketing activities are controlled is given greatest importance.    In this case, the center of gravity is Los Angeles County in California.    Accordingly, pursuant to 28 U.S.C. § 1404(a),[2] Movielink respectfully requests transfer of this action to the United States District Court for the Central District of California.

Most, if not all, of the design and development of Movielink's online movie rental service and the underlying technology ("Movielink System") were undertaken in California.    The technical infrastructure of the Movielink System is also managed from Santa Monica, California, a suburb of Los Angeles, where Movielink is located.    Likewise, the marketing of the Movielink service also is controlled from Los Angeles.    No pertinent activities occurred in Delaware. Movielink has identified at least 18 potential individual witnesses, and 13 of them are located in California.    Significantly, ten individuals who are third-party witnesses have been identified and are located in California. *See*, Tiu Decl., Exhibit B. *See also*, Tiu Decl., Exhibit C.[3]

In contrast, neither party has identified any material connection between this case and Delaware.    USVO is not located in Delaware.    None of the witnesses USVO identified in its initial disclosures is located Delaware. *See*, Tiu Decl., Exhibits A and C.    Moreover, one of

---

[2] This section provides as follows:

> For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

[3] Exhibit C is a table of all of the witnesses identified by either USVO or Movielink that identifies the state of residence and whether a party employs the witness.

USVO's witnesses is located in Los Angeles, California and is a third-party to this action. Because the important events surrounding the alleged infringement are centered in Los Angeles and there is no material connection between this case and the District of Delaware, little deference should be given to USVO's selection of a Delaware forum.

Finally, transferring this case to California will serve the interests of justice. The many third parties that are located in or around Los Angeles are likely to be within the jurisdiction of the California court, but not within the jurisdiction of this Court. These third parties are not in the control of the parties in this action. Hence, live testimony at trial cannot be assured in this Court, but can be assured only in California. Additionally, for these third parties, the Central District of California Court will have to address any discovery disputes, in any event. Thus, the transfer of this case to the Central District of California will serve the interests of justice and judicial economy.

### III.    STATEMENT OF FACTS

### A.    Movielink And Many Third-Party Witnesses Are Located In Los Angeles

Movielink provides an online movie rental service over the Internet through its web site www.movielink.com. Declaration of John P. Godwin ("Godwin Decl.") at ¶ 3. In this action, USVO alleges that Movielink's service infringes the '792 Patent. Complaint ("Compl.") ¶ 20. In addition to direct infringement, USVO has also alleged that Movielink is infringing the '792 Patent by "marketing or licensing, and/or inducing others to make, use, sell, or offer to sell and/or contributing to others making, using, selling, or offering to sell, the Movielink service through the Movielink website." *Id.*

Accordingly, the issues of infringement and damages in this case will require, among other things, an examination and understanding of the design, development, implementation,

marketing, accounting, costs and profits relating to the accused Movielink service.  Most of the witnesses and documents relating to these categories of evidence are located in California, and none are located in Delaware.  *See generally*, Godwin Decl., Tiu Decl, Exhibits A and B.

1.  **Design, Development, and Implementation of the Accused Movielink Online Movie Rental Service Occurred Mostly in Los Angeles**

Movielink is located in Santa Monica, California, a part of the county of Los Angeles. Godwin Decl. at ¶ 2.  Movielink does not own or lease any facilities or offices aside from its offices in Santa Monica.  *Id.*  Its online movie rental service and technical infrastructure are managed from Santa Monica.  *Id.* at ¶ 4.  Equally significant is that most, if not all, of the planning, design, and development of the original Movielink System occurred in California and were conducted by third parties or third parties on behalf of Sony Pictures Entertainment and/or its subsidiaries ("Sony").  *Id.* at ¶ 5.  None of these activities occurred in Delaware.  *Id.*

Initially, Sony conducted the design and development of a system known as "Moviefly." Godwin Decl. at ¶ 6.  Sony is located in Culver City, which is in Los Angeles County.  *Id.* Movielink adopted the "Moviefly" technology from Sony to form part of the Movielink System. *Id.*  During the developmental stages, several individuals were involved with Sony in the design and development of the Moviefly project, including the design of a web site and the underlying architecture, e-commerce applications, and the content security system.  *Id.* at ¶ 7.  Three of the four identified individuals involved in the Moviefly project are third parties to this action, and they are believed to be residing in or around Los Angeles County.  *Id.*  The fourth individual is also located in Los Angeles and is currently an employee of Movielink.  *Id.*

Additionally, individuals from Viant Corporation, which has since been purchased by divine, Inc., assisted Sony.  Godwin Decl. at ¶¶ 8-9.  Although Viant was then headquartered in Boston, Massachusetts, the work on the Moviefly project for Sony was primarily performed in

Culver City. *Id.* All three of the identified individuals from Viant are believed to be residing in or around Los Angeles. *Id.* Although two of the three individuals provided consulting and engineering services to Movielink for some time, they are no longer associated with Movielink. *Id.* at ¶ 9.

Moreover, Sony also contracted with Digital Island, Inc. to help design and develop Moviefly's broadband distribution architecture, which now forms the backbone for Movielink's delivery of movies over the Internet. Godwin Decl. at ¶ 10. Digital Island's employees, from its offices in Thousand Oaks and San Francisco, California, conducted the work for Sony. *Id.* Thousand Oaks is a city just outside of Los Angeles County. *Id.* At least one of the three employees identified with Digital Island (now Cable & Wireless Internet Services, Inc.) is located in Thousand Oaks and was involved in putting the distribution architecture into operation. *Id.* at ¶ 11.

A further component of the Movielink System is a software application known as the Movielink Manager. Godwin Decl. at ¶ 12. This software application needs to be installed in the customer's computer before the customer can use Movielink's online movie rental service. *Id.* Movielink engaged Stellcom, Inc. (now Vytek), a company in San Diego, California, to design and develop this software application for Movielink. *Id.*

Thus, most, if not all, of the design and development of the various components of the Movielink System occurred in or around Los Angeles County, where most of the individuals knowledgeable about it are residing currently. Likewise, Movielink maintains the pertinent documents relating to the design, engineering, software, and any other documents relating to the Movielink System, in Los Angeles County. Godwin Decl. at ¶ 13.

### 2.    Movielink's Marketing, Financial, and Corporate Decisions Are Made In Or Around Los Angeles

Movielink's marketing functions are managed from Santa Monica, where it is located, and through consultants located in Los Angeles County. Godwin Decl. at ¶ 14. All of the principal corporate decisions concerning Movielink's movie rental service are also made in Los Angeles County, and all of Movielink's finances are managed in Los Angeles County. *Id.* Movielink maintains its financial, accounting, marketing and legal documents in Los Angeles County. *Id.*

### 3.    More Third-Party Witnesses Yet To Be Identified Are Likely Located In Los Angeles

In its complaint, USVO also seeks to treble its damages by alleging that Movielink's infringement is "willful and wanton." Compl. at ¶ 21. Apparently, the basis for this charge of willful infringement is that USVO allegedly notified several third parties, Warner Brothers, Paramount Pictures Corporation, Metro-Goldwyn-Mayer, Inc., Universal Studios and Sony Pictures Entertainment, of the existence of the '792 Patent. *Id.* at ¶¶ 12 and 21. USVO also alleges that it offered licenses to these companies but that these companies never accepted the offered licenses. *Id.* According to USVO's own complaint, all of these companies are located in Los Angeles, California. *Id.* Thus, there remain more third-party witnesses yet to be identified who are likely all located in Los Angeles County.[4]

## B.    USVO And Its Witnesses Have No Connection To Delaware

Despite USVO filing this action in Delaware, USVO is without any connection to Delaware. USVO is a Wyoming corporation and has its principal place of business in

---

[4] For unknown reasons, USVO has not identified any likely witnesses from these California companies in its initial disclosures. *See* Tiu Decl., Ex. A.

Connecticut. Compl. at ¶ 4. USVO is the alleged assignee of the '792 Patent. *Id.* at ¶ 9. However, USVO was apparently not involved in the development of the alleged invention claimed in the '792 Patent.

The '792 Patent issued on July 14, 1992, naming two inventors, Elbert G. Tindell and Kyle Crawford. Compl., Exhibit A. Both of these individuals are listed as residents of Texas. *Id..* Additionally, the '792 Patent was issued to USA Video, Inc., which is listed as being located in Dallas, Texas. *Id.* Thus, examination and discovery of the issues of conception and reduction to practice of the alleged patented invention will not be made in Delaware.

In its Rule 26(a)(1) initial disclosures, USVO has identified fourteen likely witnesses. *See* Tiu Decl., Exhibit A. None of these witnesses are located in Delaware. Three of the witnesses are located in Connecticut, two are in Texas, one is in Canada, and one is in California. Locations for the seven other identified witnesses are unknown.

The California witness identified by USVO, Gordon Lee, is located in Los Angeles and is a third-party. Tiu Decl., Exhibit A at 2. He was the *former* President and CEO of USVO. *Id.* He is "knowledgeable about the acquisition of the '792 patent by USVO, efforts by USVO to test, launch and market video-on-demand services, and efforts by USVO to license the '792 Patent to others." *Id.*

Additionally, Mr. Lee is a potential witness to events relating to Movielink's Fourth Affirmative Defense of inequitable conduct before the United States Patent and Trademark Office ("USPTO"). Movielink's First Amended Answer and Affirmative Defense ("First Am. Ans.") at ¶ 26. Specifically, the '792 Patent initially expired on July 14, 1996, due to non-payment of the first maintenance fee. First Am. Ans. at ¶¶ 27-28. Although USA Video, Inc., and potentially affiliated companies, USA Video (California) Corporation, a California

Corporation, and USA Video Interactive Corp., a Canadian Corporation (all three entities collectively are referred to as "USA Video") knew or were informed of the deadline to pay the first maintenance fee, USA Video intentionally and/or negligently failed to pay the first maintenance fee for the '792 Patent because of non-availability of funds and/or lack of importance and/or interest in avoiding a lapse of the '792 Patent. First Am. Ans. ¶ 30. In 1999, USA Video twice petitioned the USPTO to reinstate the '792 Patent and made false representations to the USPTO including, but not limited to, its representation that the failure to pay the maintenance fee was "unavoidable." *Id.* at ¶¶ 31-49. Movielink believes that Mr. Lee, who was then the President and CEO of USA Video, was among those having knowledge of the circumstances relating to the non-payment of the maintenance fee. *See*, First Am. Ans. at ¶ 30.

Accordingly, Delaware has no rational connection with this case and Los Angeles will be a far more convenient forum for the witnesses.

## IV.    DISCUSSION

Based on the provision of 28 U.S.C. § 1404(a), Movielink respectfully requests that this Court transfer this case to the United States District Court for the Central District of California "for the convenience of the parties and witnesses, in the interest of justice."[5] In patent litigation, the general rule is that the *center of gravity* of the accused activity is the preferred forum. *See, e.g.*, Wechsler v. Macke International Trade, Inc., 1999 WL 1261251 *3 (S.D.N.Y. 1999) (Exhibit A hereto), citing Bordiga v. Directors Guild of America, 159 F.R.D. 457, 462 (S.D.N.Y. 1995) (center of gravity of patent litigation is "core determination under § 1404"); Ricoh Co.,

---

[5] As a threshold matter, transfer is appropriate because venue is proper in the Central District of California because Movielink is located in that district. Godwin Decl. at ¶ 2.

Ltd. v. Honeywell, Inc., 817 F.Supp. 473, 481, n.17 (D.N.J. 1993) (citing various cases including

Clopay Corp. v. Newell Companies, Inc., 527 F.Supp. 733, 736 (D. Del. 1981)).[6]

For this reason, district courts may "disregard" or give less deference to plaintiff's choice

of forum, or may reduce the burden of the moving party in showing inconvenience, especially

when the central facts of a lawsuit occur outside the forum state. *See, e.g.,* Morehouse, *supra,* 31

U.S.P.Q.2d at 1700. See also, Brunswick Corp. v. Precor Inc., 2000 U.S. Dist. LEXIS 22222, *7

(D. Del. 2000) (Exhibit C hereto) ("plaintiff's preference for Delaware is not given as much

deference because most of the events at issue, that is, the design and manufacture of the [accused

device,] occurred outside of Delaware."); Magee v. Essex-Tex Corporation, 704 F.Supp. 543,

547-548 (D. Del. 1988) ("where the Plaintiff's choice of forum in Delaware is neither connected

with Plaintiff's residence nor [defendant's] place of business or the site of the alleged acts of

infringement, [defendant's] burden of showing sufficient inconvenience with the present forum

in favor of the Central District of California becomes less difficult"); Clopay, *supra,* 527 F.Supp.

at 736 (in a situation where the plaintiff is not litigating on his "home turf," "the 'quantum of

---

[6] *See also,* Osteotech Inc. v. GenSci Regeneration Sciences, Inc., 6 F.Supp.2d 349, 357 (D.N.J. 1998) ("preferred forum is that which is the center of gravity of the accused activity.") (citations omitted); Laitram Corp. v. Morehouse, 31 U.S.P.Q.2d 1697, 1700 (E.D. La. 1994) (general rule in patent case is center of gravity of the accused activity is the preferred forum); Teknekron Software Systems, Inc. v. Cornell University, 1993 WL 215024 *7 (N.D. Cal. 1993) (Exhibit B hereto) ("litigation should proceed in that place where the case finds its 'center of gravity' ... is particularly important in patent infringement suits") (citations omitted).

inconvenience to defendant needed to tip the balance in favor of transfer' is concomitantly reduced.")[7]

## A.    California Is The Center Of Gravity For This Patent Litigation

The "center of gravity" in a patent case is found in the forum that is "as close as possible to the milieu of the *infringing device* and the hub of activity centered around its production." GTE Wireless, Inc. v. Qualcomm, Inc., 71 F.Supp.2d 517, 519 (E.D. Va. 1999) (emphasis added) (quotations omitted). "In an action for patent infringement, the locus of operative facts is in the transferee forum if the design and development of the allegedly infringing product took place there and the designers and developers of the product live and work in that forum." Lighting World, Inc. v. Birchwood Lighting, Inc., 2001 WL 1242277 *3 (S.D.N.Y. 2001) (Exhibit E hereto). While commercial activity is relevant, the focus "is the place where marketing and sales decisions are made," rather than where sales activity has occurred. Osteotech, *supra*, 6 F.Supp.2d at 358.[8]

---

[7] *Citing,* Pall Corp. v. Bentley Labs, Inc., 523 F.Supp. 450 (D. Del. 1981) (same); E.I. Du Pont de Nemours v. Diamond Shamrock, 522 F.Supp. 588 (D. Del. 1981) (granting transfer and noting that "the preference for honoring a plaintiff's choice of forum is simply that, a preference; it is not a right."). *See also,* Ricoh, *supra,* 817 F. Supp. at 481 (holding that "[w]hen the central facts of a lawsuit occur outside the forum state, a plaintiff's selection of that forum is entitled to less deference"); Laitram Corp. v. Hewlett-Packard Co., 120 F.Supp.2d 607, 609 (E.D. La. 2000) (same.); Technical Concepts L.P. v. Zurn Industries, Inc., 2002 U.S. Dist. LEXIS 21020 at *10 (N.D. Ill. 2002) (Exhibit D hereto) ("because [plaintiff] has chosen a forum that has a tenuous connection to the claim, its choice of forum is afforded reduced value in the Court's analysis.").

[8] *See also,* Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp., 11 F.Supp.2d 729, 730 (S.D.N.Y. 1998) (locus of operative facts is where "the allegedly infringing device was developed" and "the resultant product line is managed"); Hewlett-Packard, *supra,* 120 F.Supp.2d at 609 (relevant considerations "in a given case include the location of a product's development, testing, research, and production, and the place where marketing and sales decisions were made").

1.    **The Operative Facts In This Case Occurred In California**

In determining a case's center of gravity, courts look primarily to "the locus of operative facts." Lighting World, 2001 WL 1242277 (Exhibit E hereto) at *3. *See also*, Clopay, *supra*, 527 F.Supp. at 736 ("center of gravity" found where defendants' research, production, sales, marketing, and warehousing facilities are located).

Substantially all of the operative facts relating to USVO's charge of patent infringement occurred in California, and none occurred in Delaware. Movielink's online movie rental service, including its technical infrastructure, is managed from Santa Monica. Godwin Decl. at ¶ 4. Most, if not all, of the planning, design, and development of the Movielink System were conducted in California. Godwin Decl. at ¶ 5. None of these activities occurred in Delaware. *Id.* Neither does Movielink own or lease any facilities in Delaware. *Id.* at ¶ 2. Thus, the "operative facts" in this litigation – as consistently defined by the federal courts in the context of patent infringement suits – occurred mainly in California.

Although Movielink's service is available in Delaware through access to its web site, the § 1404 analysis does not change because the accused service likewise is equally accessible throughout the United States. Godwin Decl. at ¶ 15. "[S]ales alone are not enough to establish a material connection to the forum if, as is true here, '[d]efendant's goods are sold in many states.'" Boreal Laser, Inc. v. Coherent Inc., 22 U.S.P.Q.2d 1559, 1560 (S.D.N.Y. 1992).[9]

---

[9] In fact, during the period from November 2002 to June 2003, the percentage of rentals and movie downloads from customers located in Delaware was only about 0.3% compared to about 18.9% from customers in California. Thus, there is no special concentration of sales in Delaware. To the contrary, and consistent with the rationale for transfer, the sales are concentrated in California. *See e.g.*, Amersham, *supra*, 11 F.Supp.2d at 730 (granting transfer and finding about 3% of sales in transferor forum is insignificant and indicates "no special concentration of sales in" transferor forum); Ricoh, *supra*, 817 F.Supp. at 482-483 ("exceedingly small proportion" of sales in transferor forum is "insignificant and do[es] not establish [transferor forum] as the center of gravity for [plaintiff's] allegedly infringing activities.")

Rather, the critical venue question with respect to allegedly infringing sales is "where marketing and sales decisions are made," not where sales activity occurs. Osteotech, supra, 6 F.Supp.2d at 357. In this case, a California location manages the marketing and distribution of the accused service. Godwin Decl. at ¶¶ 4 and 14. Thus, Los Angeles is the logical center of this case and there is no material connection to Delaware.

2.    **Key Witnesses And Sources Of Proof Are In California**

Courts use the center of gravity analysis because it rationally informs the courts as to the location of the pertinent witnesses, documents, and evidence. Lighting World, supra, 2001 WL 1242277 at *3 (identification of the locus of operative facts "informs the court's analysis of several other factors," including the convenience of the witnesses, the location of relevant documents, and relative ease of access to source of proof). Additionally, in a case such as this where the choice is between Delaware and California, "'[t]he convenience of witnesses' and 'the location of relevant documents and relative ease of access to sources of proof[]' loom large when deciding between fora separated by roughly 3,000 miles." Amersham, supra, 11 F.Supp.2d at 730.

Los Angeles is the center of the operative facts and should be the focal point of this litigation. It is where the majority of the witnesses and documents surrounding the alleged infringement will be found, including many third-party witnesses and related evidence. For example, the issue of whether Movielink's service infringes will involve discovery and testimony directed to the planning, design, development, and implementation of the accused service and the Movielink System. Most of the witnesses and documents for these matters are located in or around Los Angeles. Godwin Decl. at ¶¶ 5-13.

12

The issues of whether Movielink actively induces or contributes to infringement will also largely focus on Movielink's marketing and promotion of the accused service. These activities are also managed and controlled in Los Angeles, and the witnesses and documents are in Los Angeles. Godwin Decl. at ¶ 14. Regarding sales, accounting, and other damages information, this evidence will also be found in Los Angeles where Movielink is located. *Id.*

Additionally, based on USVO's complaint, the issue of whether Movielink's infringement is willful will involve discovery and testimony on alleged notices and offers of licenses to five different third-party companies that are all located in Los Angeles. Compl. at ¶ 12 and 21. Furthermore, even USVO's witnesses include a third-party, Gordon Lee, who is located in Los Angeles. Mr. Lee was the former President and CEO of USVO and is supposedly knowledgeable about the acquisition or ownership of the '792 Patent." Tiu Decl., Exhibit A at 2. He is also knowledgeable about the commercialization and licensing of the patent that evidence the value, if any, of the '792 Patent. *Id.*

On the other side of the scale, there is no apparent witness located in Delaware. USVO is not located in Delaware, nor is Movielink. The inventors of the '792 Patent are listed as being located in Texas. Compl., Exhibit A. None of the witnesses USVO identified in its initial disclosures are located in Delaware. *See* Tiu Decl., Exhibit A. Thus, the ease of access to evidence and sources of proof favors transferring this case to California. *See,* Ardco Inc. v. Page, Ricker, Felson Marketing, Inc., 25 U.S.P.Q.2d 1382, 1386 (N.D. Ill. 1992) (relative ease and access to documents and other sources of proof is important factor under § 1404(a)).

What is of even greater significance in this case is that most of the foregoing witnesses are *third parties* who have no connection with Delaware. Rather, they are mostly located in California, and they cannot be expected to travel voluntarily to testify in Delaware at trial.

13

"Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury, or most litigants." Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947). Consequently, the convenience of numerous third-party witnesses who are not subject to the Court's subpoena power strongly favors transferring this case to the Central District of California. *See e.g.,* Sherwood Medical Company v. IVAC Medical Systems, Inc., 1996 U.S. Dist. LEXIS 18194 (D. Del. 1996) (Exhibit F hereto) (granting transfer because numerous third-party witnesses are subject only to subpoena in transferee forum); Mentor Graphics Corp. v. Quicktum Design Systems, Inc., 77 F.Supp.2d 505, 510-512 (D. Del. 1999) (location of third-party witnesses "weigh[ed] heavily in favor of transfer.")[10]

**B.    USVO's Choice Of Forum Deserves Little Deference**

USVO is not located in this forum. Movielink is not located in this forum, and none of the witnesses are located in this forum. This case and these parties have little or no connection to Delaware.[11]

---

[10] The location of witnesses in San Diego or Northern California does not preclude the Central District of California from issuing trial subpoenas compelling appearances at trial. *See,* F.R.C.P. 45(b)(2). *See, e.g.,* Collins v. JC Penny Life Insurance Co., 2002 U.S. Dist. LEXIS 5676 *10 n. 1 (N.D. Cal. 2002) (Exhibit G hereto) ("In California, state statute permits state-wide service of trial subpoenas.")

[11] Movielink acknowledges that it is incorporated in Delaware, but this "is not dispositive" when considering a transfer motion. Unicredito Italiano v. JP Morgan Chase Bank, 2002 U.S. Dist. LEXIS 11535 at *7 (D. Del. 2002) (Exhibit H hereto). "Where an alternative forum is more convenient and has more substantial connections with the litigation, 'incorporation in Delaware will not prevent transfer.'" APV North America, Inc. v. Sig Simonazzi North America, Inc., 2002 U.S. Dist. LEXIS 8120 (D. Del. 2002) (Exhibit I hereto). *See also,* Mentor, *supra,* 77 F.Supp.2d at 509, n.6 (although not irrelevant, state of incorporation "it is not mentioned in § 1404, nor is it among the eleven factors identified by the Third Circuit Court of Appeals in [Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995)].")

Courts have repeatedly given plaintiff's choice of forum minimal deference where, as here, that forum is not the center of gravity of the patent litigation. *See, e.g.*, GTE, *supra*, 71 F.Supp.2d at 520 ("[A]ny deference that could be afforded to Plaintiff's choice of forum is clearly outweighed by other factors of convenience to the parties and the fact that [the transferee forum] is the center of gravity in this patent infringement suit."); Brunswick, *supra*, 2000 U.S. Dist. LEXIS 22222 at *7 ("plaintiff's preference for Delaware is not given as much deference because most of the events at issue, that is, the design and manufacture of the [accused product] occurred outside of Delaware.")

Less deference to the plaintiff's choice of forum is "particularly the case where plaintiff brings suit outside of his home forum." Lighting World, 2001 WL 1242277, *4. *See also*, Sports Eye, Inc. v. Daily Racing Form, Inc., 565 F.Supp. 634, 638 (D. Del. 1983) ("the choice of forum factor is of diminished importance where, as here, the plaintiff is not litigating on its 'home turf'").

Hence, where "a tenuous connection" exists between plaintiff's claims of infringement and its choice of forum, and where the other factors weigh so heavily in favor of transfer, "the plaintiff's selection of this forum has an artificial quality" that entitles the Court to give it minimal weight. Amersham, *supra*, 11 F.Supp.2d at 730.   Stated another way, "[w]here, as here, plaintiff is not litigating in his 'home turf,' the convenience of his chosen forum is often reduced [and] in such situations, the 'quantum of inconvenience to defendant needed to tip the balance strongly in favor of transfer' is concomitantly reduced." Clopay, *supra*, 527 F.Supp. at 736.

Here, Movielink and the witnesses will be greatly inconvenienced if this case is litigated in Delaware.   Movielink is a start-up company with about fifty employees.   Godwin Decl. at ¶

16. Its online movie rental service was launched only recently, and frequent enhancements and constant maintenance are still required. *Id.* Requiring Movielink's Los Angeles based employees to travel to and stay in Delaware for proceedings relating to this case will remove them from critical posts, and will be a substantial burden to Movielink. *Id.*

In contrast, the inconvenience to USVO is, at best, minimal if this case is litigated in California. Because USVO has chosen a forum that is not its residence, its personnel and trial witnesses would have to travel regardless and would be required "to stay in Wilmington during the course of the trial *in any event*, the same thing that they would be required to do if trial were held in California." Pall, *supra*, 523 F.Supp. at 453 (emphasis added) (granting transfer and finding inconvenience to plaintiff not substantial when plaintiff is located in New York but sued in Delaware); Sports Eye, *supra*, 565 F.Supp. at 639 (same). Thus, USVO's choice of a forum with no material connection to this action is insufficient to tie this case to Delaware.

## C.     Transfer To California Will Serve The Interests Of Justice

"Interest of justice considerations include the necessity to apply state law, the conservation of judicial resources and the likelihood of an earlier trial."[12] FUL Inc. v. Unified School District Number 204, 839 F.Supp. 1307, 1311 (N.D. Ill. 1993). More significantly in this case, "the availability of compulsory process over material witnesses weighs heavily in this analysis." *Id. See also*, Mentor, *supra*, 77 F.Supp.2d. at 513 ("the interests of justice are not well served by forgoing the benefits of the subpoena power the [transferee] courts can exercise

---

[12] In this case, the median time from filing to trial of a civil case in the Central District of California is 20.0 months compared to 22.5 months in Delaware. Tiu Decl., Ex. D (attaching Federal Court Management Statistics for 2002). The median time from filing to disposition of a civil case in the Central District of California is 7.9 months compared to 8.2 months in Delaware. *Id.* Thus, these statistics slightly favor transfer. Mentor, *supra*, 77 F.Supp.2d at 514 ("The relative congestion of the dockets is a legitimate factor to be weighted in a venue transfer analysis.")

over a number of important witnesses in this case."); <u>Magee</u>, *supra*, 704 F.Supp. at 550 (same); <u>Sports Eye</u>, *supra*, 565 F.Supp. at 640 (same).

In this case, substantial numbers of third-party witnesses are beyond the subpoena power of this Court, but are within the jurisdiction of the Central District of California. No litigant in this case controls these third parties. Thus, "the greater power of the California Court to ensure the *live testimony* of relevant witnesses weighs in favor of transfer." <u>Sports Eye</u>, *supra*, 565 F.Supp. at 640 (emphasis added). In addition to the difficulty of assuring the testimony of these witnesses in Delaware, any discovery disputes with these third parties will have to be resolved by a California court in any event. Thus, conservation of judicial resources also favors the transfer to the Central District of California.

## V.    CONCLUSION

For the foregoing reasons, defendant respectfully requests that this case be transferred to the United States District Court for the Central District of California.

ASHBY & GEDDES

_____
Steven J. Balick (I.D. #2114 )
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888

*Attorneys for Defendant
MOVIELINK, LLC*

*Of Counsel:*

Jeffrey M. Olson
Samuel N. Tiu
SIDLEY AUSTIN BROWN AND WOOD LLP
555 West Fifth Street
Los Angeles, California  90013
(213) 896-6000

Dated:  November 4, 2003
134745.1

18

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 03-368-KAJ |
| MOVIELINK LLC, | ) ) ) | |
| Defendant. | ) ) ) ) | |

PLAINTIFF USA VIDEO TECHNOLOGY CORPORATION'S
ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT MOVIELINK'S MOTION TO TRANSFER

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Richard D. Kirk (#922)
222 Delaware Avenue - 10th Floor
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6960

*Attorneys for Plaintiff*

Of Counsel:

STEPTOE & JOHNSON LLP
J. William Koegel, Jr.
Jeffrey T. Hsu
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
(202) 429-3000

November 19, 2003

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF PROCEEDINGS .................................................................1

II.   SUMMARY OF ARGUMENT ...............................................................................2

III.  ARGUMENT ...........................................................................................................3

    A.    A Motion for Transfer Is Considered Under the Factors In *Jumara*, and Not the "Center of Gravity" Analysis.....................................................................................3

    B.    USVO's Choice of Forum is Entitled to Deference.............................................5

        1.    USVO Chose Delaware Because this State has Jurisdiction Over Movielink...............................................................................................6

        2.    Delaware Is a Neutral, Experienced and Convenient Forum for Both Parties.....................................................................................................7

        3.    Movielink Infringes the '792 Patent in Delaware.................................8

        4.    USVO's Choice of Delaware was Rational. ........................................9

    C.    The Convenience of The Parties and Witnesses As a Whole Does Not Support Transfer to the Central District of California.................................................10

        1.    Movielink Would Not Be "Unusually or Oppressively Burdened" by Litigating this Case in Delaware.........................................................12

        2.    Litigating the Action in Delaware Would Not Be More Inconvenient for Third Party Witnesses. .....................................................................13

    D.    A Transfer to California is Not in the Interests of Justice. ..............................14

IV.   CONCLUSION.......................................................................................................15

## TABLE OF AUTHORITIES

Ade Corp. v. Kla-Tencor Corp., 138 F. Supp. 2d 565 (D. Del. 2001)....................................4, 7, 13

Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192 (D. Del. 1998) ............................................12

Bordiga v. Directors Guild of America, 159 F.R.D. 457 (S.D.N.Y. 1995) ......................................3

Brunswick Corp. v. Precor Inc., 2000 U.S. Dist. LEXIS 22222 (D. Del. 2000) ..............................9

C.R. Bard, Inc. v. Guidant Corp., 997 F. Supp. 556 (D. Del. 1998)............................5, 9, 11, 13

Chase Manhattan Bank v. Freedom Card, Inc., 265 F. Supp. 2d 445 (D. Del. 2003) ................4, 6

Clark v. Burger King Corp., 255 F. Supp. 2d 334 (D.N.J. 2003) ..................................................11

Clopay Corp. v. Newell Companies, Inc., 527 F. Supp. 733 (D. Del. 1981)....................................3

Critikon, Inc. v. Becton Dickinson Vascular Access, 821 F. Supp. 962 (D. Del. 1993)................5

Datex-Ohmeda, Inc. v. Hill-Rom Services, Inc., 185 F. Supp. 2d 407 (D. Del. 2002) ..............4, 7

Joint Stock Society v. Heublein, Inc., 936 F. Supp. 177 (D. Del. 1996) ..........................5, 6, 9, 12

Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995)...............................................*passim*

Magee v. Essex-Tec Corp., 704 F. Supp. 543 (D. Del. 1988) ..........................................................9

Manzano v. Mid-Atlantic Coca-Cola Bottling Co., Inc., 2000 WL 250226 (E.D. Pa.
    2000) .. ...........................................................................................................................11

Motorola, Inc. v. PC-Tel, Inc., 58 F. Supp. 2d 349 (D. Del. 1999) ...................................5, 11, 13

Quantel Ltd. v. Adobe Systems, Inc., 1996 U.S. Dist. LEXIS 21651 (D.Del. 1996)......................7

Ricoh Co., Ltd. v. Aeroflex Inc., 279 F. Supp. 2d 554 (D. Del. 2003)........................................3, 4

Ricoh Co. v. Honeywell, Inc., 817 F. Supp. 473 (D.N.J. 1993) ......................................................3

Saint-Gobian Calmar, Inc. v. Nat'l Products Corp., 230 F. Supp. 2d 655 (E.D. Pa. 2002) ............4

Thorn EMI North America, Inc. v. Micron Tech., Inc., 821 F. Supp. 272 (D. Del. 1993) ..............8

Waldman v. Delaware Park, L.L.C., 2000 WL 33416863 (D.N.J. 2000)......................................11

Wechsler v. Macke International Trade, Inc., 1999 WL 1261251 (S.D.N.Y. 1999)......................3

<u>Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.</u>, 157 F.R.D. 215 (D. Del. 1993)........... *passim*

## STATUTES

28 U.S.C. § 1404(a) ............................................................................................................3

Fed.R.Civ.P. 9(b), 12(b)(6) ..............................................................................................2

Fed. R. Civ. P. 26(a) .........................................................................................................12

Fed. R. Civ. P. 45 .............................................................................................................13

Plaintiff USA Video Technology Corporation ("USVO") respectfully submits this memorandum in opposition to Defendant Movielink LLC's ("Movielink") motion to transfer this action to the Central District of California [D.I. 28]. In moving to transfer, Movielink has applied the wrong standard to determine whether a transfer is warranted. Worse yet, under the applicable standard, Movielink has quite clearly failed to meet its heavy burden of overcoming USVO's choice of forum by showing that the balance of conveniences *strongly* favors transfer. The Court should deny the motion.

## I.    NATURE AND STAGE OF PROCEEDINGS

This is an action for patent infringement. USVO is the owner of United States Patent No. 5,130,792 (the "'792 Patent"), entitled "Store and Forward Video System", and issued by the United States Patent and Trademark Office on July 14, 1992. Complaint at ¶ 9 [D.I. 1]. USVO is a small business, based in Connecticut. Complaint at ¶¶ 1-2 [D.I. 1].

Movielink is the owner and operator of a website (<http://www.movielink.com>) accessible on the Internet and World Wide Web that markets, sells and offers for sale services that allow a user to request a movie and have that movie transmitted in digital form to a remote location, via the Internet to a device such as a personal computer, for storage and playback. Complaint at ¶ 11. Movielink's members – it is a Delaware LLC with its principal place of business in California – are Warner Bros., Paramount Pictures Corp., Metro-Goldwyn-Mayer, Universal Studios, and Sony Pictures Entertainment.

USVO filed its Complaint for patent infringement on April 10, 2003, alleging that Movielink (and the service it offers) has infringed and continues to infringe the '792 Patent. Movielink filed its Answer on May 30, 2003, along with a counterclaim for patent unenforceability. Movielink admitted "that this Court has personal jurisdiction over Movielink because it is formed under the laws of the State of Delaware." Amended Answer, ¶ 7 [D.I. 6].

On June 19, 2003, USVO moved to dismiss Movielink's counterclaim pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) [D.I. 9].  On July 11, 2003, in response, Movielink submitted an Amended Answer and withdrew the counterclaim (the "Amended Answer") [D.I.15].  The initial Rule 16(b) scheduling conference took place on July 16, 2003.  Magistrate Judge Thynge then conducted a teleconference in September 2003 to address alternative dispute resolution with the parties. A mediation conference is scheduled for March 31, 2004.

After the Rule 16 teleconference, the parties served initial disclosures on August 25, 2003[ D.I. 24].  Shortly thereafter, USVO sent a draft protective order to Movielink's counsel. Despite reminders by USVO's counsel and statements by Movielink's counsel that it would provide substantive comments on the draft protective order, Movielink has failed to do so. Instead, on November 4, 2003, some 7 months after filing of the Complaint, Movielink filed its motion to transfer. (the "Motion to Transfer").

## II.    SUMMARY OF ARGUMENT

1.     In its Motion to Transfer, Movielink employs a "center of gravity" analysis. That is demonstrably the wrong standard.  The Third Circuit uses a different standard, as set forth in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995).  Pursuant to *Jumara*, which is consistently applied in this district, a party moving for transfer bears a heavy burden to show that a number of private and public interests dictate a change of venue.  This Movielink has failed to do.

2.     Movielink has not met its burden under *Jumara* of showing that the convenience of the parties strongly favors transfer, or that the third party witnesses would be more convenienced in California than in Delaware.  USVO's choice of forum is entitled to deference, especially where the defendant has availed itself of the protections of the laws of Delaware by its formation here.  Indeed, USVO's choice is entitled to substantial weight because USVO had

legitimate reasons for filing this case in Delaware. Further, the financial condition of the parties overwhelmingly contradicts transfer. Given Movielink's size and status as an enterprise engaged in business throughout the United States, litigating in Delaware is not a substantial burden for Movielink. Nor has Movielink demonstrated that the transfer of this action to California serves the interest of justice more than conducting the litigation in Delaware. Movielink is incorporated in Delaware, its infringing activity occurs as much here as anywhere, and this state has an interest in deciding patent infringement cases involving defendants that avail themselves of the benefits of Delaware law.

## III.    ARGUMENT

### A.    A Motion for Transfer Is Considered Under the Factors In *Jumara*, and Not the "Center of Gravity" Analysis.

Movielink admits it is subject to the personal jurisdiction of this Court. Amended Answer, ¶ 7 [D.I. 15]. Rather than dispute that this action was properly brought in Delaware, Movielink seeks a transfer of venue under 28 U.S.C. § 1404(a).

Movielink first argues that "[i]n patent litigation, the general rule is that the *center of gravity of the accused activity is the preferred forum.*"[1] Mot. to Transfer, at 8 (emphasis added) [D.I. 29]. Movielink then dedicates most of its argument to the propositions that "Delaware has no rational connection with this case" and that "California is the center of gravity for this patent

---

[1] To argue that a "center of gravity" analysis should be employed in this District, Movielink extrapolates from Second Circuit case law: an unpublished Southern District of New York opinion -- *Wechsler v. Macke International Trade, Inc.,* 1999 WL 1261251 *3 (S.D.N.Y. 1999) -- which cites another decision issued by that District -- *Bordiga v. Directors Guild of America,* 159 F.R.D. 457, 462 (S.D.N.Y. 1995); and one District of New Jersey case -- *Ricoh Co. v. Honeywell, Inc.,* 817 F. Supp. 473 (D.N.J. 1993). This last case, *Ricoh,* cites the District of Delaware decision in *Clopay Corp. v. Newell Companies, Inc.,* 527 F. Supp. 733 (D. Del. 1981); the *Clopay* decision, however, predates *Jumara,* and is therefore subordinate to that holding.

litigation." Mot. to Transfer, at 8, 10 [D.I. 29]. That argument misses the mark, as it is designed to address the requirements of a standard that is inapplicable in this jurisdiction.

The Third Circuit established the controlling standard for analyzing transfer motions in *Jumara* Not surprisingly, *Jumara* is applied generally in this district in deciding motions to transfer. *See, e.g., Chase Manhattan Bank v. Freedom Card, Inc.,* 265 F. Supp. 2d 445, 450 (D. Del. 2003) (Jordan, J.). More specifically, courts in this circuit consistently apply *Jumara* to motions to transfer patent cases. *See, e.g., Ricoh Co., Ltd. v. Aeroflex Inc.,* 279 F. Supp. 2d 554 (D. Del. 2003) (*Jumara* applied to motion to transfer patent action); *Saint-Gobian Calmar, Inc. v. Nat'l Products Corp.,* 230 F. Supp. 2d 655 (E.D. Pa. 2002) (same); *Datex-Ohmeda, Inc. v. Hill-Rom Services, Inc.,* 185 F. Supp. 2d 407, 413 (D. Del. 2002) (same); *Ade Corp. v. Kla-Tencor Corp.,* 138 F. Supp. 2d 565, 568 (D. Del. 2001).

Under *Jumara,* the burden is on the movant to demonstrate that the transfer would serve the convenience of the parties, the witnesses, and the interests of justice. *See Jumara,* 55 F.3d at 879; *Ade Corp.,* 138 F. Supp. 2d at 568. Under *Jumara,* the "private interests" to be considered include:

(i)     plaintiff's forum preference as manifested in the original choice;

(ii)    the defendant's preference;

(iii)   whether the claim arose elsewhere;

(iv)   the convenience of the parties as indicated by their relative physical and financial condition;

(v)    the convenience of the witnesses (to the extent that the witnesses may actually be unavailable for trial in one of the fora); and

(vi)   the location of books and records (to the extent that the files could not be produced in the alternative forum).

*Jumara*, 55 F.3d at 879. The public interests under consideration include the local interest in deciding local controversies at home. *Id.* at 889-880.

Significantly, a party moving for transfer bears a substantial burden. A transfer is warranted only if the moving party can show both: (1) that the transfer would increase the aggregate convenience of the parties and would be in the interests of justice, <u>and</u> (2) that the strength of these factors significantly outweighs the importance of respecting the plaintiff's choice of forum. *Joint Stock Society v. Heublein, Inc.*, 936 F. Supp. 177, 185 (D. Del. 1996). The Court should deny the transfer if the factors are evenly balanced or weigh only slightly in favor of transfer. *Critikon, Inc. v. Becton Dickinson Vascular Access*, 821 F. Supp. 962, 964 (D. Del. 1993). Here, Movielink has failed to recognize, let alone satisfy, its heavy burden. Indeed, application of the *Jumara* factors to this action leads unavoidably to the conclusion that this case belongs in Delaware, not California.

## B.    USVO's Choice of Forum is Entitled to Deference.

"A plaintiff's choice of forum is a paramount consideration in any determination of a transfer request, and the court should not disturb the plaintiff's choice lightly." *Joint Stock Society*, 936 F. Supp. at 185 (citations omitted); *see also Jumara*, 55 F.3d at 879; *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 562 (D. Del. 1998); *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215, 218 (D. Del. 1993). Even where the plaintiff's choice of forum is not its "home turf," that choice is still given paramount consideration.[2] *See Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 357 n. 10 (D. Del. 1999). And where the choice of forum was

---

[2] "'Home turf' now refers to the forum closest to the plaintiff's residence or principal place of business in which the party can effect personal service over the principal defendant." *Joint Stock Society*, 936 F. Supp. at 186 (citation omitted). To the extent that Movielink asserts that it is not subject to jurisdiction in Connecticut, the Court should regard Delaware as USVO's home turf.

predicated on "legitimate and rational" concerns, "[d]eference is especially due" to that choice.
*Joint Stock Society*, 936 F. Supp. at 185-86 (quoting *Waste Distillation Technology, Inc. v. Pan American Resources, Inc.*, 775 F. Supp. 759, 764 (D. Del. 1991)).

USVO chose to file in the District of Delaware for at least three legitimate and rational reasons:  (1) jurisdiction over Movielink exists in Delaware because Movielink was formed here; (2) this is a neutral, experienced and convenient forum for both parties; and (3) USVO's claims are related to this forum because Movielink infringes the '792 Patent in Delaware.

### 1.    USVO Chose Delaware Because this State has Jurisdiction Over Movielink.

Delaware is one of Movielink's "homes."  *See Wesley-Jessen Corp.*, 157 F.R.D. at 218 (based on its incorporation in Delaware, "[i]n some senses, Delaware is Visioncare's home.") *See, also, Chase Manhattan Bank*, 265 F.Supp.2d at 450 (choice of forum was rational because one of the parties was incorporated in Delaware).

USVO filed this litigation in Delaware rather than in Connecticut (USVO's principal place of business) in part to mitigate the possibility that meritless jurisdiction or venue motions would delay a hearing, and potential relief, on the merits of its claims.  USVO chose this neutral forum precisely because Movielink is incorporated here, USVO could effect personal service on Movielink, and because the infringement occurs as much here as anywhere.

Moreover, Movielink cannot now complain that another corporation has decided to bring suit against it in Delaware.  By choosing to form itself in Delaware, Movielink willingly accepted both the benefits and burdens that come with that status:

> In developing their business plans, managers may not be able to anticipate having to defend litigation in all of the states where their corporation does business.  They should, however, expect that the corporation may have to respond to litigation both at their principal place of business and in their state of incorporation.

*Wesley-Jessen Corp.*, 157 F.R.D. at 218. Consequently, absent some showing of a unique or unexpected burden, a company should not succeed in arguing that litigation in its state of incorporation is inconvenient. *Ade Corp.*, 138 F.Supp.2d at 572. That is particularly so here, as *each of Movielink's five members is also incorporated in Delaware.*[3]

### 2. Delaware Is a Neutral, Experienced and Convenient Forum for Both Parties.

Delaware is a neutral forum for both parties. The Central District of California is not. USVO has no presence in that district, a district where Movielink has its principal place of business and where its members, all large movie studios, operate one of the largest local industries. For USVO, Hollywood is not a level playing field.

There is a concomitant advantage to litigating this action here: this district is particularly conversant with patent cases. *See, e.g., Quantel Ltd. v. Adobe Systems, Inc.*, 1996 U.S. Dist. LEXIS 21651 (D.Del. 1996) (denying motion to transfer patent action to California on grounds that, *inter alia*, Delaware courts have substantial experience with patent infringement claims.) Moreover, because this District has a relatively clear body of case law on when a court will transfer a patent case, by filing here rather than in Connecticut, USVO expected that it could avoid the unnecessary and unproductive expense of a battle over a change of venue.

---

[3]     According to the Movielink website, Movielink LLC was formed in August 2001 as a joint venture among Metro-Goldwyn-Mayer Studios, Paramount Pictures ("MGM"), Sony Pictures Entertainment, Warner Bros. and Universal Pictures. Paramount Pictures and Sony Pictures Entertainment are incorporated in Delaware. MGM's filings with the Securities and Exchange Commission ("SEC") indicate that MGM On Demand Inc. (a Delaware corporation) is an investor in Movielink and believed to be a member. MGM SEC Form 10-K for 2002, filed Feb. 10, 2003. Vivendi Universal Entertainment LLLP, which is affiliated with Universal Pictures, also is a Delaware entity and is believed to be a Movielink member. Vivendi Universal S.A., SEC Form 6-K, filed Oct. 1, 2003. On information and belief, either Warner Brothers Entertainment Inc. and/or Warner Home Video, which are part of the Warner Brothers family of companies, are members of Movielink and are incorporated in Delaware. Attached as Exhibit 1 are the Certificates of Incorporation for these Movielink members.

### 3.    Movielink Infringes the '792 Patent in Delaware.

In *Jumara*, the Third Circuit held that the local interest in deciding local controversies at home is an important factor to consider regarding a motion to transfer the action away from that jurisdiction. *Jumara*, 55 F.3d at 889-890.    Delaware clearly has an interest in protecting its economy and citizens from patent infringement that occurs within the borders of its jurisdiction. *See, Datex-Ohmeda*, 185 F.Supp.2d at 413 (transfer of patent action denied because Delaware has an interest in adjudicating action involving Delaware corporation).    Thus, Delaware has an interest in this matter because the infringement of USVO's '792 Patent, via the Internet, occurs through Movielink's offering of digitized video programming (movies) to Delaware citizens via the Movielink.com website.    *See Thorn EMI North America, Inc. v. Micron Tech., Inc.*, 821 F. Supp. 272, 275 (D. Del. 1993).

In *Thorn* the court found that the defendant's distribution of allegedly infringing products in Delaware constituted a business transaction under the Delaware long arm statute.    *Id.*    The court therefore denied the defendant's motion to dismiss the patent infringement action for lack of personal jurisdiction or to transfer case to Idaho, its state of incorporation.    The court further stated that defendant's distribution efforts were really efforts to market and sell its products to Delaware customers and that "[p]otential acts of patent infringement plainly arose from [defendant's] conduct in Delaware."    *Id.*

While the infringing services offered by Movielink are national in scope and affect customers throughout the United States, that does not tilt the balance against Delaware. Movielink implies that the greater number of movie rentals and sales from the Movielink website to residents in California supports a transfer. Mot. to Transfer, fn 9 [D.I. 29].    Sales volume, however, is simply not a factor that informs the Court's decision to transfer a case under *Jumara*. Morever, it is no surprise that Movielink's sales in California are higher than in Delaware, since

Delaware had approximately 0.3%, and California 12%, of the U.S. population in 2001. *U.S.*

*Census Bureau, State and County Quick Facts*, at

<http://quickfacts.census.gov/qfd/states/1000.html> (visited on Nov. 14, 2003).

Even if the states' interests are of equal weight, this factor favors the action remaining in

Delaware. Simply put, California has no special interest in hearing and deciding this case above

or beyond Delaware's interests. This action therefore should remain in Delaware as this Court

has experience with patent infringement cases; it has an interest in preventing patent

infringement within its jurisdiction; the infringing party is incorporated in Delaware; and the

infringement affects the economy and citizens in the state.

### 4.    USVO's Choice of Delaware was Rational.

USVO chose to litigate in Delaware for many of the reasons recognized in this circuit to

be "legitimate and rational." Therefore, USVO's "choice of forum 'should be accorded

significant weight.'" *Joint Stock*, 936 F. Supp. at 188 (quoting *Waste Distillation Technology*,

775 F. Supp. at 764). *See C.R. Bard*, 997 F. Supp. at 562.

Movielink argues in its motion that "district courts may 'disregard' or give less deference

to plaintiff's choice of forum, or may reduce the burden of the moving party in showing

inconvenience, especially when the central facts of a lawsuit occur outside the forum state." Mot.

to Transfer, at 9. As support for this position, Movielink cites *Brunswick Corp. v. Precor Inc.*,

2000 U.S. Dist. LEXIS 22222, *7 (D. Del. 2000), and *Magee v. Essex-Tec Corp.*, 704 F. Supp.

543, 547-548 (D. Del. 1988). This argument need not detain the court long. In *Magee*, which

predates *Jumara*, no infringing activity occurred in Delaware. *See Magee*, 704 F. Supp. at 547.

Nor was the plaintiff litigating at or near its residence. *Id.* Finally, the court found that transfer

would not substantially inconvenience the plaintiff. *Id.* at 548.

Similarly, the decision in *Brunswick* is easily distinguishable. In that case the plaintiff's residence in Illinois was not only distant from Delaware, but the plaintiff and defendant were already engaged in pending litigation on a related patent in the Western District of Washington, where the defendant sought to have the case transferred. *Brunswick*, 2000 U.S. Dist. LEXIS 222222, *6. Not surprisingly, the court found that where related lawsuits exist "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *Id. (citing Liggett Croup, Inc. v. R. J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 537 (D.N.J. 2000) (citations omitted).

By contrast, here USVO is litigating near its residence, the infringing activity is occurring as much in Delaware as anywhere, there is no related litigation pending elsewhere, and litigating this case in California would substantially prejudice USVO given its limited financial resources, as we now show.

### C. The Convenience of The Parties and Witnesses As a Whole Does Not Support Transfer to the Central District of California.

"[T]he convenience of the parties as indicated by their relative physical and financial condition" is the next factor to be considered in assessing a motion to transfer." *Jumara*, 55 F.3d at 879. Movielink presents absolutely no evidence on this issue. That is not surprising, for it would only reveal a David *versus* Goliath match-up. USVO is a small business. It has but four employees. *See* Declaration of Edwin Molina filed contemporaneously, ¶ 3 (Exhibit 2). According to USVO's most recent Form 10-Q filed with the SEC, USVO has generated no sales for the nine-month period ending September 30, 2003 and sales in the current quarter are expected to be minimal. *Id.* at ¶ 4. For that same period, the company had a net loss of $513,115. *Id.* USVO, however, continues to explore opportunities that it hopes will result in new products for new revenue streams and it recently announced plans to release a new software

product that can be used to deter video content piracy. *Id.*  Indisputably, USVO has very limited resources.

Movielink is well aware of USVO's diminutive status and financial condition, as USVO's financial data is publicly available.  Given this condition, the transfer of this action to California would substantially prejudice USVO's ability to prosecute this infringement action.  It simply lacks the financial resources to litigate in California against a corporate opponent backed by five of the world's largest movie studios.  Movielink's financial data is not publicly available, and USVO is not otherwise privy to it.  From Movielink's silence and from the identity of Movielink's members, however, the Court can infer that the information, if revealed, would substantiate USVO's contention that Movielink has a vastly superior financial position.

In these circumstances it is beyond cavil that the condition of the parties favors retaining this case in Delaware.  While litigating this case in Delaware may be a minor inconvenience for Movielink, litigating it in California would certainly be a major inconvenience for USVO.  The courts routinely reject transfer motions where such a disparity exists.  *See Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 338 (D.N.J. 2003) (transfer denied in part because "Plaintiffs' physical and financial condition are much more limiting than Defendant's."); *Waldman v. Delaware Park, L.L.C.*, 2000 WL 33416863 *6 (D.N.J. 2000) (transfer denied in part because "the relative physical and financial condition of the parties weighs in favor of plaintiff."); *Manzano v. Mid-Atlantic Coca-Cola Bottling Co., Inc.*, 2000 WL 250226 *3 (E.D. Pa. 2000) (transfer denied; "Looking at the relative financial conditions of the parties, it would be less of a burden for the Defendant corporations to incur the cost of litigating in Philadelphia than it would be for Plaintiff to litigate in Baltimore. Therefore, this factor weighs against granting the transfer."); *Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 358 (D.Del. 1999) (transfer

denied in part because defendants' "relative physical and financial position fail to weigh heavily in favor of transfer.").

### 1. Movielink Would Not Be "Unusually or Oppressively Burdened" by Litigating this Case in Delaware.

As this Court has recognized, the ordinary and minor inconveniences involved whenever a defendant litigates outside of its home district are insufficient to provide a basis for transfer. Rather, *Movielink* must prove that litigating in Delaware would be "unusually burdensome or oppressive." *Wesley-Jessen Corp.*, 157 F.R.D. at 218; *C.R. Bard*, 997 F. Supp. at 562 (the defendant must show that litigating this case in Delaware will impose on it a "unique or unusual burden."). This Movielink cannot show.

First, Movielink makes no substantiated claim in its motion to transfer that litigating in Delaware would impose on it a unique or unexpected financial burden. Movielink is not a "Mom and Pop" operation. It is a limited liability corporation established and backed by the likes of Warner Brothers, Paramount Pictures Corporation, Metro-Goldwyn-Mayer, Universal Studios, and Sony Pictures Entertainment, all large movie studios. A corporation with such backing cannot reasonably claim that litigation in Delaware constitutes a substantial burden.

Second, the argument that a defendant is "unusually or oppressively burdened" simply because its witnesses and documents are located outside the district, has been rejected in this District. *See Joint Stock*, 936 F. Supp. at 189. Indeed, the convenience of party witnesses, or witnesses that are employees of a party, typically carries little weight in a transfer analysis.[4] *See Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 203 (D. Del. 1998). Furthermore, any

---

[4] To the extent that consideration is given to the convenience of party witnesses, the two witnesses identified by USVO's Rule 26(a)(1) initial disclosures are officers of USVO and reside in Connecticut, where USVO has its principal place of business. *See* Plaintiff USA Video Technology Corp.'s Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a), attached as Exhibit 3.

- 12 -

argument by Movielink regarding the logistical difficulties of litigating in Delaware rather than California rings hollow in this day of electronic documents.   As the Court has noted, "technological advances have substantially reduced the burden of having to litigate in a distant forum." *Wesley-Jessen Corp.*, 157 F.R.D at 218.   There is no doubt that technology will allow discovery to proceed economically and conveniently for Movielink, itself an advanced-technology company.   And Movielink will suffer no oppressive or unique burden by having to send its employees or counsel to Delaware on those rare occasions when they might be required to appear for a deposition or in actual Court appearances (which are likely limited to the trial itself).

Third, to the extent documents relevant to the litigation are located in California, their presence in that state should not be given any weight, given the ability to copy and send documents expeditiously throughout the world.  *See Motorola*, 58 F. Supp. 2d at 359; *Ade Corp.*, 138 F.Supp.2d at 570.  As Judge McKelvie explained in *Ade Corp.*, "if we look at the issue of documents, where they are stored and how they are produced, there is probably little if any incremental burden on [defendant] in trying this case in Delaware, rather than in California."

Movielink demonstrably will not be unusually or oppressively burdened by having to litigate in Delaware.  Movielink's argument boils down to its simple preference to litigate on its "home turf," knowing full well the substantial hardship that  transfer would visit on USVO.  That preference, however, is simply insufficient to overcome USVO's choice of forum.  *See C.R. Bard*, 997 F. Supp. at 562.

##### 2.    Litigating the Action in Delaware Would Not Be More Inconvenient for Third Party Witnesses.

In any litigation involving parties located and incorporated in different jurisdictions, there will likely be third-party witnesses beyond the subpoena power of the court chosen by the

plaintiff. Procedures are in place to allow the subpoena and deposition of such witnesses through the intervention of the district court that sits where they reside. Fed. R. Civ. P. 45. Very simply, if third party witnesses are unwilling to travel, then depositions can preserve their testimony for trial, as is common practice for litigation of this nature. Correspondingly, the existence of such third party witnesses should not constitute a basis for transferring this action out of the forum selected by the plaintiff.

Movielink has failed to show that transferring this case to California would lead to greater convenience to the third party witnesses identified by USVO. Only one of the twelve third party witnesses identified in USVO's Rule 26(a)(1) initial disclosures resides in California. Two USVO witnesses live in Connecticut -- closer to Delaware than to California. Two others live in Texas, which does not favor California over Delaware. The inventor of the '792 Patent, Mr. Elbert Gene Tindell, resides in Texas; as does Mr. Kenneth C. Hill, the attorney who prosecuted the '792 Patent. *See* Exhibit 3. Indeed, many of the third-party witnesses would be just as, if not more, inconvenienced by transferring this case to California.

**D.    A Transfer to California is Not in the Interests of Justice.**

It would not serve the interests of justice to transfer this case to California. This case has proceeded in this Court since April 2003. Given the record here, it would be fundamentally unfair to effectively require USVO to start over in California. This action is already scheduled for trial and the milestones for a patent action are already established. Indeed, given the facts and circumstances this Court is, under any standard, the most appropriate forum for this case.

## IV.   <u>CONCLUSION</u>

For these reasons, the Court should deny Movielink's motion to transfer.

November 19, 2003

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Richard D. Kirk (Bar I.D. No. 922)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6960

*Attorneys for Plaintiff*
*USA Video Technology Corporation*

Of Counsel:

STEPTOE & JOHNSON LLP
J. William Koegel, Jr.
Jeffrey T. Hsu
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
(202) 429-3000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 19th day of November, 2003, he caused to be served copies of the **PLAINTIFF USA VIDEO TECHNOLOGY CORPORATION'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT MOVIELINK'S MOTION TO TRANSFER** on the following attorneys of record:

### BY HAND DELIVERY
Steven J. Balick, Esq.
John G. Day, Esq.
Ashby & Geddes
222 Delaware Ave., 17th Fl.
Wilmington, DE 19801

### BY UPS OVERNIGHT
Jeffrey M. Olson, Esq.
Samuel N. Tiu, Esq.
Sidley Austin Brown & Wood
555 W. Fifth St.
Los Angeles, CA 90013

Richard D. Kirk (# 922)

# EXHIBIT G

Copyright 2006 Market Wire, Incorporated
All Rights Reserved
Market Wire

June 6, 2006 Tuesday  10:09 AM GMT

**LENGTH:** 905 words

**HEADLINE:** USVO's Video-on-Demand Patent Case Is Heard by Federal Circuit Court of Appeals

**DATELINE:** OLD LYME, CT; Jun 06, 2006

**BODY:**

USA Video Technology Corporation, a wholly owned subsidiary of USA Video Interactive Corp. (OTCBB: USVO) (TSX-V: US) (BERLIN: USF) (FRANKFURT: USF), today appeared before the Federal Circuit Court of Appeals in Washington, DC, in its appeal against Movielink LLC, which is jointly owned by Warner Bros. (NYSE: TWX), Paramount Pictures Corporation (NYSE: VIA), Metro-Goldwyn-Mayer (NYSE: SNE), Universal Studios, and Sony Pictures Entertainment (NYSE: SNE). The appeal is from an adverse district court decision last year and relates to the interpretation of certain patent claim elements as applied to Internet-based video download platforms such as Movielink's. Intellectual property law firm Goldstein, Faucett & Prebeg represents USVO in its appeal to the U.S. Court of Appeals for the Federal Circuit, which has nationwide jurisdiction over patent litigation appeals. Chief Judge Michel, with Circuit Judges Plager and Bryson, heard oral arguments today from attorneys representing both parties.

USVO developed a groundbreaking system and method for providing video-on-demand (VOD) service to consumers, and filed for patent protection related to this technology in February 1990. The United States Patent and Trademark Office granted the application and issued the company a patent on July 14, 1992, which is considered a pioneering patent in the field of video-on-demand. USVO believes that its U.S. Patent No. 5,130,792 has been infringed, and continues to be infringed, by Movielink LLC, and seeks fair compensation and an injunction against further infringement. USVO's patent has been cited by at least 165 other patents, and the company has been issued similar VOD patents in Germany, Canada, England, France, Spain, Italy, and Japan.

"We are glad to have had this important day in court and look forward to the decision of the three-judge panel," said J. Andrew Huffman, USVO's in-house patent counsel.

"I believe the oral argument went very well as the panel seemed to understand the single issue on this appeal, namely whether the trial court misapplied the claim construction in finding the Movielink system does not infringe the USVO '792 patent. I remain optimistic about the ultimate outcome," said Edward Goldstein, Partner, Goldstein, Faucett & Prebeg.

USVO developed and tested its pioneering VOD technology with Rochester Telephone Corp. Its endeavor is described in a February 22, 1993 article in Cable World magazine. The article, along with other articles on the history of video-on-demand, is available on USVO's website at http://usvo.com/history.htm.

About Goldstein, Faucett & Prebeg LLP:

The firm now known as Goldstein, Faucett & Prebeg was originally founded in January 1995 with equal focuses on patent litigation (both on contingent fee and hourly bases) and on the acquisition and licensing of patents, trademarks and copyrights. The firm quickly became recognized as a premier intellectual property boutique. In 2002, a second name change resulted in the most recent incarnation of the firm as Goldstein & Faucett. The partnership expanded in January of 2005 to include Corby Vowell and again in April 2006 to include Matt Prebeg, giving the firm its current name. Goldstein, Faucett & Prebeg is now focused primarily on patent litigation (both contingent fee and hourly) but also continues to provide a full range of intellectual property legal services, including litigation of intellectual property matters, prosecution, rendering of opinions, licensing, technology transfer and client counseling. For more information, visit www.gfpiplaw.com.

About USA Video Interactive Corp.:

USVO's Video-on-Demand Patent Case Is Heard by Federal Circuit Cour

USA Video Interactive Corp. ("USVO") designs and markets technology for delivery of digital media. USVO developed its MediaSentinel(TM) and SmartMark(TM) digital watermarking technology to provide a robust means for producers and distributors to invisibly protect their content. USA Video Technology Corp., a wholly owned subsidiary of USVO, holds the pioneering patent for store-and-forward video, filed in 1990 and issued by the United States Patent and Trademark Office on July 14, 1992; it has been cited by at least 165 other patents. USVO holds similar patents in Germany, Canada, England, France, Spain, Italy, and Japan. For more information, visit www.usvo.com.

USA Video Interactive Corporate Headquarters Office: 83 Halls Road, Old Lyme, Connecticut, 06371 Telephone (860) 434 – 5535; Facsimile (860) 434 – 5782; Canada Office: 507 – 837 West Hastings Street, Vancouver, BC V6C 3N6. Trading symbol on the OTCBB: USVO; Trading symbol on the TSX Venture Exchange US; Trading symbol on the Berlin and Frankfurt Stock Exchanges: USF. CUSIP 902924208. For more information contact USVO at (860) 434–5535 x125.

The press release may contain forward-looking statements. Actual results may differ materially from those projected in any forward-looking statements. Investors are cautioned that such forward-looking statements involve risk and uncertainties, which may cause actual results to differ from those described.

MediaSentinel and SmartMark are trademarks of USA Video Interactive Corp. The names of actual companies and products mentioned herein may be the trademarks of their respective owners.

The TSX Venture Exchange (TSX) has not reviewed and does not accept responsibility for the adequacy or accuracy of this release.

For Investor Relations Contact:
(860) 434-5535 x125


SOURCE: USA Video Interactive Corp.

LOAD-DATE: June 7, 2006

# EXHIBIT H



Portfolio Media, Inc. | 648 Broadway, Suite 200 | New York, NY 10012 | www.law360.com

Phone: +1 212 537 6331 | Fax: +1 212 537 6371 | customerservice@portfoliomedia.com

## USA Video Takes On Hollywood In Federal Circuit

*Wednesday, June 07, 2006* — USA Video Technology Corp. has launched an attack against Hollywood movie makers for allegedly infringing its video-on-demand technology (VOD) patent in the U.S. Court of Appeals for the Federal Circuit.

On Tuesday, USA Video appealed a district court decision that granted summary judgment of noninfringement for Movielink LLC, a joint venture owned by five movie studios in Hollywood.

USA Video's attorney said the case was well-argued on both sides and that the decision by the three-judge panel of the Federal Circuit could take as long as three months to a year.

"I believe the oral argument went very well as the panel seemed to understand the single issue on this appeal, namely whether the trial court misapplied the claim construction in finding the Movielink system does not infringe [USA Video's patent]. I remain optimistic about the ultimate outcome," said Edward Goldstein, partner at Goldstein Faucett & Prebeg LLP, in a statement.

USA Video sued Movielink in April 2003 in the U.S. District Court for the District of Delaware, asserting its technology for allowing users to request and play digitized movies online. USA Video sought fair compensation and an injunction against further infringement.

The district court ruled last January that Movielink's online movie distribution service did not infringe the patent asserted by USA Video.

Ironically, USA Video also sells anti-piracy products it claims can help the entertainment industry fight piracy and protect its intellectual property in court. Its Web site boasts a "robust means for producers and distributors to invisibly mark their content with the proof authorities need to catch the crooks who steal films, television shows, and video content."

California-based Movielink was formed in November 2002 to sell download digital copies of films produced by its five partners. The studios hoped to confront the growing popularity of online entertainment and the associated theft of copyrighted material by making it easy and popular to pay for the content rather than steal it.

However, USA Video claimed Movielink overlooked other intellectual property in its rush to use the technology. It called Movielink's violation "willful, wanton and deliberate, without a license, and with full knowledge of



[USA Video's] rights," according to the complaint.

Nevertheless, District Judge Kent A. Jordan ruled against USA Video and subsequently denied its motion for reconsideration.

Movielink's partners include Metro-Goldwyn-Mayer (MGM), Viacom's Paramount Pictures, AOL Time Warner's Warner Brothers, Sony's Sony Pictures Entertainment and Vivendi Universal's Universal Pictures.

USA Video, a wholly owned subsidiary of USA Video Interactive Corp., filed for the patent in February 1990. It was issued by the U.S. Patent and Trademark Office in July 1992 and has been cited by more than 165 patent applications since then, according to USA Video.

The patent covers a method of electronically transmitting compressed video content from a central data facility to a receiver over a network. It therefore covers content distribution, such as downloads and streaming, according to USA Video.

Patent-holding company Acacia Research also holds VOD patents and has been busy asserting them in court and gaining settlements.

The patent in this case is U.S. Patent No. 5,130,792.

USA Video Technology Corp. is represented by Goldstein Faucett & Prebag LLP.

Movielink LLC is represented in this case by Ashby & Geddes.

The case is USA Video Technology Corp. v. Movielink LLC, case number 05-1451, in the U.S. Court of Appeals for the Federal Circuit.

--By Erin Coe, erin.coe@portfoliomedia.com

# EXHIBIT I

3/19/85        XR      4,506,387

# United States Patent [19]

## Walter

[11]  Patent Number:  **4,506,387**

[45]  Date of Patent:  **Mar. 19, 1985**

[54]  **PROGRAMMING-ON-DEMAND CABLE SYSTEM AND METHOD**

[76]  Inventor:  **Howard F. Walter,** P.O. Box 11617, Fort Wayne, Ind. 46859

[21]  Appl. No.:  **497,885**

[22]  Filed:  **May 25, 1983**

[51]  Int. Cl.³ ............................................ H04N 7/16
[52]  U.S. Cl. ............................ 455/612; 455/3;
        455/6; 455/53; 358/86; 370/3
[58]  Field of Search ................... 455/4, 5, 6, 53, 612;
        358/86, 102, 114

[56]  **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,696,392 | 10/1972 | Fossum et al. | 340/717 |
| 3,725,874 | 4/1973 | Van Heel | 364/200 |
| 3,931,512 | 1/1976 | Kent et al. | 250/205 |
| 3,997,913 | 12/1976 | Rittenbach | 360/8 |
| 4,062,043 | 12/1977 | Zeidler et al. | 358/86 |
| 4,071,697 | 1/1978 | Bushnell et al. | 179/2 TV |
| 4,131,765 | 12/1978 | Kahn | 179/81 R |
| 4,135,202 | 1/1979 | Cutler | 358/86 |
| 4,381,522 | 4/1983 | Lambert | 358/86 |

**OTHER PUBLICATIONS**

*16 Shows & What Do You Get* from Video Magazine, Jul. 1983.
Dr. M. Kawahata, "The HI-OVIS Optical Communication System", (17–20 Sep. 1979).

*Primary Examiner*—Robert L. Griffin
*Assistant Examiner*—Timothy K. Greer
*Attorney, Agent, or Firm*—Albert L. Jeffers; Anthony Niewyk

[57]                **ABSTRACT**

A programming-on-demand cable system is provided which allows any one of a plurality of individual users to request anyone of a plurality of video programs they wish to view from a library of programs, and permits the requested program to be available for viewing on a conventional television set at the user's location following a request initiated by the user. Each program is preprogrammed in a memory device selectable by a host computer at a central data station in response to an address signal transmitted from the user. The host computer in conjunction with other electronics transmits the video program at a high non-real-time rate over a fiber optic line network to a data receiving station at the user's location. The data receiving station then converts the received optical data back to electrical data and stores it for subsequent real-time transmission to the user's television set. The system permits the user to view any one of a number of programs transmitted on a non-real-time basis, and also allows the user to store the transmitted program at his data receiving station for an indefinite period of time for viewing at a later date. A method is also provided for transmitting the programs on a non-real-time basis.

**14 Claims, 4 Drawing Figures**





FIG. 1



FIG. 2



*FIG. 3*



*FIG. 4*

4,506,387

1

## PROGRAMMING-ON-DEMAND CABLE SYSTEM AND METHOD

### BACKGROUND OF THE INVENTION

This invention pertains to a broadcasting cable system, and more particularly to a programming-on-demand cable system wherein any one of a plurality of stored video programs can be broadcast in a non-real-time basis to a user.

Generally and to the best of applicant's knowledge, existing video broadcast services provide a user any one of a plurality of programs to be viewed on a real-time basis. The user may select any one of the video programs, however, he is restricted in his enjoyment of the program in that the user has no control over when in time the program is broadcast to his video or television set. For example, video programs are routinely announced in video or television guides listing the programs available to the user for his choice in viewing at a specific time of day. Consequently, the user does not have the choice of viewing the program when he so desires, but rather is restricted to that particular time listed in the video or television guide.

Moreover, it would be much too impractical and costly to provide the necessary equipment to process numerous concurrent requests for real-time transmission of video programs at any time desired by the users. Present broadcasting systems transmit the data by one of many methods, for example, "over-the-air", electrical lines or cables, fiber optic lines or cables, and the like. Presently, transmission by means of fiber optics is becoming more practical, however, the user is still restricted to viewing his program at a broadcasting time not of his choosing.

### SUMMARY OF THE INVENTION

The present invention overcomes the problems and disadvantages of present broadcasting systems by providing an improved programing-on-demand cable system.

The programming-on-demand cable system of the present invention overcomes the inability of a user to select any one of a number of video programs for viewing at a time of his choice by providing a non-real-time transmission of the desired program. Any number of various programs are stored in memory devices at a central location or library and are viewable by a user at any time by means of the cable system of the present invention. A host computer at the library is electrically connected to the memory devices, and upon receiving an address signal from a keyboard located at the user's location, the host computer selects the memory device identified by the address signal, and causes the program stored therein to be transmitted by a fiber optic line to a data receiving station at the user's location. A central data station, of which the host computer is a part, causes the program identified by the address signal to be converted from electrical data to optical data and transmitted over the fiber optic line to the data receiving station, which then reconverts the optical data back to the original electrical data. Thereafter, the reconverted electrical data is transmitted to the user's television set for virtually immediate viewing; or the reconverted electrical data is stored in a memory module in the data receiving station for subsequent viewing by the user at the time of his choice. If necessary, the electrical data received by the data receiving station is reconstructed,

2

which may be necessary if the electrical data is received in a form not acceptable by the television for viewing, and is transmitted at a normal rate to the user's television.

Further, the data transmitted from the central data station to the data receiving station is transmitted in multiplexed fashion so that the equipment at the central data station is dedicated for only a short period of time, for example, on the order of 20 to 30 seconds, thereby minimizing any delay between transmission of an address signal by the user and the receipt of the desired program at the user's location.

To facilitate the storage and manipulation of the video programs, and to allow the method to be placed under automatic computer control, the electrical data representing each video program is converted to compressed digital form and stored in suitable high density memory devices.

In one form of the invention, there is provided an improvement in a broadcasting system including a central data station having means for converting electrical data to optical data, a data receiving station having means for reconverting the optical data back to the electrical data, a fiber optic line means connecting the central data station and data receiving station for transmitting the optical data therethrough, and a broadcasting device electrically connected to the receiving station for receiving and broadcasting the reconverted electrical data to the user. The improvement comprises a plurality of memory devices electrically connected to the central data station, wherein each memory device is identifiable by a respective address signal and has pre-programmed therein respective electrical data representing a video program. Each memory device is responsive to its received address signal to thereby transmit its electrical data to the converting means. A user-operable generator device at the user's location is operatively connected to the central data station for selectively generating any one of the address signals and transmitting a selected address signal to the central data station, whereby the central data station transmits that address signal to the identified memory device which then transmits its electrical data to the converting means for subsequent transmission to and broadcasting by the broadcasting device at the user's location.

The present invention also provides a method for broadcasting on a non-real-time basis any one of a plurality of electrical data representing different video programs comprising the steps of providing a central data station including an electro-optical transducer for converting electrical data to optical data, a data receiving station including an optoelectrical transducer for reconverting the optical data back to the electrical data, a fiber optic line means connecting the transducers, and a broadcasting device electrically connected to the data receiving station for receiving and broadcasting the electrical data transmitted. The method further comprises the steps of providing a plurality of memory devices electrically connected to the central data station, wherein each of the memory devices is identifiable by a respective address signal, and preprogramming each memory device with respective electrical data representing a video or broadcast program, each memory device being responsive to its received address signal to thereby transmit its electrical data to the electro-optical transducer. Further provided is a user-operable generator device at the location of the broadcasting

4,506,387

3

device and which is operatively connected to the central data station and responsive to input applied by the user for generating any one of the address signals. Further steps are applying an input to the generator device to generate a selected one of the address signals, and transmitting the generated address signal to the central data station for identification of the memory device identifiable by the generated address signal. Thereafter, transmitting the generated address signal to the identified memory device, whereby the memory device transmits its electrical data to the electro-optical transducer for converting the electrical data to optical data and transmitting the optical data through the fiber optic line to the opticoelectrical transducer for reconverting the optical data back to the electrical data, and then transmitting the electrical data to the broadcasting device for the broadcast thereof.

It is an object of the present invention to provide a programming-on-demand cable system which permits a user to selectively control which program he desires to view at a particular time, subject only to the contents of the library of video programs maintained at the central data station.

Another object of the present invention is to provide a method for allowing a user to selectively control when and what program he desires to view, subject only to the contents of the library of video programs available.

Further objects of the present invention will appear as the description proceeds.

BRIEF DESCRIPTION OF THE DRAWINGS

The above mentioned and other features and objects of this invention, and the manner of attaining them, will become more apparent and the invention itself will be better understood by reference to the following description of an embodiment of the invention taken in conjunction with the accompanying drawings, wherein:

FIG. 1 is a schematic of a preferred embodiment of the present invention;

FIG. 2 is a schematic of a portion of the central data station and a multi-fiber data bus of the embodiment in FIG. 1;

FIG. 3 is a schematic illustrating how data is divided among a memory device of the embodiment in FIG. 1; and

FIG. 4 is a schematic illustrating a portion of the multifiber data bus and the data receiving station of the embodiment of FIG. 1

DESCRIPTION OF A PREFERRED EMBODIMENT

Referring to FIG. 1, programming-on-demand cable system 10 is schematically illustrated generally comprising central data station 12, data receiving station 14, a multi-fiber data bus 16, and keyboard 18.

Central data station 12 includes host computer 20 electrically connected to electronic switching system 22. The electronic switching system 22 is electrically connected to a library of memory modules 24, 26, 28, 30, 32, 34, as indicated by digital data flow arrows 36, 38, 40, 42, 44, 46, respectively. Electronic switching system 22 selectively connects any one of the memory modules 24–34 to multi-fiber data bus 16, as will be described in detail hereinafter. Although only one data bus 16 is illustrated in FIG. 1, the present invention contemplates numerous such data buses 16 wherein electronic switching system 22 is capable of selectively

4

electrically connecting any memory module 24–34 to any one or plurality of other such data buses 16.

Although only six memory modules 24–34 are illustrated in FIG. 1 as representing a library of video programs, it should be understood that more or fewer such memory modules may be included in the library and connected to electronic switching system 22. In this particular embodiment, only six such memory modules 24–34 are illustrated, and each one contains a specific video program for broadcasting. The video programs are preprogrammed into respective memory modules 24–34 in digital format for rapid and inexpensive transmission, as will be described in greater detail below. It should be realized however, that the video programs may be stored in other formats, such as an analog format.

Central data station 12 further includes four laser diode modules 48, 50, 52, 54, each of which includes four pulse code modulators respectively connected in series with four laser diodes for converting digital data to optical data and one holographic plate, a description of which will be made in greater detail below with reference to FIG. 2. Continuing with FIG. 1, laser diode modules 48–54 are optically connected to fiber optic lines 56, 58, 60, 62, respectively, of multi-fiber data bus 16.

Host computer 20 is also electrically connected to communications controller 64 by line 66, which is further electrically connected to respective laser diode modules 48–54 by lines 68, 70, 72, 74. Following a command from host computer 20, communications controller 64 assumes control of fiber optic lines 56–62 of data bus 16.

Host computer 20 is electrically connected to electronic switching system 22 by line 76, and electronic switching system 22 is electrically connected to laser diode modules 48–54 as illustrated by digital data flow arrows 78, 80, 82, 84, respectively.

Continuing to refer to FIG. 1, data receiving station 14 includes four photo-diode modules 86, 88, 90, 92 optically connected to fiber optic lines 62, 60, 58, 56, by fiber optic lines 94, 96, 98, 100, respectively. It is emphasized that fiber optic lines 56–62, which make up four of the five lines in multi-fiber data bus 16, continue on as illustrated in FIG. 1 by arrows to additional users. Each photodiode module 86–92 includes four filters, four photodiodes, and four demodulators connected in series as illustrated in FIG. 4, a more detailed description of which will continue below.

Photodiode modules 86–92 are connected to memory module 102 as illustrated by digital data flow arrows 104, 106, 108, 110, respectively. Data receiving station 14 further includes control computer 112 electrically connected to memory module 102 by line 114, to DA (digital-to-analog) converter 116 by line 118, and to RF modulator 120 by line 122. Control computer 112 is electrically connected to each of the photodiode modules 86, 88, 90, 92 by lines 117, 119, 121, 123, respectively, which branch off from line 115; this allows control computer 112 to transmit clock signals for data that requires synchronization to modules 86–92.

Host computer 20 is connected to control computer 112 by line 124, laser diode module 126, fiber optic line 128, fiber optic line 129 coupled to line 128, photodiode module 130, and digital data flow arrow 132. Laser diode module 126 includes only two pulse code modulators, two laser diodes, and one holographic plate; and photodiode module 130 includes two interference fil-

4,506,387

5

ters, two photodiodes, and two demodulators, which will be described in greater detail below with reference to FIG. 2. Fiber optic line 128 is the fifth of the five fiber optic lines in data bus 16 and continues on as illustrated in FIG. 1 to additional users. Communications controller 64 is connected to control computer 112 by line 131, laser diode module 126, fiber optic lines 128, 129, photodiode module 130, and digital data flow arrow 132.

Data receiving station 14 further includes automatic modem 134 electrically connected to control computer 112 by line 136. Automatic modem 134 communicates with host computer 20 by means of line 138, which is connected to the user's telephone line 140, telephone line 142, modem 143, and line 145.

Keyboard 18 is electrically connected to control computer 112 by line 144, and television 146 is connected to RF modulator 120 by analog data flow arrow 148.

Referring now to FIG. 2, a more detailed description of the interface between central data station 12 and multi-fiber data bus 16 will be made. FIG. 2 illustrates in an exploded manner the method in which laser diode modules 48–54 are operatively connected to fiber optic lines 56–62, respectively, and since the connection between each of the four laser diode modules to its respective fiber optic line is identical only one such description will be made and will suffice for all four.

Briefly, each program in each digital memory module 24–34 is logically divided into 16 data cells in that particular memory module so as to reduce the transmission time of the program. Each laser diode module 48–54 is designed to transmit four of the sixteen cells of data representing the program and are illustrated in FIG. 2 by digital, data flow arrows 150, 152, 154, 156, which are included in, by example only in FIG. 1, digital data flow arrow 46 and make up the digital data flow arrow 84 when memory module 34 is selected.

It should be understood that, while four groups of data streams 150–156 are shown in FIG. 2, the data included in these groups of data streams is not identical. Each of the sixteen illustrated data streams 150–156 transfers data from respective ones of the sixteen unique data cells of one of the memory modules 24–34, each data stream comprising a portion of a single program. Continuing to refer to FIG. 2, four of the sixteen cells of data representing a single program of memory module 34 are separately transmitted to pulse code modulators 158, 160, 162, 164 for subsequent transmission to laser diodes 166, 168, 170, 172, respectively. Pulse code modulators 158–164 are electrically connected to laser diodes 166–172 by lines 174, 176, 178, 180, respectively. Digital data transmitted to pulse code modulators 158–164 are individually modulated and transmitted to laser diodes 166–172 by lines 174–180, and laser diodes 166–172 then transmit the digital data as optical data having different light wavelengths to holographic plate 182. As illustrated laser diodes 166–172 are oriented such that the four different light wavelengths L1, L2, L3, L4, converge at holographic plate 182, which redirects the four wavelengths in a parallel manner to fiber optic line 62. As described, the digital data transmitted to laser diode module 54 is now spectrally multiplexed in fiber optic line 62. Various methods for deflecting light beams, for example, by holographic plates, are disclosed in U.S. Pat. No. 4,062,043 issued Dec. 6, 1977 to Zeidler et al. The methods disclosed in Zeidler are

6

used to deflect multiple light wavelengths onto a single fiber.

In a similar manner the other twelve cells of digital data are likewise spectrally multiplexed and transmitted through fiber optic lines 56–60.

FIG. 2 further illustrates the interface between fiber optic line 128 with central data station 12 and multi-fiber data bus 16 by means of laser diode module 126 comprising pulse code modulator 184 electrically connected in series with laser diode 186 and pulse code modulator 188 electrically connected in series with laser diode 190. Digital data flow arrow 193 represents line 124 connecting host computer 20 to laser diode module 126 in FIG. 1. Digital data flow arrow 193 transmits certain control data from host computer 20 to data receiving station 14 for display on the user's television 146. Digital data flow arrows 192, 194 represent line 131 (FIG. 1) connecting communications controller 64 to laser diode module 126. Flow arrow 192 transmits other control data to control computer 112, and flow arrow 194 illustrates transmission of synchronization data from communications controller 64 to control computer 112. The control and synchronization data are spectrally multiplexed in fiber optic line 128 in an identical manner as described above for line 62.

As explained above, optical data transmitted from laser diodes 166–172 is oriented to converge on holographic plate 182, however, it is recognized that the optical data could be transmitted from laser diodes 166–172 in a parallel fashion to a convex lens to be deflected to holographic plate 182.

Referring now to FIG. 3, an exemplary description will be made of how digital data is stored in one of the memory modules 24–34. FIG. 3 illustrates a memory module 196 containing only three cells 198, 200, 202 in this example. Memory module 196 is of the recirculating shift register type, and is logically divided into the three cells 198–202 and is illustrated as storing a nine bit program. Storing is by the bit rotation logic method wherein bit one is stored in cell 202, bit 2 stored in 200, bit 3 stored in cell 198, bit 4 stored in cell 202, etc. The data are retrieved from memory module 196 in a parallel fashion and are subsequently sent to the fiber optic lines of the data bus, which also operate in parallel. The purpose for the use of bit rotation is to permit memory module 102 in FIG. 1 in data receiving station 14 to operate at a lower data rate during playback.

Referring now to FIG. 4, there is schematically illustrated the interface between fiber optic lines 94–100 and 129 at data receiving station 14. Since the interface between fiber optic lines 94–100 are identical, and 129 similar, only one such interface will be described using fiber optic line 94. Fiber optic line 94 is connected to photodiode module 86 comprising diverging optical element 204, interference filters 206, 208, 210, 212, photodiodes 214, 216, 218, 220, and demodulators 222, 224, 226, 228. Photodiodes 214–228 are connected to respective demodulators 222–228 by respective lines 230, 232, 234, 236. The spectrally multiplexed light beam is transmitted from fiber optic line 94 to diverging optical element 204 which divergingly transmits the light beam to interference filters 206–212, each of which permits only a discrete wavelength to pass therethrough to thereby demultiplex the light beam. As illustrated in FIG. 4, filter 206 permits only wavelength L1 to pass through, filter 208 permits only wavelength L2, filter 210 permits only wavelength L3, and filter 212 permits only wavelength L4 to pass through. The operation of diverging

4,506,387

7

optical element 204 is known and disclosed in U.S. Pat. No 4,062,043 issued Dec. 6, 1977 to Zeidler et al., which is incorporated by reference herein.

The light wavelengths are then transmitted to photo-diodes 214–220 and demodulators 222–228 for convert-ing the optical data back to the original digital data The data is then transmitted to memory module 102 as illus-trated by digital data flow arrow 104 in FIG. 1. Mem-ory module 102 is arranged identically to memory mod-ules 24–34 with sixteen parallel cells for containing the data.

Thereafter the digital data is retrieved and fed to the DA converter 116 on command from control computer 112 for converting the digital data to analog data, and is then transmitted to RF modulator 120 for subsequent transmission and broadcasting by television 146.

The data in memory modules 24–34 is in compressed digital form, thereby accomplishing a considerable sav-ings in transmission costs. After host computer 20 has signaled electronic switching system 22 to electrically connect the selected one of the memory modules 24–34, host computer 20 then signals communications control-ler 64 to assume control of the compressed digital data transmitted to laser diode modules 48–54. Communica-tions controller 64 also then assumes control of laser diode module 126. The digital data is compressed in memory modules 24–34 by a technique known as inter-frame differential pulse code modulation. The digital data is received, as described above, at data receiving station 14 and reconstructed by control computer 112. The inter-frame differential pulse code modulation technique just described is known in the art, and addi-tional circuitry may be added to avoid problems caused by rapid motion in the picture. Further, the bit rate requirements may be reduced even further by means of other similar but more complicated procedures.

By utilizing inter-frame differential pulse code modu-lation, each second of video program playing time yields about 44 megabits. Further, according to the present state of the art, 650 megabits per second can be transmitted on a single wavelength, and since in the present embodiment there are 16 optical data channels in the four fiber optic lines 56, 58, 60, 62, the total trans-mission rate is 10,400 megabits per second. Therefore, a two hour movie can be transmitted in about 31 seconds (7,200 seconds×44 megabits per second /10,400 mega-bits per second).

In operation, the user determines which program he desires to watch, and then inputs the correct address signal in keyboard 18 which transmits the signal to computer control 112, which in turn transmits the signal to automatic modem 134. Automatic modem 134 then transmits via lines 138, 142, modem 143, and line 145 the address signal to host computer 20 which determines which data bus 16 serves the user and enters the address signal in a queue for the particular data bus 16 of the user. Host computer 20 then transmits a receipt signal through line 145, modem 143, lines 142, 138, automatic modem 134, and line 136 to control computer 112, which in turn transmits the signal through line 122 to RF modulator 120 for display on television 146, thereby indicating to the viewer that the host computer 20 has received and entered the selected address signal. There-after, host computer 20 transmits other instructions and information to the viewer via digital data flow arrow 193 (FIG. 2) which represents line 124 in FIG. 1. When the user's turn comes up, host computer 20 transmits the address signal to electronic switching system 22 which

8

selects the one identified memory module 24–34 con-taining the selected video program. Following this, host computer 20 signals communications controller 64 to assume control of laser diode modules 48–54, 126, after which communications controller 64 causes electronic switching system 22 to transmit the selected digital data to laser diode modules 48–54 and thereafter to data receiving station 14 as described above. Communica-tions controller 64 communicates with control com-puter 112, as described above, when each step of the transmission sequence is begun and terminated.

After transmission, the video program is stored in memory module 102 of data receiving station 14 as earlier described, and communications controller 64 communicates with host computer 20 that data trans-mission is complete. Host computer 20 then informs the user via digital data flow arrow 193 (FIG. 2) that the program is ready for viewing by displaying a ready signal on television 146. The user begins the video pro-gram by depressing a "START" switch on keyboard 18, whereby control computer 112 signals memory module 102 to transfer the digital data to DA converter 116 as illustrated by digital data flow arrow 238 for converting the digital data to analog data upon com-mand from control computer 112. Thereafter control computer 112 commands converter 116 to transmit the analog data to modulator 120 as illustrated by digital data flow arrow 240, and then to television 146 via the analog data flow arrow 148.

Although the above description includes converting the digital data to analog data at the data receiving station 14 for display on television 146, it is contem-plated that this step may be eliminated with television sets capable of receiving digital data for display thereof.

Although the above description was made in terms of a fully completed transmission of a program before viewing by the user, the present invention fully contem-plates that the user may begin viewing his program before the complete transmission thereof. Central data station 12 may transmit only a portion of the selected program to the user for his viewing, and then begin transmitting a portion of another selected program to a second user. This permits central data station 12 to simultaneously handle several users, rather than waiting for complete transmission of one selected program be-fore proceeding with another user's address signal.

While this invention has been described as having a preferred embodiment, it will be understood that it is capable of further modifications. This application is therefore intended to cover any variations, uses, or adaptations of the invention following the general prin-ciples thereof, and including such departures from the present disclosure as come within known or customary practice in the art to which this invention pertains and fall within the limits of the appended claims.

What is claimed is:

1. In a broadcasting system including a central data station, a data receiving station, a fiber optic line means connecting said central data station and said data re-ceiving station, said central data station including means for converting electrical data to optical data and trans-mitting said optical data through said fiber optic line means to said data receiving station, said data receiving station including means for reconverting said optical data back to said electrical data, and a broadcasting means electrically connected to said data receiving station for receiving and broadcasting said electrical

9

10

data transmitted from said data receiving station, the improvement comprising:

a plurality of memory devices electrically connected to said central data station, each memory device being identifiable by a respective address signal and having a plurality of data cells, each data cell having electrical data representing a portion of a broadcast program preprogrammed therein such that said memory device contains an entire broadcast program, each said memory device being responsive to its received said address signal transmitted thereto from said central data station to transmit its said electrical data to said converting and transmitting means, and

a user-operable generating means near said broadcasting means and operatively connected by telephone line to said central data station for selectively generating any one of said address signals and transmitting said one address signal to said central data station, whereby said central data station transmits said one address signal to one of said memory devices identified by said one address signal, said one memory device transmitting its said electrical data to said converting and transmitting means for converting said electrical data to pulse code modulated optical data and transmitting said optical data through said fiber optic line means to said data receiving station, said converting and transmitting means comprising a plurality of parallel transmission means for simultaneous transmission of said optical signals representing electrical data in each of said data cells, said reconverting means reconverting said optical data back to said electrical data and said data receiving station transmitting said said electrical data to a memory device for selective transmission to said broadcasting means for the broadcast of said broadcast program represented by said electrical data to the user.

2. The system of claim 1 wherein said memory devices are programmable digital memory devices, each said programmable digital memory device having its respective said electrical data preprogrammed therein in digital form.

3. The system of claim 2 wherein said data receiving station includes a digital-to-analog converter means for converting electrical data from digital to analog form for transmission to said broadcasting means.

4. The system of claim 2 wherein said broadcasting means includes a digital-to-analog converter means for converting electrical data received from said data processing station from digital to analog form for the broadcasting thereof.

5. The system of claim 2 wherein said memory devices have their respective said digital electric data preprogrammed therein in compressed digital form.

6. The system of claim 1 further including a memory means operatively electrically connected to said data receiving station and said broadcasting means for storing therein for an indefinite period of time received electrical data, said memory means being responsive to a received transmit signal for transmitting said stored electrical data therefrom for subsequent broadcast by said broadcasting means, said generating means being operatively electrically connected to said memory means for generating and transmitting a transmit signal to said memory means.

7. The system of claim 6 further including a plurality of said data receiving stations connected to said fiber optic line means,

a like plurality of said broadcasting means electrically connected to respective ones of said data receiving stations for receiving and broadcasting electrical data transmitted from respective said data receiving stations to a plurality of users,

a like plurality of said memory means operatively electrically connected to respective ones of said data receiving stations and respective ones of said broadcasting means, and

a like plurality of said user-operable generating means at respective ones of said broadcasting means and connected to said central data station, whereby any one or the plurality of users may individually selectively generate any one of said address signals to store selected electrical data in respective ones of said memory means, and thereafter individually selectively generate a transmit signal for the broadcasting of selected electrical data.

8. The system of claim 7 wherein said broadcast programs are video programs and said broadcasting means are televisions for broadcasting respective ones of said video programs.

9. A method for broadcasting on a non-real-time basis any one of a plurality of electrical data representing different broadcast programs, comprising the steps of:

providing a central data station including an electro-optical transducer apparatus for converting electrical data to optical data, a data receiving station including an optico-electrical transducer apparatus for reconverting the optical data back to the electrical data, a fiber optic line comprising a plurality of transmission channels connecting the transducer apparatuses, and a broadcasting device electrically connected to the data receiving station for receiving and broadcasting the electrical data transmitted from the data receiving station,

providing a plurality of memory devices electrically connected to the central data station, each memory device having a plurality of data cells and being identifiable by a respective address signal,

preprogramming each memory device data cell with electrical data representing a portion of a broadcast program such that each memory device contains an entire broadcast program, each memory device being responsive to its received address signal to thereby transmit its electrical data to the electro-optical transducer apparatus,

providing a user-operable generating device at the location of the broadcasting device, the user-operable generating device being electrically connected by a telephone line to the central data station and responsive to input applied by the user for generating any one of the address signals,

applying an input to the generating device to generate a selected one of the address signals,

transmitting the generated address signal to the central data station for identification of the memory device identifiable by the generated address signal,

transmitting the generated address signal to the identified memory device, whereby the memory device simultaneously transmits the electrical data in each of its data cells to the electro-optical transducer apparatus for converting the electrical data to digital pulse code modulated optical data and then transmits the optical data through the plurality of

4,506,387

11

transmission channels of the fiber optic line to the optico-electrical transducer apparatus for reconverting the optical data back to the electrical data, each of said channels carrying a separate portion of said entire broadcast program, and

thereafter transmitting the electrical data to the broadcasting device for the broadcasting thereof.

10. The method of claim 9 wherein the electrical data preprogrammed in each respective memory device is in digital form.

11. The method of claim 10 further including the step of providing the data receiving station with a digital-to-analog converter for converting digital electrical data to analog electrical data for broadcasting by the broadcasting device.

12. The method of claim 11 wherein the step of preprogramming each memory device with electrical data in digital form includes preprogramming the electrical data in compressed digital form.

12

13. The method of claim 9 further including the step of storing the electrical data reconverted by the optico-electrical transducer apparatus in an other memory device operatively electrically connected to the data receiving station and the broadcasting device for broadcasting at a later time.

14. The method of claim 13 wherein the other memory device is responsive to a received transmit signal for transmitting its stored electrical data to the broadcasting device, and wherein the user-operable generating device is operatively electrically connected to the other memory device and responsive to other input applied by the user for generating and transmitting the transmit signal to the other memory device, and

further including the step of applying other input to the generating device, whereby the other memory device transmits its stored electrical data to the broadcasting device.

* * * * *

# EXHIBIT J

Copyright 2006 Market Wire, Incorporated
All Rights Reserved
Market Wire

June 14, 2006 Wednesday 4:45 PM GMT

**LENGTH:** 437 words

**HEADLINE:** Cable Companies Sued for Infringing USVO'S VOD Patent

**DATELINE:** OLD LYME, CT; Jun 14, 2006

**BODY:**

USA Video Technology Corp., a wholly owned subsidiary of USA Video Interactive Corp. (OTCBB: USVO) (TSX-V: US) (BERLIN: USF) (FRANKFURT: USF), filed suit yesterday in the U.S. District Court for the Eastern District of Texas, alleging that its U.S. Patent No. 5,130,792 is infringed by Time Warner, Inc. (NYSE: TWX), Cox Communications, Inc., Charter Communications, Inc. (NASDAQ: CHTR), Comcast Cable Communications LLC (NASDAQ: CMCSA), Comcast of Richardson, LP, Comcast of Plano, LP, and Comcast of Dallas, LP, and seeking fair compensation and a court injunction against further infringement. The companies cited in the lawsuit operate digital cable systems in which they provide allegedly infringing video-on-demand services to their subscribers.

About USA Video Interactive Corp.:

USA Video Interactive Corp. ("USVO") designs and markets technology for delivery of digital media. USVO developed its MediaSentinel(TM) and SmartMark(TM) digital watermarking technology to provide a robust means for producers and distributors to invisibly protect their content. USA Video Technology Corp., a wholly owned subsidiary of USVO, holds the pioneering patent for store-and-forward video, filed in 1990 and issued by the United States Patent and Trademark Office on July 14, 1992; it has been cited by approximately 200 other U.S. patents. USVO holds similar patents in Germany, Canada, England, France, Spain, Italy, and Japan. For more information, visit www.usvo.com.

USA Video Interactive Corporate Headquarters Office: 83 Halls Road, Old Lyme, Connecticut, 06371 Telephone (860) 434 - 5535; Facsimile (860) 434 - 5782; Canada Office: 507 - 837 West Hastings Street, Vancouver, BC  V6C 3N6. Trading symbol on the OTCBB: USVO; Trading symbol on the TSX Venture Exchange US; Trading symbol on the Berlin and Frankfurt Stock Exchanges: USF.  CUSIP 902924208. For more information contact USVO at (860) 434-5535 x125.

The press release may contain forward-looking statements. Actual results may differ materially from those projected in any forward-looking statements. Investors are cautioned that such forward-looking statements involve risk and uncertainties, which may cause actual results to differ from those described.

MediaSentinel and SmartMark are trademarks of USA Video Interactive Corp. The names of actual companies and products mentioned herein may be the trademarks of their respective owners.

The TSX Venture Exchange (TSX) has not reviewed and does not accept responsibility for the adequacy or accuracy of this release.

```
For Investor Relations Contact:
(860) 434-5535 x125
```

SOURCE: USA Video Interactive Corp.

**LOAD-DATE:** June 15, 2006

# EXHIBIT K

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

**1. Article Addressed to:**

USA Video Technology Corporation
83 Halls Road
P.O. Box 245
Old Yme, CT  06371

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                      ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
Mar. D Crow                        6-7c

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail      ☐ Express Mail
☒ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

**2. Article Number**
(Transfer from service label)      RA 122 365 615 US

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

# EXHIBIT L

**COUNTY,**

**Affidavit of Service**

RECEIVED

JUL 10 2006

A&G

STATE OF

COUNTY OF

DOCKET#: 06-387

**Time Warner Cable Inc.,**

PLAINTIFF(S)

**USA Video Technology Corp.,**

DEFENDANT(S)

I, Danielle Broderick , being first duly sworn, on oath, deposes and say that I am the identical person requested by the Plaintiff to make service of the Summons and Complaint in the foregoing action, that I am not an interested party therein, that I am over the age of 19 years.

I served the Summons and Complaint by delivering a copy of the same to USA Video Technology Corp., by leaving a true and correct copy of the same with Jo Lyn Jordan, Vice President, a person over the age of 14 years old at USA Video Technology Corp., c/o Registered Agency Services 2120 Carey Ave. Cheyenne, WY on 7/3/2006 at 3:44:00 PM .

Date Prepared

July 05, 2006

*Danielle Brodrick*

Danielle Broderick

Subscribed and sworn to before me by Danielle Broderick this **5** day of **July** 2006.

Notary Public/Clerk

KEEGAN RUSSELL
NOTARY
PUBLIC
STATE OF COLORADO
My Commission Expires 10/11/2009

**Server Comments:**

138266

Ashby & Geddes

Debtor #:

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA Video Technology Corporation, | § § | |
| Plaintiff | § § | |
| v. | § § | Case No.2:06-cv-239 RHC |
| TIME WARNER CABLE, INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP | § § § § § § § · | JURY TRIAL DEMANDED |
| Defendants | | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff, USA Video Technology Corporation ("USVO"), files this Original Complaint against Defendants, Time Warner Cable, Inc. ("Time Warner"), Cox Communications, Inc. ("Cox"), Charter Communications, Inc. ("Charter"), Comcast Cable Communications LLC ("Comcast"), Comcast of Richardson, LP ("Comcast Richardson"), Comcast of Plano, LP ("Comcast Plano"), and Comcast of Dallas, LP ("Comcast Dallas") and alleges as follows:

**THE PARTIES**

1.    USVO is a corporation organized under the laws of the State of Connecticut with its principal place of business at 83 Halls Road, P.O. Box 245, Old Lyme, Connecticut, 06371.

2.    Time Warner, on information and belief, is a corporation organized under the laws of the State of Delaware. Time Warner is doing business in Texas, and, on information and belief, has a principal place of business at 290 Harbor Drive; Stamford, CT 06902. Time

Warner may be served with process by serving its registered agent, the CT Corporation System, 350 North St. Paul St., Dallas, TX 75201.

3.     Cox, on information and belief, is a corporation organized under the laws of the State of Delaware. Cox is doing business in Texas, and, on information and belief, has a principal place of business at 1400 Lake Hearn Drive, Atlanta, GA 30319. Cox may be served with process by serving its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

4.     Charter, on information and belief, is a corporation organized under the laws of the State of Delaware. Charter is doing business in Texas, and, on information and belief, has a principal place of business at 12405 Powerscourt Drive, St. Louis, MO 63131. Charter may be served with process by serving its registered agent, Corporation Service Company DBA CSC-Lawyers Incorporating Service Company, 701 Brazos, Suite 1050, Austin, TX 78701.

5.     Comcast, on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast is doing business in Texas, and, on information and belief, has a principal place of business at 1500 Market Street, Philadelphia, PA 19102-2148. Comcast may be served with process by serving its registered agent, Comcast Capital Corporation at 1201 Market Street, Suite 1000, Wilmington, DE 19801.

6.     Comcast Richardson on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Richardson is doing business in Texas, and, on information and belief, has a principal place of business at 1201 Market Street, Suite 1405, Wilmington, DE 19801. Comcast Richardson may be served with process by

2

serving its registered agent, CT Corporation System, 350 North St. Paul St., Dallas, TX 75201.

7.    Comcast Plano on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Plano is doing business in Texas, and, on information and belief, has a principal place of business at 1201 Market Street, Suite 1405, Wilmington, DE 10901. Comcast Plano may be served with process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

8.    Comcast Dallas on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Dallas is doing business in Texas, and, on information and belief has a principal place of business at 1201 Market Street, Suite 1405, Wilmington, DE 19801. Comcast Dallas may be served with process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

## JURISDICTION & VENUE

9.    This is an action for infringement of a United States patent. Accordingly, this action arises under the patent laws of the United States of America, 35 U.S.C. § 1 et. seq. and jurisdiction is properly based on Title 35 United States Code, particularly § 271, and title 28 United States Code, particularly § 1338(a).

10.   Venue is proper in this court under Title 28 United States Code § 1391(b) and 1400(b).

## PATENT INFRINGEMENT COUNT

11.   On July 14, 1992, United States Patent No. 5,130,792 ("the '792 patent") entitled "Store and Forward Video System" was duly and legally issued. A true and correct copy of the '792 patent is attached as Exhibit A. The '792 patent is directed to systems that communicate

3

video programs to subscribers upon request, commonly referred to as video-on-demand (VOD).

12.    Pursuant to 35 U.S.C. § 282, the above-listed United States Patent is presumed valid.

13.    USVO is the owner of the '792 patent.

14.    Time Warner, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Time Warner provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Time Warner has in the past and continues to infringe at least claim 1 of the '792 patent.

15.    Cox, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Cox provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Cox has in the past and continues to infringe at least claim 1 of the '792 patent.

16.    Charter, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Charter provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Charter has in the past and continues to infringe at least claim 1 of the '792 patent.

17.    Comcast, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

18.    Comcast Richardson, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast Richardson provides

4

its subscribers with digital set-top boxes to enable access to the VOD services. By offering

such products and/or services Comcast has in the past and continues to infringe at least claim

1 of the '792 patent.

19.     Comcast Plano, on information and belief, operates digital cable systems in which it provides

video-on-demand (VOD) services to its subscribers. Comcast Plano provides its subscribers

with digital set-top boxes to enable access to the VOD services. By offering such products

and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792

patent.

20.     Comcast Dallas, on information and belief, operates digital cable systems in which it

provides video-on-demand (VOD) services to its subscribers. Comcast Dallas provides its

subscribers with digital set-top boxes to enable access to the VOD services. By offering

such products and/or services Comcast has in the past and continues to infringe at least claim

1 of the '792 patent.

21.     The Defendants' infringement of the '792 patent alleged above has injured USVO and thus,

it is entitled to recover damages adequate to compensate for the Defendants' infringement,

which in no event can be less than a reasonable royalty.

## DEMAND FOR JURY TRIAL

22.     USVO hereby demands a jury trial on all claims and issues triable of right by a jury.

## PRAYER FOR RELIEF

Wherefore, USVO prays for entry of judgment:

A.     that Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson,

Comcast Plano and Comcast Dallas, have infringed one or more claims of the '792 patent;

B.      that Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson, Comcast Plano and Comcast Dallas, account for and pay to USVO all damages caused by the infringement of the '792 patent, which by statute can be no less than a reasonable royalty;

C.      that USVO be granted pre-judgment and post-judgment interest on the damages caused to them by reason of Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson, Comcast Plano and Comcast Dallas's infringement of the '792 patent;

D.      that USVO be granted its attorneys' fees in this action;

E.      that costs be awarded to USVO;

F.      that USVO be granted such other and further relief as the Court may deem just and proper under the current circumstances.

Respectfully submitted,

Date:  August 18, 2006

/s/ Edward W. Goldstein
Edward W. Goldstein
Texas Bar. No. 08099500
GOLDSTEIN, FAUCETT & PREBEG, LLP
1177 West Loop South, Suite 400
Houston, TX 77027
Tel: 713/877-1515
Fax: 713/877-1737
E-mail: cgoldstein@gfiplaw.com

6

T. John Ward, Jr.
State Bar No. 00794818
Law Office of T. John Ward, Jr., P.C.
P.O. Box 1231
Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)
E-mail: jw@jwfirm.com

ATTORNEYS FOR PLAINTIFF

Of Counsel:

GOLDSTEIN, FAUCETT & PREBEG, L.L.P
Corby R. Vowell
Texas Bar No. 24031621
1177 West Loop South, Suite 400
Houston, Texas  77027
(713) 877-1515 – Telephone
(713) 877-1737 – Facsimile

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 18, 2006.  Any other counsel of record will be served by first class U.S. mail.

/s/ Edward W. Goldstein
Edward W. Goldstein

# EXHIBIT N

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORP., | ) ) ) | |
| Plaintiff, | ) ) | Case No.  2-06cv-239 |
| v. | ) ) | Honorable Ron Clark |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS INC.; COMCAST CABLE; COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP | ) ) ) ) ) ) ) ) ) | JURY |
| Defendants. | ) ) ) | |

## COX COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR IN THE ALTERNATIVE, TO TRANSFER VENUE TO THE DISTRICT OF DELAWARE AND BRIEF IN SUPPORT THEREOF

OF COUNSEL:
Matthew B. Lehr
Suong T. Nguyen
Duane Nash
Yiping Liao
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park CA  94025
Telephone:  650-752-2000
Facsimile:  650-752-2111

Mitchell G. Stockwell
Lead Attorney
Georgia Bar No.
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:  404-815-6555

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX  75710-0359
Telephone:  903-597-8311
Facsimile:  903-593-0846
**Attorneys for Cox Communications, Inc.**

# TABLE OF CONTENTS

Page

I.     Undisputed Material Facts ............................................................................. 3

II.    Issues Presented ........................................................................................... 5

III.   Argument ....................................................................................................... 5

     A.     U.S. Video Cannot Sustain Its Burden Of Proving Personal
          Jurisdiction Over Cox .......................................................................... 5

          1.     Cox Has Not Committed a Tortious Act Within Texas and
               Cannot be Subject to Jurisdiction Under Texas' Long Arm
               Statute. ............................................................................... 5

          2.     Cox Has Insufficient Contacts With Texas Under
               Constitutional Due Process Requirements To Support
               General Personal Jurisdiction. ............................................ 6

          3.     Cox is Not Subject to Specific Jurisdiction Because it has
               No Contacts with Texas Related to U.S. Video's Claim. ........... 8

          4.     Actions of Cox's Affiliates Do Not Matter for Personal
               Jurisdiction Purposes. ....................................................... 9

     B.     If Plaintiff May Pursue this Action Against Cox, Delaware is the
          Appropriate Forum .......................................................................... 11

          1.     Cox's Lack of Jurisdictional Contacts Renders Texas an
               Improper Forum for this Action. ....................................... 11

          2.     Delaware is the Proper, More Convenient Forum for
               Resolving Plaintiff's Claims. .............................................. 12

IV.    CONCLUSION ........................................................................................... 13

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995) ...................................... 7

*Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000) ........................ 6

*Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925) .................................... 9

*Carmichael v. United Techs. Corp.*, 835 F.2d 109, 111 (5th Cir. 1988) ......................... 5

*Coastal Plains, Inc.*, 1779 F.3d 197, 205-06 (5th Cir. 1999) ....................................... 12

*Data General Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed.Cir.1996) ........................... 12

*Dunn v. Svitzer*, 885 F. Supp. 980, 987 (S.D. Tex. 1995)............................................. 9

*Entek Corp. v. Southwest Pipe and Supply Co.*, 683 F. Supp. 1092, 1104-05 (N.D.
Tex. 1988)............................................................................................................. 9

*Frito-Lay, Inc. v. Proctor & Gambell Co.*, 364 F. Supp. 243, 250 (N.D. Tex.
1973) ..................................................................................................................... 6

Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metro. Bottling Co.,
785 F. Supp. 514 (E.D. Pa. 1992) ....................................................................... 10

*Hargrave v. Fibre Board Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983) ........................... 9

*Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984) .......... 7

*Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001)................................... 5

*International Shoe Co. v. Washington*, 326 U.S. 310,. 316 (1945) ................................... 8

*J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D. N.Y.
2001) ................................................................................................................... 10

Naxon Telesign Corp. v. GTE Information Sys., Inc., 89 F.R.D. 333 (N.D. Ill.
1980) ................................................................................................................... 11

*Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir.
1998) ..................................................................................................................... 9

*Shaffer v. Heitner*, 433 U.S. 186, 213-14 (1977)......................................................... 7

*Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003)............... 7

Tandy Corp. v. Comus Int'l, Inc., 704 F. Supp. 115 (N.D. Tex. 1987) (Mahon, J.) .................. 5, 7

USA Video Tech. Corp. v. MovieLink LLC, 354 F. Supp. 2d 507, 509-13 (D. Del.
2005) .......................................................................................................................... 3, 4

Von Grabe v. Sprint PCS, 312 F. Supp. 2d 1285, 1301 (S.D. N.Y. 2003) .................................... 10

**Rules**

Fed. R. Civ. P. 15 ........................................................................................................................ 10

Fed. R. Civ. P. 21 ........................................................................................................................ 12

Federal Rule of Civil Procedure 12(b)(2) .................................................................................. 1, 13

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, . <br><br> Plaintiff(s), <br><br> v. <br><br> TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, <br><br> Defendant(s). | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No.:  2-06CV-239 (RC) |

COX COMMUNICATIONS, INC.'S MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION OR IN THE ALTERNATIVE,
TO TRANSFER VENUE TO THE DISTRICT OF DELAWARE
AND BRIEF IN SUPPORT THEREOF

Defendant Cox Communications, Inc. ("Cox") moves to dismiss Plaintiff's claims against

it under Federal Rule of Civil Procedure 12(b)(2) because this Court lacks personal jurisdiction

over Cox.  In the alternative, Cox moves to transfer venue to the District of Delaware, pursuant

to 28 U.S.C. §1404(a).

First, Plaintiff has sued the wrong company.  Cox is a Delaware corporation,

headquartered in Atlanta, Georgia.  Cox only provides services in Georgia.  Cox is not in the

business of providing the video-on-demand services the Complaint alleges infringe Plaintiff's

patent.  Cox does not own or operate and has never owned or operated cable systems in Texas;

does not offer or provide and has never offered or provided video-on-demand services in Texas;

and does not otherwise reside or operate in Texas.  Cox does not have the minimum contacts

with Texas sufficient to support personal jurisdiction and there is thus no basis for this Court to exercise personal jurisdiction over Cox. Therefore, Plaintiff's Complaint should be dismissed with prejudice.

Second, Plaintiff has sued in the wrong forum. Venue over U.S. Video's purported claims against Cox is not appropriate in Texas. Neither Cox nor U.S. Video have ties to Texas that could invoke any local interest. The District of Delaware is the court that has most recently considered and ruled upon key patent claim construction issues that will be raised in addressing U.S. Video's complaint. Venue is proper in Delaware, where plaintiff has previously sued on the patent at issue and where Cox is incorporated. The public interest in judicial economy and avoidance of conflicting decisions thus militates for transfer. Moreover, U.S. Video previously resisted transfer of venue on the ground that Delaware was the appropriate and more convenient venue for litigating the same patent U.S. Video now asserts. Having prevailed in that argument, U.S. Video is estopped from arguing that Delaware would be an inconvenient forum in which to litigate.

Finally, one of Cox's affiliates, CoxCom, Inc. does offer cable communications services, albeit not in Texas. But it is an independent entity and it has long been settled that a subsidiary's contacts with a forum state do not give rise to personal jurisdiction over the parent. Moreover, because CoxCom has initiated a declaratory judgment suit in Delaware, judicial economy warrants transferring this suit to that District. Thus, even assuming Plaintiff's claims can go forward against Cox, they should be transferred to Delaware, the most appropriate forum for this matter.

2

## I.    Undisputed Material Facts

1.    Cox is a diversified broadband telecommunications company, incorporated in Delaware, with a principal place of business in Atlanta, Georgia. (Declaration of John Spalding, attached as Exhibit A, ¶ 2. "Spalding Dec.")

2.    Cox is not registered to do business in Texas. (*Id.*, ¶5.) Cox does not provide cable television or video-on-demand services in Texas. (*Id.*, ¶¶ 4-5.) Cox does not maintain any place of business, does not have offices, and does not keep any corporate books or records in Texas. (*Id.*, ¶3.)

3.    CoxCom, Inc. is an affiliate of Cox that initiated a declaratory judgment action against U.S. Video in the District of Delaware. (Exhibit B.)

4.    Cox's affiliates are party to an Asset Transfer Agreement by which all Texas assets of Cox's affiliates were sold. (*Id.*, ¶ 4.) The sole Texas material asset of the affiliates of Cox that was not transferred was the Henderson, Texas cable television franchise, as to which the city government refused to consent to transfer. The Henderson, Texas cable television franchise does not offer video-on-demand services and is not managed or operated by any of Cox's affiliates, but rather by a third party, under a Management Agreement. (*Id.*, ¶¶ 4-7.)

5.    Plaintiff U.S. Video is a Connecticut corporation, with a principal place of business in Connecticut. (Complaint, ¶ 1.)

6.    In April 2003, U.S. Video filed suit in the District of Delaware contending that video-on-demand services infringed claim 1 of United States Patent No. 5,130,792 ("the '792 patent") entitled "Store and Forward Video System." *See USA Video Tech. Corp. v. MovieLink LLC*, 354 F. Supp. 2d 507, 509-13 (D. Del. 2005) ("Delaware action").

3

7.    Here, U.S. Video likewise contends that Cox provides "video-on-demand" services that infringe claim 1 of the '792 patent. (Complaint, ¶¶ 11-13, 15.)

8.    The Delaware District Court evaluated the parties' evidence, including expert reports on claim construction and the accused technology, and in January of 2005 construed claim 1 of the '792 patent. *USA Video Tech. Corp.*, 354 F. Supp. 2d at 509-11, 514.

9.    The Delaware court grappled with numerous motions, including the following: Motion for Summary Judgment of Non-Infringement Relating to U.S. Video's Infringement Allegations for Which No Support in the Record Exists; Motion for Summary Judgment on Non-Infringement, and Alternative Motion for Summary Judgment of Invalidity; Motion for Summary Judgment of Invalidity under 25 U.S.C. § 112 and to Strike Portions of Expert Report; Motion for Summary Judgment as to the Gunter Article and the '792 Patent's Enablement; and Motion to Exclude or Limit Admissibility of the Expert Reports and Testimony of Richard T. Mihran and Joseph A. Konstan. *USA Video Tech. Corp.*, 354 F. Supp. 2d at 508-09.

10.    The Delaware court found that the language of Claim 1, which describes a "distribution interface" that "initiates connections over the telephone network," requires that the "distribution interface" begin forming the connection.    In other words, a system that involves starting the claimed "connections over the telephone network" by anything other than the claimed "distribution interface," is outside the scope of the '792 patent. *Id.* at 514-15.

11.    The Delaware court's construction, which has been upheld by the Federal Circuit, 2006 U.S. App. LEXIS 14699 (Fed. Cir. June 7, 2006), substantially limited the scope of the rights U.S. Video was purporting to assert and resulted in a finding that MovieLink did not infringe claim 1 of the '792 patent. *Id.* at 515-16.

4

## II.    Issues Presented

1.    Are there sufficient "minimum contacts" between Cox and Texas to confer personal jurisdiction over Cox?

2.    In the alternative, should this case be transferred to the District of Delaware pursuant to 28 U.S.C. § 1404(a)?

## III.    Argument

### A.    U.S. Video Cannot Sustain Its Burden Of Proving Personal Jurisdiction Over Cox

U.S. Video has the burden of establishing that Cox has "minimum contacts" with Texas sufficient to establish personal jurisdiction. *See Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001) (Federal Circuit law controls personal jurisdiction issues and requires plaintiff to show personal jurisdiction over defendant in patent case). U.S. Video cannot meet its burden because (i) Cox has not committed any act that would trigger application of the Texas Long Arm Statute to authorize Plaintiff's service of process on Cox, and (ii) Cox lacks constitutional minimum contacts with Texas.[1]

### 1.    Cox Has Not Committed a Tortious Act Within Texas and Cannot be Subject to Jurisdiction Under Texas' Long Arm Statute.

To establish that the service of process Plaintiff made upon Cox was proper, U.S. Video must show that Cox "engages in business" in Texas and that this proceeding "arises out of the business done in this state and to which [Cox] is a party." Tex. Civ. Prac. & Rem. Code Ann., § 17.044(b) (Vernon 1997). Acts which constitute engaging in business comprise contracting with Texas residents or "commit[ting] a tort in whole or in part in" Texas. *Id.* at § 17.042. *See Carmichael v. United Techs. Corp.*, 835 F.2d 109, 111 (5th Cir. 1988) (service of process

---

[1]    The absence of personal jurisdiction over Cox requires dismissal under Rule 12(b)(2) (lack of personal jurisdiction), but Rule 12(b)(5) (insufficiency of process) also would direct dismissal upon the same grounds. That is because Plaintiff served pursuant to the Texas Long Arm Statute, which requires personal jurisdiction to exist for service to be proper. *E.g., Tandy Corp. v. Comus Int'l. Inc.*, 704 F. Supp. 115, 116 (N.D. Tex. 1987).

5

through secretary of state insufficient where "none of the businesses mentioned has agents or officers in Texas or does business in Texas, nor did the cause of action arise from business dealings in Texas."); *Frito-Lay, Inc. v. Proctor & Gambell Co.*, 364 F. Supp. 243, 250 (N.D. Tex. 1973) ("amenability to service turns on whether a defendant has 'done business' or 'committed a tort' in the forum") (citations omitted).

Here, Cox has done neither. U.S. Video alleges that Cox wrongfully made, imported, used or sold allegedly infringing video-on-demand services. (Complaint, at ¶14.) Cox, however, does not engage in these acts within Texas. (Spalding Decl., ¶¶3, 4.) Cox thus has not committed any tortious act or engaged in any business within Texas from which this action could arise, thereby rendering improper Plaintiff's service of process upon Cox via the Texas Secretary of State.

### 2. Cox Has Insufficient Contacts With Texas Under Constitutional Due Process Requirements To Support General Personal Jurisdiction.

This Court's personal jurisdiction over a non-resident corporate defendant such as Cox is appropriate only if authorized by the Texas Long Arm Statute, which has been construed to be coextensive with constitutional due process requirements. *See Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (Vernon 1997). This Court thus must determine (1) if Cox has "purposefully availed [it]self of the benefits and protections" of Texas by establishing "minimum contacts" with Texas; and (2) whether exercising jurisdiction over Cox would "offend 'traditional notions of fair play and substantial justice.'" *Alpine View Co.*, 205 F.3d at 215 (citations omitted).

In evaluating "minimum contacts," the Court may look both to evidence of minimum contacts that would support specific personal jurisdiction – that is, contacts that are related to the subject matter of the litigation, and the more extensive contacts that would support general

6

jurisdiction – contacts that are unrelated to the instant cause of action. *See Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003) (evidence of substantial, systematic, continuous contacts with the forum state may support general jurisdiction ); *Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995) (evidence to support specific jurisdiction includes defendant's activities purposefully directed at the forum, out of which the cause of action arises). Here, U.S. Video has shown no facts sufficient to support either general or specific jurisdiction.

General jurisdiction exists when a court exercises jurisdiction in an action not arising out of Cox's specific contacts with Texas. *Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984). The Court explained that for causes of action unrelated to forum activities, jurisdiction may be proper "when there are sufficient contacts between the State and the foreign corporation." *Id.* at 414. Only the presence of substantial, regular and systematic contacts that are qualitatively different from contacts sufficing for specific jurisdiction allow a defendant to foresee being haled before a Texas court. For example, property ownership does not establish general jurisdiction. *Shaffer v. Heitner*, 433 U.S. 186, 213-14 (1977). Nor does purchasing or selling products within the state alone establish general jurisdiction. *Helicopteros*, 466 U.S. at 418.

Cox is a Delaware corporation that is not registered or even qualified to do business in Texas because it does none here. (Spalding Decl., ¶3.) Cox does not provide services to any customers in Texas. (*Id.*) Cox does not operate or maintain offices or even books or records in Texas. (*Id.*) This case is like the patent case in *Tandy Corp. v. Comus Int'l, Inc.*, 704 F. Supp. at 118-19 (N.D. Tex. 1987, in which the court concluded that it lacked general jurisdiction over a defendant who lacked the kinds of qualitative minimum contacts required by the Supreme Court to satisfy Constitutional due process. The defendant Comus did not lease or own Texas property,

7

was not licensed to do business in Texas, and maintained no bank accounts, phone listings, or employees here. *Id.* Like Comus, Cox has no "continuous and systematic general business contacts" with Texas.

U.S. Video has not alleged any facts relevant to personal jurisdiction, aside from the conclusory (and erroneous) allegation that "Cox is doing business in Texas."[2]    (Complaint, at ¶3.) In fact, Cox is <u>not</u> doing business in Texas and has neither the "substantial, systematic, and continuous contacts" that would support general jurisdiction nor the specific, litigation-related contacts that would support specific personal jurisdiction. Cox does not have any property, offices, employees, records, or other assets in Texas. Cox does not offer, sell, or otherwise provide any telecommunications services in Texas, much less digital cable systems services or "video-on-demand" services. *See generally*, Spalding Declaration, Exhibit A. Cox's minimal contacts with Texas are <u>not</u> such that maintenance of U.S. Video's suit would "not offend traditional notions of fair play and substantial justice," because Cox could <u>not</u> reasonably have anticipated being haled into Texas court. *International Shoe Co. v. Washington*, 326 U.S. 310,. 316 (1945) (internal quotation omitted). In short, no substantial contacts between Texas and Cox exist to make reasonable the exercise of personal jurisdiction over Cox.

### 3.    Cox is Not Subject to Specific Jurisdiction Because it has No Contacts with Texas Related to U.S. Video's Claim.

U.S. Video likewise cannot carry its burden of establishing minimum contacts necessary to show specific personal jurisdiction because it cannot show any contacts between Cox and Texas that are related to its claims. Only by meeting three requirements can such specific

---

[2]    According to U.S Video, Cox is "organized under the laws of the State of Delaware . . .is doing business in Texas . . and has a principal place of business in Atlanta, GA," Complaint at ¶3, and that Cox "operates digital cable systems in which it provides video-on-demand (VOD) services . . . [and] provides its subscribers with digital set-top boxes to enable access to the VOD services." *Id.* at ¶15.

jurisdiction be shown.  First, the defendant must have "'purposefully directed' its activities at

residents of the forum." *Inamed*, 249 F.3d at 1356.  Second, the claim must "'arise[] out of or

relate[] to' the defendant's activities within the forum." *Id.*  Third, the exercise of personal

jurisdiction must be reasonable and fair. *Id.*  None of these requirements can be shown here.

Undoubtedly, using the accused video-on-demand services within Texas could show that

Cox purposefully directed its actions toward Texas residents.  But Cox does not offer such

services in Texas – and neither have any of its affiliates. (Spalding Decl., ¶¶ 3,6,7.)  U.S. Video

thus cannot demonstrate any facts that could meet its burden of showing that its claims to arise

out of or relate to Cox's alleged, but unproven, actions in Texas.  As a result, there can be no

specific personal jurisdiction.

### 4.    Actions of Cox's Affiliates Do Not Matter for Personal Jurisdiction Purposes.

Cox does not do business in Texas.  (Spalding Decl., ¶3.)  It is settled law that the

activities of Cox's affiliated companies, some of which have done business in Texas, are

irrelevant to determining whether Cox has sufficient contacts with Texas to support jurisdiction.

*See Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925) (subsidiary's acts in North

Carolina not imputed to parent for jurisdictional purposes); *Phonometrics, Inc. v. Northern

Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998) (Sprint not subject to jurisdiction in Florida

despite activities of its United Telephone subsidiary); *Hargrave v. Fibre Board Corp.*, 710 F.2d

1154, 1159 (5th Cir. 1983) ("Generally, a foreign parent corporation is not subject to the

jurisdiction of a forum state merely because its subsidiary is present or doing business there.");

*Dunn v. Svitzer*, 885 F. Supp. 980, 987 (S.D. Tex. 1995) ("As long as a parent and subsidiary

maintain separate and distinct corporate entities, the presence of one in the forum may not be

attributed to the other."); *Entek Corp. v. Southwest Pipe and Supply Co.*, 683 F. Supp. 1092,

1104-05 (N.D. Tex. 1988) (no jurisdiction over parent corporation for subsidiaries' acts in Texas

9

in the absence of an allegation of a lack of formal separation between parent and subsidiaries and absence of greater control than "normally associated with common ownership and directorship"). Cox and its affiliates share the same name and webpage, but that is insufficient where the Federal Circuit has cautioned in this context that "the corporate form is not to be lightly cast aside." *3D Sys.*, 160 F.3d at 1380-81 (no jurisdiction over out-of-state parent company of alleged infringer). *See also, e.g., Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1301 (S.D. N.Y. 2003) (subsidiary Sprint Spectrum L.P.'s use "Sprint" trade name "was not a sufficient basis for establishing personal jurisdiction" over its parent); *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D. N.Y. 2001) (parent's failure to distinguish between itself and subsidiary on webpage and in annual report did not support exercise of personal jurisdiction).

Here, as noted, Plaintiff has simply sued the wrong party. Cox is not responsible for its affiliates' actions and Plaintiff cannot point to the affiliates' contacts to justify this action. U.S. Video has not even alleged, and cannot show, that there is anything other than a normal parent-subsidiary relationship between Cox and its affiliates. It thus cannot ignore the corporate forms.

Moreover, Plaintiff cannot now amend its complaint to add such affiliates – especially where one of Cox's affiliates has already initiated a declaratory judgment action in Delaware, the most appropriate forum for resolving this dispute. *See* Exhibit B. Even if an amendment were sought or allowed, however, such an amendment would not relate back to the filing of plaintiff's original Complaint under Fed. R. Civ. P. 15 because plaintiff could (and should) have known for some time about these others yet purposefully chose not to name them. *See, e.g., Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metro. Bottling Co.*, 785 F. Supp. 514, 516 (E.D. Pa. 1992) (no relation back under Rule 15(c) because "an amendment should relate back only where there has been an error made concerning the identity of the proper party" and

the proposed defendant may have believed plaintiff made a deliberate choice rather than a mistake); *Naxon Telesign Corp. v. GTE Information Sys., Inc.*, 89 F.R.D. 333, 337-38 (N.D. Ill. 1980) (filing of patent infringement action against corporate parent did not relate back to original complaint against the parent's subsidiary).

**B.    If Plaintiff May Pursue this Action Against Cox, Delaware is the Appropriate Forum.**

Cox joins and incorporates by reference herein the motion for transfer filed by Defendant Comcast on August 10, 2006.  (Docket Entry No. 18)  Cox's case for transfer is, however, even stronger, given that Cox does nothing in Texas, much less anything relevant to the subject-matter of this case.  There are thus no local interests to counter the clear public interest in efficient and consistent resolution of claims.  The convenience of the parties, neither of which resides or does business in Texas, clearly favors transfer.  Moreover, U.S. Video is estopped by its own sworn assertions in the MovieLink matter from contesting that Delaware is an appropriate and convenient forum.

**1.    Cox's Lack of Jurisdictional Contacts Renders Texas an Improper Forum for this Action.**

Venue in patent suits is proper a) where the defendant resides, which for corporate defendants includes any forum in which they are amenable to personal jurisdiction, or b) where the defendant has infringed and has a regular and established place of business.  28 U.S.C. §§ 1391, 1400.  Cox is not subject to personal jurisdiction in Texas and has no place of business there.  *Supra.*  Cox is, however, subject to personal jurisdiction in Delaware because it is incorporated there.  (Complaint at ¶6.)  Delaware, therefore, is the proper forum for Plaintiff's suit.

US2000 9429628.2

**2.     Delaware is the Proper, More Convenient Forum for Resolving Plaintiff's Claims.**

As stated, Cox has done nothing that would support Plaintiff's claims for infringement. Even if Plaintiff were able to pursue this action against Cox, and even if jurisdiction and venue were proper, this Court may, "[f]or the convenience of parties and witnesses [and] in the interest of justice," transfer this action "to any other district . . . where it might have been brought." 28 U.S.C. § 1404(a). This provision and the Federal Rules allow for severing and transferring a cause of action against one defendant to a different forum while maintaining plaintiff's action against other defendants in the original forum. *See* Fed. R. Civ. P. 21 ("Any claim against a party may be severed and proceeded with separately."). At minimum, given the absence of contacts with Texas and in light of the "public and private interest factors" discussed in Comcast's motion, the Court should transfer Plaintiff's claim against Cox to the District of Delaware.

Comcast's motion demonstrated numerous grounds for transfer. In addition, the propriety of transfer is further buttressed by U.S. Video's previous insistence in the *MovieLink* litigation that the District of Delaware was the appropriate venue in which to bring its infringement claims based on the '792 patent, because the District of Delaware was its "home district." When a party has succeeded in obtaining a ruling on the basis of its factual and legal arguments, that party may not turn to a different court and seek an inconsistent advantage by pursuing an incompatible argument. *See Data General Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed.Cir.1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed"), *In re Coastal Plains, Inc.*, 1779 F.3d 197, 205-06 (5th Cir. 1999) (equitable doctrine of judicial estoppel precludes a litigant from

US2000 9429628 2

taking inconsistent positions in successive litigations); *see also* Wright & Miller, 18B Fed. Prac. & Proc. Juris.2d § 4477 (discussing judicial estoppel or "preclusion of inconsistent positions").[3] Indeed, U.S. Video should be judicially estopped from taking any inconsistent position concerning venue in Delaware. Because the Delaware court ruled in favor of U.S. Video and denied MovieLink's motion to transfer, see Order of January 9, 2004, attached as Exhibit C, U.S. Video may not now turn to this Court and assert inconsistent venue arguments.

## IV.    CONCLUSION

For the reasons stated above, the Court should grant Cox Communications, Inc.'s Motion to Dismiss For Lack of Personal Jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). Alternatively, the Court should transfer this matter to the District of Delaware, pursuant to 28 U.S.C. § 1404(a).

Respectfully submitted, this 14th day of August, 2006.

OF COUNSEL:
Matthew B. Lehr
Suong T. Nguyen
Duane Nash
Yiping Liao
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park CA  94025
Telephone:  650-752-2000
Facsimile:  650-752-2111

/s/
Mitchell G. Stockwell
Lead Attorney
Georgia Bar No. 682912
KILPATRICK STOCKTON LLP
1100 Peachtree St NE
Suite 2800
Atlanta GA  30309-4530
Telephone:  404-815-6214
Facsimile:   404-815-6555

---

[3]    Judicial estoppel protects the finality of decisions and promotes consistency of disposition by preventing a party from "playing fast and loose" with the judicial system and taking contradictory positions to serve its self interests. *See Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988).

13

Michael Edwin Jones
POTTER MINTON PC
110 N. College, Suite 500
P.O. Box 359
Tyler, TX 75710-0359
Telephone: 903-597-8311
Facsimile: 903-593-0846

**Attorneys for Cox Communications, Inc.**

14

## CERTIFICATE OF CONFERENCE

This is to certify that Candice C. Decaire, counsel for Defendants Cox Communications, Inc., has conferred with Edward Goldstein, counsel for Plaintiff, regarding the matters included in this motion. Counsel for Plaintiff states that this motion is OPPOSED.

/s/
Candice C. Decaire

15

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORP., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2-06cv-239 |
| v. | ) ) | Honorable Ron Clark |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS INC. COMCAST CABLE; COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP | ) ) ) ) ) ) ) ) | JURY |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 14th day of August, 2006. Any other counsel of record will be served by first class mail.

_____/s/_____
Mitchell G. Stockwell

16

US2000.9429628.1

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA Video Technology Corporation, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No.2:06-cv-239 RHC |
| | § | |
| TIME WARNER CABLE, INC.; COX | § | |
| COMMUNICATIONS, INC.; | § | |
| CHARTER COMMUNICATIONS, | § | **JURY TRIAL DEMANDED** |
| INC.; COMCAST CABLE | § | |
| COMMUNICATIONS, LLC; | § | |
| COMCAST OF RICHARDSON, LP; | § | |
| COMCAST OF PLANO, LP; | § | |
| COMCAST OF DALLAS, LP | § | |
| | | |
| Defendants | | |

**OPPOSITION TO COX COMMUNICATIONS, INC.'S MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION, OR, IN THE ALTERNATIVE, TO
TRANSFER VENUE TO THE DISTRICT OF DELAWARE**

Plaintiff USA Video Technology Corporation ("USVO") hereby files this

Opposition to Cox Communications, Inc.'s ("Cox") Motion to Dismiss for Lack of

Personal Jurisdiction, or, in the Alternative, to Transfer Venue to the District of

Delaware.

**I.   SUMMARY OF THE CASE**

Cox essentially advances three arguments in its Motion to Dismiss, or in the

alternative, To Transfer Venue to the District of Delaware.  First and foremost, Cox

argues that USVO has sued the wrong party for infringing United States Patent No.

5,130,7092 ("the '792 patent).  Cox argues that it is its wholly-owned subsidiary,

Coxcom, Inc. ("Coxcom"), not the parent company, that provides the "video-on-demand"

1

services that USVO has alleged infringe its patent. Secondly, Cox argues this case

should be dismissed due to lack of jurisdiction as to both Cox and Coxcom because

neither party does business in Texas. Thirdly, Cox argues that even if this Court does not

see fit to dismiss this action, this action should be transferred to Delaware.


## II.    RESPONSE TO LIST OF UNDISPUTED MATERIAL FACTS

1. Undisputed

2. Can not respond to this fact without additional discovery. USVO
   believes it necessary to take a 30(b)(6) deposition to glean the full
   extent of Cox's business dealings in Texas. USVO is unable to give a
   time schedule for this hearing since no case management plan has been
   entered by the Court.

3. Undisputed

4. Can not respond to this fact without additional discovery. USVO
   believes it necessary to take a 30(b)(6) deposition to glean the full
   extent of Cox's business dealings in Texas. Some of the business
   deals referred to in Paragraph 4 are quite recent and USVO has not
   been able to confirm or deny the truth of the allegations. USVO is
   unable to give a time schedule for this hearing since no case
   management plan has been entered by the Court.

5. Undisputed

6. Disputed. USVO disputes Cox's characterization that USVO contends
   that video-on-demand services in general infringe claim 1 of the '792

2

patent. In the 2003 suit in Delaware, cited in Paragraph 6, USVO alleged that the Movielink system specifically infringed claim 1 of the '792 patent.

7.   Undisputed

8.   Disputed. Again USVO dispute's Cox's characterization of the prior lawsuit. In that suit, the Court construed only one word in claim 1 of the '792 patent. The parties disputed other claim terms, but the Court declined to rule on those constructions. (Memorandum Opinion entered 1-31-05)

9.   Disputed. While each Motion cited in Paragraph 9 was filed before the Court, it ruled only on one motion.

10. Disputed. USVO does not dispute that the Delaware Court held that "initiates" means "begins." USVO disagrees with Cox's summary of the rest of the claim. The Court declined to construe any additional terms in Claim 1. The rest of the claim is therefore given its plain and ordinary meaning. See claim 1 of the '792 patent.

11. Disputed. USVO disputes the assertion that "the Court substantially limited the scope of rights U.S. video was purporting to assert." The Court's only determination was that Movielink's particular system didn't fall within the scope of claim 1 of the '792 patent.


III.   ISSUES PRESENTED

1.   Are there sufficient "minimum contacts" with the state of Texas to

confer personal jurisdiction over Cox?

2. After evaluating the private and public factors, does the scale tip so
   heavily in favor of transfer as to upset the Plaintiff's choice of forum.

## IV.    ARGUMENT OPPOSING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A. USVO Has Added Coxcom As a Party Based On Cox's Representations

Cox argues in its Motion to Dismiss that its affiliate CoxCom would be the proper

party in a lawsuit to determine whether Cox's video-on-demand service infringes

Plaintiff's patent. Based on that representation, USVO has filed, concurrent with this

Opposition, a Second Amended Complaint that adds CoxCom as a Defendant in this suit.

### B. Cox Meets *International Shoe* Standards for Personal Jurisdiction in the Eastern District of Texas

### 1. Public Documents Show Cox Does Business in Texas

The seminal case on personal jurisdiction, *International Shoe Co. v. Washington*,

326 U.S. 310 (1945), set the standard of "minimum contacts such that the maintenance

of the suit does not offend 'traditional notions of fair play and substantial justice." Id. at

316. The first "minimum contacts" prong of the due process inquiry focuses on whether

the defendant "has purposefully directed his activities at residents of the forum and the

litigation results from alleged injuries that arise out of or relate to those activities."

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471 (U.S. 1985). The second prong of

"fair play and substantial justice" gives the defendant an opportunity to "present a

compelling case that the presence of some other considerations would render jurisdiction

unreasonable." Id. at 476-77. In the first prong, the burden of proof is on the plaintiff to

4

establish "minimum contacts." However, in the second prong, the burden of proof is on

the defendant to demonstrate the presence of other considerations that render the exercise

of jurisdiction unreasonable. *Akro Corp. v. Luker*, 45 F.3d 1541, 1546 (Fed. Cir. 1995).

In its brief, Cox admits, at the very least, that it still owns a cable television

franchise in Henderson, Texas.  That franchise is listed as Cox Communications, 109

North High Street, Henderson, Texas, 75652.  Secondly, a company press release dated

March 10, 2005, listed several U.S. markets, 12 of those being in Texas cities (see

Exhibit A).

Additionally, Cox Communications is listed by the Texas Secretary of State as

having affiliates in Texas.  See Exhibit B, listing Cebridge Telecom Tx., L.P. Cablevision

of Pflugerville, Inc., Cablevision of Leander, Inc., Cox Cable Midland, Inc., Cox

Communications (Dallas), Cox Communications (Irving), Cox Communications (Austin).

Cox Communications is listed as having ownership of mineral rights by the City

of Lubbock.  And Conroe Cable TV, an affiliate of Cox Communications, is listed as

owning property in Conroe, Tx.  See Exhibit B.

Furthermore, searches found Coxcom doing business as TCA Communications,

LLC, a Texas corporation, Texas Community Antennas, Inc., TCA Management

Company and MT Associates, Inc.  See Exhibit C

These ties satisfy the first prong of the test, proving that, at a bare minimum, Cox

has set out to do business with and derived income from residents of Texas so that

maintenance of this suit would not offend notions of fair play and justice.  Cox has thus

far failed to meet its burden of proving that jurisdiction is unreasonable.

**2. Cox Has Not Argued Jurisdiction in Other Texas Lawsuits**

Cox is the named Defendant – along with CoxCom – in four other Texas suits, three of those in the Eastern District.[1]  In at least one of those cases (also alleging patent infringement), case no. 2:05cv318, filed in Marshall, Texas, Coxcom specifically did not contest jurisdiction in the Eastern District of Texas.  (See Page 19, Paragraph 3 of Defendant Coxcom, Inc.'s Answer and Counterclaim, attached hereto as Exhibit D).   It is not possible for Cox, or Coxcom to have enough ties to remain in the Eastern District for the purposes of one suit, but not enough for another.   A Defendant should not be allowed to pick and choose when to contest jurisdiction.

### C. USVO Should Be Allowed Some Discovery As To The Extent of Cox's Ties to Texas

If this Court is not persuaded by Exhibits A-C detailing Cox's business dealings with Texas, USVO asks for leave of Court to conduct discovery directed at this jurisdiction issue.  While Cox alleges in its undisputed facts (Page 3, Paragraph 4) that an Asset Transfer Agreement eliminated most of its Texas holdings, it has not provided Plaintiff or the Court with that agreement.  In Exhibit A of its Motion to Dismiss, John Spaulding testifies via declaration that the Asset Transfer Agreement was executed on October 31, 2005, less than one year ago.  USVO has not been provided with any documentation, but has been forced to rely solely on public records in making its jurisdictional allegations.

### V.    ARGUMENT OPPOSING TRANSFER

---

[1] In the Eastern District of Texas, Cox is a named Defendant in *Rembrandt Technologies, LP v. Charter Communications, Inc. et al.* cause no. 2:06cv223; *Fogent Networks, Inc. v. Echostar Communications Corp. et al,* cause no. 2:05cv318; and *Fogent Networks, Inc. v. Echostar Communications Corporation et al* cause no. 6:06cv208.  Cox is also a Defendant in the Northern District of Texas in *Fogent Networks, Inc. et. al. v. Echostar Communications Corp. et al.* cause no. 3:06mc50.

Cox joined and incorporated by reference the arguments advanced by the

Comcast Defendants in their Motion To Transfer.  The Comcast Motion was based on

three premises: (1) This suit would be more convenient in Delaware; (2) Delaware

District Court Judge Kent A. Jordan has already construed the claims of U.S. Patent No.

5,130,792 ("the '792 Patent), which was at issue in the earlier case involving Defendant

Movielink LLC and this current case, and (3) related cases (asking for declaratory

judgments of non-infringement of the '792 patent) are already pending in Delaware.   In

addition, Cox argues that its lack of jurisdictional contacts renders Texas an improper

forum.  None of these factors warrants transfer.

## A.  Plaintiff's Choice of Forum Should Rarely Be Disturbed

USVO does not dispute the premise that this suit could have been brought in

Delaware and that Delaware would be an appropriate forum.  However, it strongly

disagrees with the notion that public and private factors favor upsetting Plaintiff's choice

of forum by transferring this case to Delaware.

While Plaintiff's forum choice by itself is not conclusive or determinative, it

should only be disturbed if Defendant can show that the balance is strongly in favor of

transfer. *Symbol Techs. v. Metrologic Instruments, Inc.*, 2006 U.S. Dist. LEXIS 55099

(E.D. Tex. 2006), citing *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F. 2d

821, 828 (5th Cir. 1986).  The movant bears the burden of proof in demonstrating that

transfer is warranted. *Z-Tel Communs., Inc. v. SBC Communs. Inc., v. SBC Communs.,*

*Inc.* 331 F. Supp. 2d 567, 570 (E.D. Tex. 2004)

## B.  Weighing of Interests Favors Keeping This Case in The Eastern
## District of Texas

In order to favor transfer, the Defendant(s) must convince the Court that a

7

weighing of public and private factors strongly favors transfer.  These factors include

the relative ease of access to the sources of proof;  the cost of obtaining attendance of

witnesses and other trial expenses; the place of the alleged wrong; and  the possibility of

delay and prejudice if granted. Id. at 571, quoting *Mortensen v. Maxwell House Coffee

Co.*, 879 F. Supp. 54, 56 (E. D. Tex. 1995); See also *Walter Fuller Aircraft Sales v.

Republic of Philippines*, 965 F.2d 1375, 1389 (5th Cir. 1992)). Additionally, the court

should consider the public interest factors of: 1) the relative backlog and other

administrative difficulties in the two jurisdictions; 2) the fairness of placing the burdens

of jury duty on the citizens of the state with the greater interest in the dispute; 3) the local

interest in adjudicating local disputes; and 4) the appropriateness of having the case in a

jurisdiction whose law will govern the dispute in order to avoid difficult problems in

conflicts of laws. *Id.*

### 1. Delaware Judge is Not Expected to Hear This Case, So Familiarity With the Patent/Issues is a Moot Argument

Many of the arguments supporting Cox's Motion to Transfer[2] revolve around the

idea that Judge Jordan is already familiar with the patent and has already construed the

claim in a Markman hearing.  This argument fails to be persuasive for several reasons,

including the fact that Judge Jordan has recently been nominated to the U.S. Court of

Appeals for the Third circuit.  If this case were transferred to Delaware, it is highly

unlikely that Judge Jordan would be the one to hear this case, and his colleagues on the

bench in Delaware are no more familiar with the '792 patent than is this Court.

The Comcast Defendants also rely heavily on the fact that Judge Jordan

conducted a Markman hearing in the earlier case against Movielink.  In that case, Judge

---

[2] As incorporated by reference from the Comcast Defendant's Motion to Transfer.  For the remainder of this brief, USVO will refer to the points made by the Comcast Defendants in their brief.

Jordan eventually construed one word – "initiate."   While Defendants seem worried that a second Markman would be a waste of judicial time and resources, they can rest assured that this Court will not have to duplicate any prior efforts unless it sees fit to do so since USVO is precluded under the theory of collateral estoppel from offering any alternative construction than the one already adopted by one court. *Tex. Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 585-586 (E. D. Tex. 2002).   Furthermore, since the Delaware Court construed only one word from one claim, it is expected that another Markman hearing will be necessary no matter which court tries this case.

To further their argument about conserving judicial resources, the Comcast Defendants point out that the District of Delaware currently has jurisdiction over three Declaratory Judgment lawsuits (asking the Court find no infringement of the '792 patent) filed against USVO by the same Defendants that appear in this suit.   USVO has filed Motions to Dismiss, Stay or Transfer in each of those three actions.   Those Motions are based on the fact that this action was pending in the Eastern District of Texas prior to the filing of those Declaratory Judgment suits.   Those suits never should have been brought.   Instead, the proper action would be to have those issues litigated as defenses and/or counterclaims in this suit.

And while the Northern District of Texas did express a willingness to stay or transfer a patent case to another district where a second-filed action sat, the Court's reasoning for doing so makes it distinguishable from this matter.   See *Taylor v. Ishida Co.*, 2002 U.S. Dist. LEXIS 9916 (D. Tex. 2002).   In *Taylor*, the Court held "This court can defer to a second-filed action when, as here, the judge in the subsequent case has extensive prior experience concerning the patent-in-suit." Id.   Again, this reasoning

becomes moot as soon as Judge Jordan leaves the District of Delaware to take a seat on

the Third Circuit of Appeals. This is expected to happen before his "extensive prior

experience concerning the patent-in-suit" will be of any use to this litigation. In addition,

as noted earlier, while the patent is the same, the technology is quite different, thus any

court that hears this case will have to become familiar with the technology practiced by

these Defendants. USVO believes that the Eastern District of Texas is as capable of

doing so as the District of Delaware.

### 2. Eastern District Will Have to Hear At Least One Suit

It should also be noted that this suit involves four distinct defendants: Time

Warner Cable, Cox Communications, Charter Communications and the Comcast

Defendants. Only three of the Defendants filed declaratory judgments in Delaware. The

same three filed motions to transfer. Charter Communications did neither. In addition,

Time Warner Cable has not filed a Motion to Transfer. Therefore, at a minimum,

USVO's suit against Charter Communications and Time Warner Cable will go forward in

the Eastern District of Texas regardless of its rulings on transfer for the other defendants.

The Eastern District of Texas will be forced to become familiar with the patent and

technology and will have to conduct a Markman hearing. Hence, contrary to what the

Comcast Defendants have argued, it would in fact be more judicially economic and

efficient to deny transfer and keep all defendants in Texas.

### 3. Eastern District of Texas Is Favorable Venue For Efficient Patent Litigation

Defendants accuse USVO of "forum shopping" in its selection of the Eastern

District of Texas in which to file suit. All Plaintiffs engage in some degree of forum

shopping when they file a suit. As the Eastern District pointed out in Z-Tel, "it seems

quite logical that a plaintiff would hope for favorable outcome for its lawsuit." *Z-Tel*

*Communs.* At 572.  In *Z-Tel*, the Eastern District of Texas enumerated several factors

that are legitimate reasons to choose a forum.  "A court may be selected because its

docket moves rapidly, its discovery procedures are liberal, its jurors are generous, the

rules of law applied more favorable, or the judge who presides in that forum is thought

more likely to rule in the litigant's favor." Id. quoting  *In re Triton Secs. Litig.*, 70 F.

Supp. 2d 678, 689 (D. Tex. 1999).   USVO chose the Eastern District of Texas for many

of the same reasons enunciated recently by the attorney for Symbol in *Symbol Techs.*

LEXIS 55099 at *7-8.

> Frankly, there's nothing like the patent rules up in New York. . . .
> . . . [J]ust the fact that we have the early disclosures of infringement
> positions; we've got the claim charts underway; we're going to get that
> to them, you know, promptly; the requirement of having their
> invalidity contentions to us promptly, those are things we don't have in
> other courts. . . .
> . . . And so it will save us time, it will save us money, and it will much
> more likely lead to a prompt determination, respectfully, Your Honor,
> if you keep the case. . .
> . . . I try patent cases all over the country. And when we get before a
> judge-and obviously they all work hard and mean well and want to do
> the best-that doesn't understand patents or doesn't like patent cases, it's
> -- it takes years longer; it's much [*8]  more expensive; there are no
> procedures in place to make it work efficiently.

*Symbol Techs.* LEXIS 55099 at *7-8.  In his holding in that case, Judge Davis said

Symbol's most convincing argument focuses on "the interest of justice and that the most

convenient district is the district which would provide the parties and judicial system with

the most efficient and least expensive resolution of the case."  Id at *9.  The District of

Delaware averaged 23.5 months from filing to trial last year.  The Eastern District of

Texas, on the other hand, averaged a mere 15.9 months.[3]  In its own Motion, the Comcast

---

[3] Federal Court Management Statistics as detailed on www.uscourts.gov

Defendants point out that the Movielink case, which was disposed of at the summary judgment stage, consisted of "several years of discovery and a Markman hearing." The Eastern District of Texas - with rules regarding early disclosure of infringement positions, claim charts and Markman hearings - will not allow a case to drag on in that manner, which causes undue burden and financial stress on all parties.

### 4. Comcast Makes No Argument that The Private Interests Favor Transfer

Comcast makes no arguments regarding the relative ease of access to proof, the availability of witnesses, the cost of attendance for witnesses or any other practical problem related to trial in the Eastern District of Texas versus trial in Delaware. Therefore, this Court should assume that these are non-factors. In fact, with Defendants' having principal places of business in New York (TimeWaner), Georgia (Cox), Missouri (Charter) and Pennsylvania and Delaware (Comcast Defendants), there is no single forum that would afford all parties relative ease to proof, availability of witnesses and a low cost of attendance for witnesses.

### VI.    CONCLUSION

USVO has proven that Cox has enough ties to meet the minimum standard enunciated in *International Shoe* to confer jurisdiction in the Eastern District of Texas. In addition, this Court has found that the Plaintiff's desire to achieve the most efficient and least expensive resolution of the case is a good reason for choosing a particular forum. That choice of forum should only be upset if the movant makes a convincing showing that a weighing of private and public factors favors transfer. Cox has not succeeded in meeting this burden and this case should continue to go forward in the

Eastern District of Texas.


Respectfully submitted,


Date: August 28, 2006                    /s/ Edward W. Goldstein
                                         Edward W. Goldstein
                                         Texas Bar. No. 08099500
                                         GOLDSTEIN, FAUCETT & PREBEG, LLP
                                         1177 West Loop South, Suite 400
                                         Houston, TX 77027
                                         Telephon: 713/877-1515
                                         Fax: 713/877-1737
                                         E-mail: egoldstein@gfpiplaw.com

                                         T. John Ward, Jr.
                                         State Bar No. 00794818
                                         Law Office of T. John Ward, Jr., P.C.
                                         P.O. Box 1231
                                         Longview, Texas 75606-1231
                                         (903) 757-6400 (telephone)
                                         (903) 757-2323 (facsimile)
                                         E-mail: jw@jwfirm.com
                                         ATTORNEYS FOR PLAINTIFF

Of Counsel:

GOLDSTEIN, FAUCETT & PREBEG, L.L.P
Corby R. Vowell
Texas Bar No. 24031621
1177 West Loop South, Suite 400
Houston, Texas 77027
(713) 877-1515 – Telephone
(713) 877-1737-Facsimile
E-mail: cvowell@gfpiplaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 28, 2006. Any other counsel of record will be served by first class U.S. mail.

/s/ Edward W. Goldstein
Edward W. Goldstein

# EXHIBIT P

**UNITED STATES DISTRICT COURT**
**FOR THE FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | ) ) ) | |
| Plaintiff(s), | ) ) ) | |
| v. | ) ) ) | |
| TIME WARNER INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP, | ) ) ) ) ) ) ) ) ) | Case No.: 2-06CV-239(RHC)  JURY TRIAL DEMANDED |
| Defendant(s). | ) ) ) ) ) | |

**THE COMCAST DEFENDANTS' MOTION TO TRANSFER TO THE DISTRICT OF**
**DELAWARE PURSUANT TO 28 U.S.C. 1404(a) OR, IN THE ALTERNATIVE,**
**TO STAY THE ACTION, AND BRIEF IN SUPPORT THEREOF**

Defendants Comcast Cable Communications, LLC; Comcast of Richardson, LP; Comcast of Plano, LP; and Comcast of Dallas, LP (collectively, the "Comcast Defendants") hereby move the Court pursuant to 28 U.S.C. Section 1404(a) to transfer this action from the United States District Court for the Eastern District of Texas to the United States District Court of Delaware (the "Delaware District Court"), or, in the alternative, to stay this action pending resolution of related proceedings in Delaware.

**SUMMARY OF THE CASE**

This is an action for alleged infringement of U.S. Patent No. 5,130,792 (the " '792 Patent"), owned by plaintiff USA Video Technologies, Inc. ("Plaintiff" or "USA Video"). The '792 Patent is allegedly "directed to systems that communicate video programs to subscribers upon request, commonly referred to as video-on-demand (VOD)." Complaint ¶ 11. Only five days before filing this lawsuit against the Comcast Defendants, USA Video lost its appeal of a Delaware District Court decision which construed the term "initiates" in Claim 1 of the '792 Patent and granted

1

1  summary judgment on non-infringement in favor of Movielink, a provider of VOD services. See

2  USA Video Tech. Corp. v. Movielink LLC, 354 F. Supp. 2d 507 (D. Del. 2005), aff'd 2006 U.S.

3  App. LEXIS 14699 (Fed. Cir. June 7, 2006). Construction of Claim 1 of the '792 Patent, including

4  the same language already construed against USA Video by the Delaware District Court, will be a

5  central issue in this action.

6        Rather than commence this action before the same Delaware District Court already familiar

7  with the '792 Patent and the VOD technology at issue, USA Video instead chose a forum where

8  none of the parties reside. None of the parties – not even USA Video – is organized under the laws

9  of the State of Texas, but rather, under the laws of Connecticut (USA Video) and Delaware (all

10 defendants). Nor do any of the parties, including USA Video, have a principal place of business in

11 Texas.[1] Indeed, USA Video has not operated in Texas since it shut down its Texas-based

12 subsidiary in 1995. See Declaration of Suong Nguyen dated August 10, 2006 (the "Nguyen

13 Decl."), at ¶ 11 and Ex. F.

14        The only logical explanation for USA Video shunning the Delaware District court – the

15 forum where USA Video itself chose to bring the Movielink action – is a desire to escape the forum

16 where the '792 Patent has already been construed and held inapplicable to typical contemporary

17 VOD technology. This Court should not countenance Plaintiff's blatant attempt to forum shop.

18 The Delaware District Court is already familiar with the '792 Patent, is proximate to where Plaintiff

19 and most defendants reside, and is convenient for the parties and witnesses in this case. Plaintiff

20 surely cannot complain of inconvenience in its own previously chosen forum for the same patent.

21 Furthermore, the Delaware District Court currently has before it three separate actions filed by the

22 Comcast Defendants and other defendants in this case seeking a declaratory judgment that the '792

23 Patent is not infringed, invalid and/or unenforceable (the "Delaware Declaratory Judgment

24 Actions"). For these reasons, and those set forth below, the Comcast Defendants respectfully

25 request that this case be transferred to the Delaware District Court.

26

27        [1] The Complaint alleges that USA Video is a Connecticut corporation, with its principal place of business
   ("ppb") in Connecticut. The principal places of business of the defendants are alleged to be as follows: TimeWarner
   (New York); Cox (Georgia); Charter (Missouri); the Comcast Defendants (Pennsylvania or Delaware). See Complaint

28 ¶¶ 1-8. As detailed here, all defendants are corporations organized under the laws of Delaware.

1        **UNDISPUTED MATERIAL FACTS**

2    **A.**    **The Parties Involved**

3        1.    Plaintiff USA Video is a corporation organized under the laws of the State of

4  Connecticut with its principal place of business in Connecticut.  See Complaint ¶ 1.

5        2.    USA Video has purposefully availed itself of the Delaware District Court in

6  connection with the Movielink litigation involving the same patent at issue here.  See USA Video

7  Tech. Corp. v. Movielink LLC, 354 F. Supp. 2d 507 (D. Del. 2005), aff'd 2006 U.S. App. LEXIS

8  14699 (Fed. Cir. June 7, 2006).

9        3.    The Comcast Defendants, Defendant Cox Communications, Inc. ("Cox"), and

10  Defendant Charter Communications, Inc.("Charter") are corporations organized under the laws of

11  Delaware.  See Complaint ¶¶ 3-8.

12        4.    Defendant Time Warner, Inc. ("TimeWarner") is also a corporation organized under

13  the laws of Delaware, see Nguyen Decl. Ex. G, although USA Video have mistakenly alleged that

14  TimeWarner was incorporated in the state of New York.  See Complaint ¶ 2.

15        5.    None of the parties in this case reside in Texas, but instead, have principal places of

16  business in Connecticut (USA Video), New York (TimeWarner), Georgia (Cox), Missouri

17  (Charter), Delaware or Philadelphia (the Comcast Defendants).  See Complaint ¶¶ 1-8.

18    **B.**    **Nature and Stage of Proceedings**

19        1.    USA Video filed this patent infringement action on June 13, 2006.  The Complaint

20  alleges that Time Warner Inc. ("TimeWarner"), Cox Communications ("CoxCom"), Charter

21  Communications ("Charter") and the Comcast Defendants infringed Claim 1 of its '792 Patent by

22  providing VOD services to their respective subscribers.  See Complaint ¶¶ 14-20.

23        2.    Cox, Charter and the Comcast Defendants are scheduled to respond to the complaint

24  on August 14, 2006.  To date, TimeWarner has not been served with the complaint.  No

25  proceedings with respect to the case have occurred to date.  See Nguyen Decl. at ¶ 2.

26    **C.**    **The '792 Patent Litigation in the Delaware District Court**

27        1.    The '792 Patent has also been and is currently the subject of litigation in the

28  Delaware District Court before the Honorable Kent A. Jordan, the first of which was a patent

1  infringement action commenced by USA Video against Movielink on April 10, 2003. <u>See</u> Nguyen

2  Decl. at ¶ 3.  After several years of discovery and a Markman hearing, Judge Jordan issued a

3  decision on January 28, 2005 construing the term "initiates" in Claim 1 of the '792 Patent and

4  granting summary judgment in favor of Movielink on non-infringement. <u>See</u> Nguyen Decl. Ex. A

5  (attaching a copy of Judge Jordan's opinion in <u>USA Video Tech. Corp. v. Movielink LLC</u>, 354 F.

6  Supp. 2d 507 (D. Del. 2005)).  Specifically, Judge Jordan rejected USA Video's proposed

7  construction of the claim term, and interpreted "initiates" to mean "begins" in the phrase "wherein

8  said distribution interface *initiates* connections over the telephone network with remote locations in

9  response to requests received by said request interface" ('792 Patent, col. 7, ll. 52-56). <u>See</u>

10  <u>Movielink</u>, 354 F. Supp. at 514.  On the basis of that construction, Judge Jordan determined that

11  Movielink did not infringe the '792 Patent because the user – rather than the distribution interface

12  as claimed – initiates the connection which results in the transmission of the requested video

13  program. <u>See</u> <u>id.</u>, at 515-516, 519-520, 523.  On June 7, 2006 – six days before USA Video

14  commenced the instant action against the Comcast Defendants – the Federal Circuit affirmed Judge

15  Jordan's decision. <u>See</u> <u>USA Video Tech. Corp. v. Movielink LLC</u>, No. 05-1451, 2006 U.S. App.

16  LEXIS 14699 (Fed. Cir. June 7, 2006) (attached as Exhibit B to the Nguyen Declaration).

17      2.      Notably, in connection with the <u>Movielink</u> litigation, USA Video opposed

18  Movielink's motion to transfer the action to California, repeatedly stressing the convenience and

19  suitability of litigating the '792 Patent in the Delaware District Court:

20  •  "USVO is litigating near its residence [of Connecticut]," and noting in particular USA
     Video's limited resources in litigating outside of Delaware. <u>See</u> Nguyen Decl. Ex. C
21     (Plaintiff USA Video Technology Corporation's Answering Brief in Opposition to
       Defendant Movielink's Motion to Transfer ("USA Video Delaware Brief"), at 10-11).
22

23  •  "USVO's principal place of business is located in Connecticut.  We are a very small
       operation: we have four full-time employees, including the two senior executive officers,
24     one technology and one administrative employee.  Two of the employees reside in
       Connecticut . . . and two reside in Vancouver, Canada." <u>See</u> Nguyen Decl. Ex. D
25     (Declaration of Edwin Molina in Support of Plaintiff USA Video Technology Corp.'s
       Answering Brief in Opposition to Defendant Movielink, LLC's Motion to Transfer, at ¶ 3).\
26

27  •  USA Video has also observed that the Delaware District Court "is particularly conversant
       with patent cases." <u>See</u> Nguyen Decl. Ex. C (USA Video Delaware Brief at 7) (citing cases
28     that note that Delaware courts have substantial experience with patent infringement claims).

On January 9, 2004, Judge Jordan entered an Order denying Movielink's Motion to Transfer.

3.    Judge Jordan is also presiding over three separate actions seeking a declaratory judgment for non-infringement, invalidity and/or unenforceability of the '792 Patent. See TimeWarner Cable, Inc. v. USA Video Tech. Corp., No. 1:06-cv-00387 KAJ (D. Del.) (declaratory judgment action filed on June 15, 2006); CoxCom, Inc. v. USA Video Tech. Corp., No. 1:06-cv-00394 KAJ (D. Del.) (declaratory judgment action filed on June 19, 2006); Comcast Cable Commc'ns, LLC et al. v. USA Video Tech. Corp., No. 1:06-cv-00407 KAJ (D. Del.) (declaratory judgment action filed on June 27, 2006).  USA Video answered and asserted counterclaims in each of the declaratory judgment actions on August 10, 2006.  See Nguyen Decl. ¶ 10.  On that same date, USA Video also filed motions to dismiss, stay or transfer in those actions.  See Nguyen Decl. ¶ 10.

## ISSUES PRESENTED

This Court is presented with the issue of whether to transfer this action pursuant to 28 U.S.C. § 1404(a) from this forum, where none of the parties in this case reside or are incorporated, to the Delaware District Court, where all defendants are incorporated and where Judge Jordan has for several years presided over a patent infringement lawsuit brought by Plaintiff related to the same patent at issue and is currently presiding over several declaratory judgment suits also involving the same patent.  If this Court declines to transfer this case, this Court is presented with the issue of whether to stay this action pending the declaratory judgment suits in the Delaware District Court.

## ARGUMENT

I.    **THIS ACTION SHOULD BE TRANSFERRED**
      **TO THE DELAWARE DISTRICT COURT**

This Court has authority to transfer any civil action to any other district where it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a).  The purpose of Section 1404(a) is to "prevent the waste of time, energy, and money and

1    to protect litigants, witnesses and the public against unnecessary inconvenience and expense." <u>Van</u>

2    <u>Dusen v. Barrack</u>, 376 U.S. 612, 616 (1964) (citations omitted) (superceded by statute on other

3    grounds). In determining whether transfer is appropriate, courts consider numerous private and

4    public interest factors, none of which individually has dispositive weight. <u>See, e.g.</u>, <u>In re</u>

5    <u>Volkswagen AG</u>, 371 F.3d 201, 203 (5th Cir. 2004); <u>Action Indus., Inc. v. United States Fid. &</u>

6    <u>Guar</u>, 358 F.3d 337, 340 (5th Cir. 2004). The private interest factors include: (1) relative ease of

7    access to sources of proof; (2) the availability of compulsory process to secure the attendance of

8    witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that

9    make trial of a case easy, expeditious and inexpensive. The public factors include: (1) the

10    administrative difficulties flowing from court congestion; (2) the local interest in having localized

11    interests decided at home; (3) the familiarity of the forum with the law that will govern the case;

12    and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law.

13    <u>In re Volkswagen AG</u>, 371 F.3d at 203. A court also considers the plaintiff's choice of forum, but

14    this factor by itself "is neither conclusive nor determinative." <u>In re Horseshoe Entm't</u>, 337 F.3d

15    429, 434 (5th Cir. 2003).

16           Transfer of this action to the Delaware District Court would serve the "interest of justice"

17    and the "convenience of the witnesses and parties" for the following reasons:

18           1.      As an initial matter, the Delaware District Court is one where this action "might

19    have been brought" as required under Section 1404(a). Delaware is the state of incorporation of all

20    of the Defendants, and USA Video transacts business within Delaware and has purposefully availed

21    itself of the Delaware District Court in connection with its <u>Movielink</u> litigation on the same patent

22    at issue here. Moreover, Delaware is where the Comcast Defendants, as well as Coxcom, Inc. and

23    Time Warner Cable, Inc., have filed declaratory judgment actions related to the '792 Patent. All of

24    those actions are before Judge Jordan.

25           2.      However, in an apparent attempt to forum shop in view of Judge Jordan's adverse

26    <u>Movielink</u> decision interpreting its '792 Patent, USA Video commenced this action in a forum

27    having no direct relation to the operative, underlying facts of the case. None of the alleged

28    infringers in this case have principal places of business in Texas – which is "often the critical and

1  controlling consideration in adjudicating transfer of venue motions" in intellectual property

2  infringement actions. <u>Spiegelberg v. The Collegiate Licensing Co.</u>, 402 F. Supp. 2d 786, 791-792

3  (S.D. Tex. 2005). Likewise, the Complaint is devoid of any allegation that USA Video (the owner

4  of the '792 Patent and headquartered in Connecticut) has any connection to Texas whatsoever. <u>See</u>

5  Complaint ¶¶ 1, 13.

6       3.    This Court should reject USA Video's transparent attempt to forum shop and

7  transfer this case to the Delaware District Court, which has already presided and is presiding over

8  litigation related to the '792 Patent. <u>See Regents of the Univ. of Cal. v. Eli Lilly & Co.</u>, 119 F.3d

9  1559, 1565 (Fed. Cir. 1997) ("Consideration of the interest of justice, which includes judicial

10  economy, 'may be determinative to a particular transfer motion, even if the convenience of the

11  parties and witnesses might call for a different result.'") (internal citations omitted). Having

12  overseen the <u>Movielink</u> litigation for several years, Judge Jordan in particular is already familiar

13  with USA Video, the technology at hand, and the '792 Patent. <u>See Zoltar Satellite Sys., Inc. v. LG</u>

14  <u>Elecs. Mobile Commc'ns Co.</u>, 402 F. Supp. 2d 731, 735 (E.D. Tex. 2005) (noting that "[i]n cases

15  that involve a highly technical subject matter, such as patent litigation, judicial economy may favor

16  transfer to a court that is already familiar with the issues involved in the case" and granting

17  defendants' motions to transfer case from the Eastern District of Texas to the Northern District of

18  California). Not only has Judge Jordan presided over claim construction arguments regarding

19  seventeen separate terms used in the '792 Patent claims, he has also construed the patent's language

20  in a decision affirmed by the Federal Circuit. <u>See</u> Nguyen Decl. Ex. B.

21       4.    In a recent case, the United States District Court for the Northern District of Texas

22  indicated a willingness to stay or transfer a patent case to another district court where the presiding

23  judge had interpreted the claims of the patent-in-suit in a <u>Markman</u> hearing, examined the patent-

24  in-suit's prosecution history, and studied relevant prior art references over several years if that

25  judge consents to preside over the transferred case. <u>See</u> Taylor v. Ishida, No. 3:02-CV-0402-D,

26  2002 WL 1268028, at *7 (N.D. Tex. May 31, 2002). Specifically, the Court observed that, "[a]

27  court can defer to a second-filed [declaratory judgment] action when, as here, the judge in the

28  subsequent case has extensive prior experience concerning the patent-in-suit. . . . The interests of

1    justice strongly favor such a course when the judge who will preside over the case presided over

2    another action that involves the same parties and the same patents and has developed a familiarity

3    with the relevant technology." See id. at *7.  Similarly, this Court should transfer this case to Judge

4    Jordan in the District of Delaware because, as in Taylor, Judge Jordan's considerable familiarity

5    with the '792 patent presents "compelling reasons" for such a transfer. See id.; see also Ricoh Co.,

6    Ltd. v. Honeywell, Inc., 817 F. Supp. 473, 487 (D.N.J. 1993) (permitting the transfer of an action

7    for patent infringement to the venue of a subsequently filed action for declaratory judgment).

8         5.      Furthermore, once transferred, this case can be consolidated with the other

9    declaratory judgment lawsuits already pending before Judge Jordan for purposes of discovery.  No

10    delay or prejudice would result from a transfer of this case to the Delaware District Court, as no

11    proceedings have occurred in this case to date.  See Ruth v. KLI, Inc., 143 F. Supp. 2d 696, 698

12    (E.D. Tex. 2001) ("because this case is in the early stages, there is little chance that a transfer of

13    venue will result in delay or prejudice to either side.").

14         6.      While the Comcast Defendants recognize that Judge Jordan has recently been

15    nominated to the U.S. Court of Appeals for the Third Circuit, see Nguyen Decl. Ex. H, it is

16    Delaware that has a significant interest in presiding over an action presiding over an action

17    commenced against entities that are all incorporated there.  See Ricoh Co., 817 F. Supp. at 486

18    (noting the state of defendant's principal place of business has a "compelling interest in regulating

19    the conduct of business in its state"); see also John Forcillo v. LeMond Fitness, Inc., 220 F.R.D.

20    550, 552 (S.D. Ill. 2004) ("where the plaintiff's choice is not its resident forum, the chosen forum is

21    entitled to less deference."); Rock Bit Int'l, Inc. v. Smith Int'l, Inc., 957 F. Supp. 843, 844 (E.D.

22    Tex. 1997) ("This court, and many others, have ruled previously in a number of other cases . . . that

23    the usual deference accorded the plaintiff's choice of forum is of minimal value when none of the

24    parties reside in this division of this District.").  Indeed, the Delaware District Court has invested

25    much time and resources in presiding over the disputes arising out of the '792 Patent already.  That

26    court should not be deprived of the ability to continue to oversee such litigation as a result of USA

27    Video's forum shopping.

28

8

7.    Finally, it should be stressed that USA Video must previously have determined that the District of Delaware was a convenient and cost-effective forum when USA Video opted to file it infringement claims against Movielink in the Delaware court. This further undercuts the minimal deference due USA Video's present choice of forum. See ConnecTel v. Cisco Sys., Inc., 2005 WL 366966, *2 (E.D. Tex. 2005) (plaintiff is presumed to have considered convenience and cost when choosing a forum). To verify that the Delaware District Court is the proper venue for this action, the Court need look no farther than USA Video's own arguments resisting Movielink's motion to transfer USA Video's previous action out of the Delaware court. See USA Video Delaware Brief (arguing that public and private interest factors, including Delaware court's patent expertise and U.S. Video's convenience, warranted keeping the case in Delaware).

8.    Indeed, the case for venue in Delaware is even stronger now, given that the Delaware court invested its time and resources to construe the claims of the patent at issue and apply those claims to the technology at issue. That USA Video wants a "second bite" at the claim construction and infringement arguments that Judge Jordan already has heard, evaluated, and rejected is insufficient reason for this Court to invest its time and resources to duplicate the Delaware court's efforts.

## II.    IN THE ALTERNATIVE, ALL PROCEEDINGS IN THIS MATTER SHOULD BE STAYED PENDING THE RESOLUTION OF THE DELAWARE PROCEEDINGS

In the alternative, the Court should stay all proceedings in this action pending resolution of the Delaware Declaratory Judgment Actions. The court's power to stay proceedings is "incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." See Landis v. N. Am. Co., 299 U.S. 248, 254 (1936); see also Clinton v. Jones, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.")

Here, staying this action would avoid duplicative litigation in two jurisdictions related to the same '792 Patent, and hence, would avoid the risk of inconsistent rulings related to that patent. Given that Judge Jordan has already construed the '792 Patent in the prior Movielink litigation, and is presiding over several declaratory judgment actions related to that patent, this Court should stay

1   this action until resolution of the declaratory judgment actions.  See Taylor v. Ishida, 2002 WL

2   1268028, at *7 (noting that the Court can "defer to a second-filed [declaratory judgment] action

3   when, as here, the judge in the subsequent case has extensive prior experience concerning the

4   patent-in-suit" and indicating the Court's willingness to stay or transfer the action to the Northern

5   District of California if that judge consents to preside over the transferred case).  To the extent the

6   '792 Patent is determined to be not infringed, invalid and/or unenforceable, such a decision would

7   moot this action by USA Video.  Therefore, to the extent the Court declines to transfer this case to

8   the Delaware District Court, it should stay this action pending resolution of the Declaratory

9   Judgment Actions.

10                                   **CONCLUSION**

11          For all of the foregoing reasons, the Comcast Defendants respectfully request that this Court

12  enter an Order to transfer this action to the Delaware District Court.  In the alternative, the Comcast

13  Defendants request that the Court stay all proceedings until such time as the Delaware Declaration

14  Judgment Actions are resolved.

15  Respectfully submitted,

                                                        GILLAM & SMITH, L.L.P.

16  OF COUNSEL:
    Matthew B. Lehr
17  Suong T. Nguyen                                              /S/
18  Duane Nash                              _____
    Yiping Liao                            Harry L. "Gil" Gillam, Jr.
19  DAVIS POLK & WARDWELL                   Lead Attorney
    1600 El Camino Real                     Texas State Bar No. 07921800
20  Menlo Park, CA  94025                   GILLAM & SMITH, L.L.P.
    Telephone:   (650) 752-2000             303 South Washington Avenue
21  Facsimile:   (650) 752-2111             Marshall, Texas 75670
22                                          Telephone: (903) 934-8450
                                            Facsimile:  (903) 934-9257
23
                                            **Lead Attorney for Cox Communications,**
24                                          **Inc., Charter Communications, Inc., Comcast**
                                            **Cable Communications, LLC, Comcast of**
25                                          **Richardson, LP, Comcast of Plano, LP, and**
                                            **Comcast of Dallas, LP**
26

27

28

                                        10

1

## CERTIFICATE OF CONFERENCE

2

3    This is to certify that Suong Nguyen of Davis Polk & Wardwell, counsel for Defendants

Comcast Cable Communications, LLC, Comcast of Richardson, LP, Comcast of Plano, LP, and

4    Comcast of Dallas, LP, has conferred with Alisa Lipski of Goldstein, Faucett & Prebeg, LLP,

5    counsel for Plaintiff USA Video Technology Corporation, regarding the matters included in this

6    motion.  USA Video Technology Corporation states that this motion is OPPOSED.

7

8                                                    /S/
9                                          Harry Gillam, Jr. (State Bar No. 07921800)

10

11                          ## CERTIFICATE OF SERVICE

12    The undersigned hereby certifies that the foregoing document was filed electronically in

13    compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who have

14    consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and

15    Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service

16    were served with a true and correct copy of the foregoing by certified mail, return receipt requested,

17    on this the 10th day of August 2006.

18

19                                                    /S/
20                                          Harry Gillam, Jr. (State Bar No. 07921800)

21

22

23

24

25

26

27

28

11

# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

USA VIDEO TECHNOLOGY          )
CORPORATION,                  )
                              )
     Plaintiff              )
                              )
v.                            )          Case No. 2-06CV-239
                              )
TIME WARNER INC; COX          )
COMMUNICATIONS, INC.; CHARTER )
COMMUNICATIONS, INC.; COMCAST )
CABLE COMMUNICATIONS, LLC; COMCAST )
OF RICHARDSON, LP; COMCAST OF PLANO, )
LP; and COMCAST OF DALLAS, LP,  )
                              )
     Defendants             )

JOINDER IN MOTION TO TRANSFER BY
DEFENDANT CHARTER COMMUNICATIONS, INC.

Defendant Charter Communications, Inc. ("Charter") hereby joins in The Comcast

Defendants' Motion to Transfer to the District of Delaware Pursuant to 28 U.S.C. 1404(a) or, in

the Alternative, to Stay the Action, and Brief in Support Thereof ("the Comcast Motion" filed at

Docket #18). In further support of the Motion, Charter states that Charter is incorporated in the

state of Delaware and does not have its principal place of business within the Eastern District of

Texas, the state of Texas, or any state neighboring the state of Texas. *See* Complaint and Answer

and Counterclaims of Charter Communications, Inc.

In addition, transfer of this case to Delaware would serve the interests of justice as it

would allow litigation in a forum where the Court has personal jurisdiction over each of the

parties thereto. Upon information and belief, defendant Cox Communications, Inc. has filed, or

is planning to file, a Motion to Dismiss for Lack of Personal Jurisdiction or in the Alternative to

Transfer Venue to Delaware ("Cox Motion"). If the Cox Motion is successful, USA Video would

3403619

be unable to proceed with this case in this forum against all of the named parties. Rather than create this untenable situation, it is in the interests of justice to transfer this case to a forum where personal jurisdiction exists for all parties.

Accordingly, Charter Communications, Inc. joins Comcast Cable Communications, LLC, Comcast of Richardson, LP, Comcast of Plano, LP and Comcast of Dallas, LP in their Motion to Transfer to the District of Delaware or, in the Alternative, to Stay the Action.

Respectfully submitted,

GILLAM & SMITH, L.L.P.

_____·__/s/_____
Melissa R. Smith
Texas State Bar No. 24001351
Harry L. "Gil" Gillam, Jr.
Texas State Bar No. 07921800
GILLAM & SMITH, L.L.P.
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

**Attorney for Charter Communications, Inc.**

Of Counsel for Charter
Communications, Inc.:
Dean L. Franklin
Nicholas B. Clifford Jr.
Matt A. Rosenberg
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000
Facsimile: (314) 552-7000

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel for Charter Communications, Inc. and counsel for USA Video Technology Corporation conferred in a good faith attempt to resolve this matter without Court intervention and USA Video Technology Corporation opposes this motion.

_____/s/_____
Melissa R. Smith

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this motion was served on all counsel who have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this the 14th day of August 2006.

_/s/_____
Melissa R. Smith

3403619

- 3 -

# EXHIBIT R

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA VIDEO TECHNOLOGY CORPORATION, | § § § | |
| Plaintiff | § § | |
| v. | § § | Case No. 2:06-cv-00239-RHC |
| TIME WARNER CABLE, INC.; COX COMMUNICATIONS, INC.; CHARTER COMMUNICATIONS, INC.; COMCAST CABLE COMMUNICATIONS, LLC; COMCAST OF RICHARDSON, LP; COMCAST OF PLANO, LP; COMCAST OF DALLAS, LP | § § § § § § § § § | Honorable Ron Clark  JURY TRIAL DEMANDED |
| Defendants | § § | |

PLAINTIFF USA VIDEO TECHNOLOGY CORP.'S OPPOSITION
TO DEFENDANT COMCAST'S MOTION TO TRANSFER TO THE DISTRICT
OF DELAWARE, OR, IN THE ALTERNATIVE, TO STAY THE ACTION

Plaintiff USA Video Technology Corporation ("USVO") hereby files this

Opposition to the Motion to Transfer to the District of Delaware, or, In the Alternative,

To Stay the Action, filed by Defendants Comcast Cable Communications, LLC; Comcast

of Richardson, LP; Comcast of Plano, LP; and Comcast of Dallas, LP (collectively, the

"Comcast Defendants")

I.     SUMMARY OF THE CASE

The Comcast Defendants' Motion To Transfer is based on three premises: (1)

This suit would be more convenient in Delaware; (2) Delaware District Court Judge Kent

A. Jordan has already construed the claims of U.S. Patent No. 5,130,792 ("the '792

Patent), which was at issue in the earlier case involving Defendant Movielink LLC and this current case, and (3) related cases (asking for declaratory judgments of non-infringement of the '792 patent) are already pending in Delaware. Those arguments gloss over some well-established legal principles, as well as paint a picture that is murky at best. For example, Defendants give little credence to the issue of the heavy weight afforded to Plaintiff's choice of forum. They rely heavily on the declaratory judgment actions currently pending in Delaware[1] yet give little weight to the fact that those actions were filed **after** the onset of this litigation, affording them less significance to black letter first-to-file law. They focus on the fact that Judge Jordan is familiar with '792 patent, yet place little significance to the fact that Judge Jordan has been nominated to the U.S. Court of Appeals for the Third Circuit[2], making it highly unlikely that he would be the sitting judge by the time the declaratory judgment case were heard. In addition, they focus heavily on the fact that Judge Jordan has already construed the patent claims, while the truth is that Judge Jordan construed only one word in the patent at suit.

## II.    RESPONSE TO LIST OF UNDISPUTED MATERIAL FACTS

### A. The Parties Involved

1. Undisputed

2. Undisputed

3. Undisputed

4. Undisputed

5. Undisputed

---

[1] Plaintiff USVO has filed motions to dismiss, stay or transfer in each of the three declaratory judgment actions.

[2] According to the website www.whitehouse.gov, Judge Kent A. Jordan's nomination to the Third Circuit Court of Appeals was sent to the Senate by President George W. Bush on June 26, 2006.

### B. Nature and Stage of Proceedings

1. Undisputed

2. Disputed as to service. The statement by Comcast that Time Warner had not been served was accurate when written. Since then, Plaintiff has begun service of the First Amended Original Complaint on Time Warner.

### C. The '792 Patent Litigation in Delaware District Court

1. Undisputed

2. Undisputed

3. Undisputed

## III.   ISSUES PRESENTED

The issue presented is whether the weighing of private and public factors weighs so heavily in favor of transfer as to upset the Plaintiff's choice of forum.

## IV.   ARGUMENT AGAINST TRANSFER

It is not at all unusual for the same patent to be litigated in different forums against different defendants, as would be the case here. The infringement analysis in this case will be completely different since it involves a significantly different technology. The Defendant in the prior litigation, Movielink LLC, operates a video-on-demand (VOD) service over the Internet.   In Movielink's system, movies are ordered by the customer and delivered to the customer's computer over the Internet using the Hyper Text Transfer Protocol (HTTP) and the Transmission Control Protocol (TCP). The grant

3

of summary judgment of non-infringement in the Movielink litigation hinged on the particular way that connections are created between computers over the Internet using the HTTP and TCP protocols.

In the present case, the Defendant Coxcom operates a VOD service over its digital cable network.  In a digital cable service, the television content and VOD content is transmitted from the cable company's local facility, called a head-end, to a cable set-top box in the subscriber's home. Coxcom's VOD service involves completely different technologies than were at issue in the Movielink case for creating connections and communicating data between the cable head-end and the subscriber's set-top box.

It is hard to claim with a straight face that a Markman hearing in the Eastern District of Texas would be a waste of judicial time and resources when (1) only one word was construed by the Delaware Court, and (2) USVO is bound by that construction in this action and any others related to the '792 patent.  And it's equally hard to buy the argument that Judge Jordan's familiarity with the patent should be a deciding factor when Judge Jordan is not expected to be still be sitting on the District of Delaware bench when this case is heard.

In addition, since one defendant has not filed a declaratory judgment in Delaware and two defendants have not filed motions to transfer, it is a certainty that this case will be tried in Texas – against at least one defendant – no matter how this court rules on the two pending motions to transfer.  It would therefore be more judicially economic to keep all defendants in Texas.

4

This brief will further demonstrate that USVO had significant reasons for filing in the Eastern District of Texas and that Comcast has not met the burden required to upset the Plaintiff's choice of forum.

## A. Plaintiff's Choice of Forum Should Rarely Be Disturbed

USVO does not dispute the premise that this suit could have been brought in Delaware and that Delaware would be an appropriate forum. However, it strongly disagrees with the notion that public and private factors favor upsetting Plaintiff's choice of forum by transferring this case to Delaware.

While Plaintiff's forum choice by itself is not conclusive or determinative, it should only be disturbed if Defendant can show that the balance is strongly in favor of transfer. *Symbol Techs. v. Metrologic Instruments, Inc.*, 2006 U.S. Dist. LEXIS 55099 (E.D. Tex. 2006), citing *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F. 2d 821, 828 (5th Cir. 1986). The movant bears the burden of proof in demonstrating that transfer is warranted. *Z-Tel Communs., Inc. v. SBC Communs. Inc., v. SBC Communs., Inc.* 331 F. Supp. 2d 567, 570 (E.D. Tex. 2004)

## B. Weighing of Interests Favors Keeping This Case in The Eastern District of Texas

In order to favor transfer, the Defendant(s) must convince the Court that a weighing of public and private factors strongly favors transfer. These factors include the relative ease of access to the sources of proof; the cost of obtaining attendance of witnesses and other trial expenses; the place of the alleged wrong; and the possibility of delay and prejudice if granted. Id. at 571, quoting *Mortensen v. Maxwell House Coffee Co.*, 879 F. Supp. 54, 56 (E. D. Tex. 1995); See also *Walter Fuller Aircraft Sales v. Republic of Philippines*, 965 F.2d 1375, 1389 (5th Cir. 1992)). Additionally, the court

5

should consider the public interest factors of: 1) the relative backlog and other

administrative difficulties in the two jurisdictions; 2) the fairness of placing the burdens

of jury duty on the citizens of the state with the greater interest in the dispute; 3) the local

interest in adjudicating local disputes; and 4) the appropriateness of having the case in a

jurisdiction whose law will govern the dispute in order to avoid difficult problems in

conflicts of laws. *Id.*

### 1. Delaware Judge is Not Expected to Hear This Case, So Familiarity With the Patent/Issues is a Moot Argument

Many of the arguments supporting Defendants' Motion to Transfer revolve

around the idea that Judge Jordan is already familiar with the patent and has already

construed the claim in a Markman hearing.   This argument fails to be persuasive for

several reasons, including the fact that Judge Jordan has recently been nominated to the

U.S. Court of Appeals for the Third circuit.  If this case were transferred to Delaware, it

is highly unlikely that Judge Jordan would be the one to hear this case, and his colleagues

on the bench in Delaware are no more familiar with the '792 patent than is this Court.

The Comcast Defendants also rely heavily on the fact that Judge Jordan

conducted a Markman hearing in the earlier case against Movielink.   In that case, Judge

Jordan eventually construed one word – "initiate."   While Defendants seem worried that

a second Markman would be a waste of judicial time and resources, they can rest assured

that this Court will not have to duplicate any prior efforts unless it sees fit to do so since

USVO is precluded under the theory of collateral estoppel from offering any alternative

construction than the one already adopted by one court. *Tex. Instruments, Inc. v. Linear

Techs. Corp.*, 182 F. Supp. 2d 580, 585-586 (E. D. Tex. 2002).   Furthermore, since the

Delaware Court construed only one word from one claim, it is expected that another Markman hearing will be necessary no matter which court tries this case.

To further their argument about conserving judicial resources, Comcast Defendants point out that the District of Delaware currently has jurisdiction over three Declaratory Judgment lawsuits (asking the Court find no infringement of the '792 patent) filed against USVO by the same Defendants that appear in this suit. USVO has filed Motions to Dismiss, Stay or Transfer in each of those three actions. Those Motions are based on the fact that this action was pending in the Eastern District of Texas prior to the filing of those Declaratory Judgment suits. Those suits never should have been brought. Instead, the proper action would be to have those issues litigated as defenses and/or counterclaims in this suit.

And while the Northern District of Texas did express a willingness to stay or transfer a patent case to another district where a second-filed action sat, the Court's reasoning for doing so makes it distinguishable from this matter. See *Taylor v. Ishida Co.*, 2002 U.S. Dist. LEXIS 9916 (D. Tex. 2002). In *Taylor*, the Court held "This court can defer to a second-filed action when, as here, the judge in the subsequent case has extensive prior experience concerning the patent-in-suit." Id. Again, this reasoning becomes moot as soon as Judge Jordan leaves the District of Delaware to take a seat on the Third Circuit of Appeals. This is expected to happen before his "extensive prior experience concerning the patent-in-suit" will be of any use to this litigation. In addition, as noted earlier, while the patent is the same, the technology is quite different, thus any court that hears this case will have to become familiar with the technology practiced by

7

these Defendants. USVO believes that the Eastern District of Texas is as capable of doing so as the District of Delaware.

### 2.  Eastern District Will Have to Hear At Least One Suit

It should also be noted that this suit involves four distinct defendants: Time Warner Cable, Cox Communications, Charter Communications and the Comcast Defendants. Only three of the Defendants filed declaratory judgments in Delaware. The same three filed motions to transfer. Charter Communications did neither. In addition, Time Warner Cable has not filed a Motion to Transfer. Therefore, at a minimum, USVO's suit against Charter Communications and Time Warner Cable will go forward in the Eastern District of Texas regardless of its rulings on transfer for the other defendants. The Eastern District of Texas will be forced to become familiar with the patent and technology and will have to conduct a Markman hearing. Hence, contrary to what the Comcast Defendants have argued, it would in fact be more judicially economic and efficient to deny transfer and keep all defendants in Texas.

### 3.  Eastern District of Texas Is Favorable Venue For Efficient Patent Litigation

Defendants accuse USVO of "forum shopping" in its selection of the Eastern District of Texas in which to file suit. All Plaintiffs engage in some degree of forum shopping when they file a suit. As the Eastern District pointed out in Z-Tel, "it seems quite logical that a plaintiff would hope for favorable outcome for its lawsuit" *Z-Tel Communs.* At 572. In *Z-Tel*, the Eastern District of Texas enumerated several factors that are legitimate reasons to choose a forum. "A court may be selected because its docket moves rapidly, its discovery procedures are liberal, its jurors are generous, the rules of law applied more favorable, or the judge who presides in that forum is thought

more likely to rule in the litigant's favor." Id. quoting *In re Triton Secs. Litig.*, 70 F.

Supp. 2d 678, 689 (D. Tex. 1999).   USVO chose the Eastern District of Texas for many

of the same reasons enunciated recently by the attorney for Symbol in *Symbol Techs.*

LEXIS 55099 at *7-8.

> Frankly, there's nothing like the patent rules up in New York. . . .
> . . . [J]ust the fact that we have the early disclosures of infringement
> positions; we've got the claim charts underway; we're going to get that
> to them, you know, promptly; the requirement of having their
> invalidity contentions to us promptly, those are things we don't have in
> other courts. . . .
> . . . And so it will save us time, it will save us money, and it will much
> more likely lead to a prompt determination, respectfully, Your Honor,
> if you keep the case...
> . . . I try patent cases all over the country. And when we get before a
> judge-and obviously they all work hard and mean well and want to do
> the best-that doesn't understand patents or doesn't like patent cases, it's
> -- it takes years longer; it's much [*8]  more expensive; there are no
> procedures in place to make it work efficiently.

*Symbol Techs.* LEXIS 55099 at *7-8.   In his holding in that case, Judge Davis said

Symbol's most convincing argument focuses on "the interest of justice and that the most

convenient district is the district which would provide the parties and judicial system with

the most efficient and least expensive resolution of the case."  Id at *9.  The District of

Delaware averaged 23.5 months from filing to trial last year.  The Eastern District of

Texas, on the other hand, averaged a mere 15.9 months.[3]  In its own Motion, the Comcast

Defendants point out that the Movielink case, which was disposed of at the summary

judgment stage, consisted of "several years of discovery and a Markman hearing."  The

Eastern District of Texas - with rules regarding early disclosure of infringement

positions, claim charts and Markman hearings - will not allow a case to drag on in that

manner, which causes undue burden and financial stress on all parties.

---

[3] Federal Court Management Statistics as detailed on www.uscourts.gov

### 4. Comcast Makes No Argument that The Private Interests Favor Transfer

Comcast makes no arguments regarding the relative ease of access to proof, the availability of witnesses, the cost of attendance for witnesses or any other practical problem related to trial in the Eastern District of Texas versus trial in Delaware. Therefore, this Court should assume that these are non-factors. In fact, with Defendants' having principal places of business in New York (TimeWaner), Georgia (Cox), Missouri Charter) and Pennsylvania and Delaware (Comcast Defendants), there is no single forum that would afford all parties relative ease to proof, availability of witnesses and a low cost of attendance for witnesses.

### V.    ARGUMENT AGAINST STAYING ALL PROCEEDINGS

The Comcast Defendants' argument for a stay is again based on the declaratory judgment actions filed in Delaware. Again, these cases were filed _after_ this suit. If this Court is to allow the suit to remain in Texas and go forward, all claims in the declaratory judgment actions could properly be brought as defenses and/or counterclaims. USVO agrees that the slew of litigation should be conducted in one jurisdiction rather than two. However, USVO strongly believes that the proper course of action would be to continue with this first-filed action and assume that the District of Delaware will properly rule to either dismiss or stay those declaratory judgment actions pending a result in this case.

### VI.    CONCLUSION

This Court has ruled in the past that a Plaintiff's desire to achieve the most efficient and least expensive resolution of the case is a good reason for choosing a particular forum. That choice of forum should only be upset if the movant makes a convincing showing that a weighing of private and public factors favors transfer. The

Comcast Defendants have not succeeded in meeting this burden and this case should

continue to go forward in the Eastern District of Texas.

                                        Respectfully submitted,

Date: August 22, 2006                   /s/ Edward W. Goldstein
                                        Edward W. Goldstein, Esq.
                                        Texas Bar. No. 08099500
                                        **GOLDSTEIN, FAUCETT & PREBEG, LLP**
                                        1177 West Loop South, Suite 400
                                        Houston, TX 77027
                                        (713) 877-1515 – Telephone
                                        (713) 877-1737 – Facsimile
                                        E-mail: egoldstein@gfpiplaw.com

                                        T. John Ward, Jr., Esq.
                                        State Bar No. 00794818
                                        **LAW OFFICE OF T. JOHN WARD, JR., P.C.**
                                        P.O. Box 1231
                                        Longview, Texas 75606-1231
                                        (903) 757-6400 – Telephone
                                        (903) 757-2323 – Facsimile
                                        E-mail: jw@jwfirm.com

                                        **ATTORNEYS FOR PLAINTIFF**
                                        **USA VIDEO TECHNOLOGY CORP.**

**OF COUNSEL:**

Corby R. Vowell, Esq.
Texas Bar No. 24031621
**GOLDSTEIN, FAUCETT & PREBEG, LLP**
1177 West Loop South, Suite 400
Houston, Texas 77027
(713) 877-1515 – Telephone
(713) 877-1737-Facsimile
E-mail: cvowell@gfpiplaw.com

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 22, 2006. Any other counsel of record will be served by first class U.S. mail.


/s/ Edward W. Goldstein
Edward W. Goldstein

# EXHIBIT S



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALFRED A. TAYLOR, et al.,                    §
                                             §
                    Plaintiffs,              §
                                             §  Civil Action No. 3:02-CV-0402-D
VS.                                          §
                                             §
ISHIDA CO., LTD., et al.,                    §
                                             §
                    Defendants.              §

## ORDER

For the reasons stated in a May 31, 2002 memorandum opinion and order, and having

considered the October 18, 2002 order of the Northern District of California denying defendants'

motions to dismiss and alternative motions to transfer, the court hereby orders that this action be

transferred to the United States District Court for the Northern District of California, San Jose

Division. The clerk of court shall effect the transfer in accordance with the usual procedure.

**SO ORDERED.**


October  30  , 2002.



SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

56

# EXHIBIT T



MAIL
56  MAY 22 1991
PAT. & TRADEMARK OFFICE

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of:

Elbert Gene Tindell et al                 Examiner: V. Kostak

Serial No.  07/475,137                     Art Unit:  262

Filed:     February 1, 1990

For:  VIDEO COMMUNICATION SYSTEMS

<u>AMENDMENT</u>

RECEIVED

MAY 30 1991

GROUP 260

Hon. Commissioner of Patents
      and Trademarks
Washington, D.C.  20231

Sir:

    In response to the Office Action mailed December 17,
1990, please amend the above identified application as
follows.  Please charge any fees necessary for
prosecution of the present application to deposit account
no. 06-0580.

CERTIFICATE OF MAILING
37 CFR 1.8(a)

I hereby certify that this correspondence is being deposited with the United States Postal Service as First Class Mail
in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D. C. 20231 on May 17, 1991.

_____
Signature

**IN THE TITLE**

Please change the title of the invention to read as follows:  STORE AND FORWARD VIDEO SYSTEM

**IN THE CLAIMS**

Please cancel Claims 1 - 24.

Please add the following new claims 25 - 33:

SUBBY

al
cont

--25.    A system for transmitting video programs to remote locations over a switched telephone network, comprising:

a central data facility having means for storing digital compressed versions of video programs;

a request interface connected to said central data facility and to the telephone network, wherein said request interface receives requests for video programs made over the telephone network and communicates them to said central data facility;

a distribution interface connected to said central data facility and to the telephone network, wherein said distribution interface initiates connections over the telephone network with remote locations in response to requests received by said request interface, and transmits thereto compressed versions of video programs previously requested through said request interface, such compressed versions being transmitted at a rate faster than real time;

a receiver at each remote location for connecting to the telephone network and receiving compressed video programs transmitted from said distribution interface at

the faster than real time rate, for storing the received programs, and for subsequently playing the video programs at a real time rate on a video display.

**2.**
26. The system of Claim 25, wherein requests are made to said request interface through preselected sequences of ~~touch tone~~ DTMF transmissions made from a telephone transceiver.

**3.**
27. The system of Claim 25, wherein said distribution interface comprises:

a plurality of converters for converting digital video programs to a format suitable for transmission over a telephone line; and

a controller for simultaneously providing data representative of digital compressed video programs to each of said converters, wherein a plurality of the remote receivers can be simultaneously receiving such programs.

**4.**
28. The system of Claim 27, wherein said controller comprises:

a high speed central processor for providing processing and data transfer functions;

at least one gateway connected to said central processor by a high speed communications bus; and

a communications network having a lower data carrying capacity than the high speed communications bus connected to each of said gateways, wherein a plurality of converters are connected to each communications

-3-

network, and wherein said central processor controls the transfer of data to said converters through said gateways over the high speed communications bus and said communications network.

29. The system of Claim 25, further comprising:

means for inputting video programs in real time; and

conversion means connected to said inputting means and to said central data facility for digitizing and compressing video programs read in to said inputting means, and for transmitting such compressed video programs to said central data facility for storage and subsequent transmission to remote locations.

30. A method for viewing video programs at a location remote from a central data facility, comprising the steps of:

receiving at the central data facility a request for a selected program over a switched telephone network, such request identifying a preregistered requester;

determining whether the selected program is available;

if the selected program is available, initiating a connection over the telephone network to a remote receiving unit previously associated with the preregistered requester;

transmitting a previously stored compressed version of the selected program over the initiated connection at a rate which is faster than real time;

-4-

receiving the selected program at the remote receiving unit and storing it on a mass storage device; and

after all of the selected program has been stored on the mass storage device, decompressing the selected program and playing it back in real time on a video display.

7.
~~31~~. The method of Claim ~~30~~ 6 wherein the request received at the central data facility comprises a sequence of tones generated by a ~~touch-tone~~ DTMF telephone.

8.
~~32~~. The method of Claim ~~30~~ 6 wherein, if the selected program is available, such availability is confirmed during a connection in which such request is made, followed by terminating such connection prior to said step of initiating a connection.

33. A system for transmission of video programs over a switched telephone network, comprising:

a central data facility for storing a plurality of video programs in a digital, compressed format;

means connected to said central data facility for digitizing and compressing video programs, and communicating them to said central data facility for storage;

a request interface connected to the telephone network and to said central data facility for receiving requests for desired video programs over the telephone network, such requests being communicated to said request interface by sequences of tones generated by a touch tone

-5-

telephone in response to a user pressing buttons thereon
in selected patterns, such patterns identifying the user
and the desired video program, wherein said request
interface communicates to the user a confirmation of
availability if a desired video program is available for
the communication to the user;

a distribution interface connected to said central
data facility and to the telephone network, said
distribution interface containing a plurality of
converters for converting compressed digital data to a
form suitable for transmission over the telephone
network, wherein said distribution interface initiates a
connection with a receiving unit at a preselected remote
location in response to the user's request and transmits
the digitized, compressed video program to such remote
unit over such connection at a rate which is faster than
real time display rate;

a plurality of receiving units at a plurality of
remote locations, each of said receiving units connected
to the telephone network and being capable of completing
a connection initiated by said distribution interface and
receiving digitized, compressed video programs over such
connections, wherein each of said receiving units
includes a mass storage subsystem for storing a received
video program in compressed format, and a decompression
subsystem for reading a stored video program from the
mass storage subsystem at the user's convenience and
converting it to a decompressed form suitable for display
in real time; and

a video display device connected to each receiving
unit for displaying the converted video program.--

**REMARKS**

-6-

In response to the Office Action dated December 17, 1990, Applicant cancelled Claims 1 - 24, and added new Claims 25 - 33. The title was changed as requested to make it more descriptive. Claims 25 - 33 are currently pending in the application.

Various formal objections to the claims and Specification were made. Such objections are rendered moot by the cancellation of Claims 1 - 24.

The original claims were rejected for a variety of reasons over several prior art references. Such references will now be discussed insofar as they relate to the newly added claims. In addition, several additional patents have been cited by the Applicant in the attached information disclosure statement, and some of the patents introduced there are described and distinguished from the presently claimed invention.

Of all of the cited references, the Cohen reference (cited by the Examiner), and the Monslow and Walter references (cited in the information disclosure statement) are believed to be the most relevant. The Cohen reference describes a system in which a local unit calls a central unit over telephone lines, and initiates a download of a video program such as a movie. The program is stored in the local unit for later play back as desired. The telephonic connection and request is made by the local unit itself; no use of the telephone by a user is involved. Cohen does not describe the use of compression techniques to allow the program to be downloaded at a faster than real time rate. The same telephone connection is used to request the program and to download it to the receiving unit.

The Monslow reference teaches the use of a telephone to order a video program from a central library. The selected programs are broadcast over a cable network in

real time. No compression is considered, nor storage in
a local unit. The programs must be scrambled when they
are broadcast so that they are received by the intended
recipient.

The Walter reference is directed to a system in
which a user requests a program from a video library,
which is transmitted at a faster than real time rate to
the viewer. A fiber optic line is used for such
transmission. A receiving unit converts the signal back
to real time, and can store several programs for later
viewing. The programs are broadcast to all units
connected to a cable network, rather than to a single
specific recipient.

The system of Claim 25 is directed to a system which
has a central data facility for storing video programs.
A request interface is provided, which receives call in
requests over the telephone network. A distribution
interface then initiates a call to a remote unit, and
transmits a compressed video program to it. The remote
unit stores the program for later playback.

The distribution interface initiates all calls to
remote units before transmitting the video programs to
them. This provides a security feature, and a
convenience feature as well. All of the prior art
references provide for broadcasting over a cable, or
returning the video program over the same link as was
used to make the request. The broadcast cable techniques
are clearly not relevant to the claimed invention; they
provide for transmission to many possible users
simultaneously while the claimed system sends a program
only to a single intended recipient. the techniques
which request and send in a single session do not allow a
user to request a program from anywhere other than the
receiving unit. For example, the user in the prior art
systems could not call in to request a program from a car

phone on the way home from work and have it available in the receiving unit when arriving home; this can easily be done using the claimed system. Thus, the combination of security provided by calling only preauthorized locations from the distribution center with the convenience of being able to order a program from anywhere distinguish the claimed system from prior art techniques.

The entire combination of Claim 25, including a central facility for storing compressed programs, a request interface for taking orders, a distribution interface for calling a remote unit over the phone lines and downloading a compressed video program for later decompression and playback, is not shown or suggested by the references. Combining the references would result in, at best, a system for calling in a request and downloading a program using the same connection. This is not enough to obviate the claimed system.

The differences in the claimed system as described above and the references leads to a system which is constructed on entirely different philosophical lines than in the prior art. In the prior art, the local unit is in charge of the transaction, ordering and receiving a program at its convenience. In the claimed system, the user merely requests a program; the central facility ten initiates a new connection at its convenience and sends a program to the remote unit identified in the request. Since the central unit is in control rather than the remote unit, it is easier to design the central unit to make it run very efficiently. Given the extremely large amounts of data which are transferred when a large number of remote units are being driven simultaneously, such efficiencies are very important and can determine whether a commercial system makes a profit or a loss.

The method of Claim 30 provides for receiving a call at the central location, and determining whether a

request can be met.  If it can, a call is initiated from the central facility to a remote unit.  As described above, this is a different technique from that shown in the prior art.  No reference describes a method for transmitting programs which includes this approach, and the claimed method is believed patentably distinct over the references.

The system of Claim 33 includes the features of a central data facility for storing compressed video programs, a means for compressing the programs, a request interface connected to the telephone network for fielding requests which use touch tones from a telephone set, a distribution interface which initiates a connection with a remote unit and transmits a program thereto, and a plurality of receiving units at the remote locations. The entire combination is not suggested by combining the prior art references as described above.  Thus, Claim 33 is believed patentably distinct over the cited references.

The various dependent claims add additional features to the independent claims, and are therefore believed allowable.  Also, the dependent claims are believed patentably distinct on their own merits as being directed to combinations not suggested by the references.

The remaining references cited by the examiner and by the Applicant in its information disclosure statement are believed less relevant to the claims.  They describe various compression and communictaion techniques.  None describe a system or method fro tramsmitting prestored compressed vidoe programs in a library which can be downloaded over phone lines to a remote unit for later playback.

For the reasons set forth above, all of the newly added claims are believed allowable over the prior art.

Applicant therefore respectfully requests a favorable consideration of Claims 25 – 33, and allowance thereof.

Respectfully submitted,

Kenneth C. Hill
Reg. No. 29,650
Felsman, Bradley,
    Gunter & Dillon
777 Main Street
2600 Continental Plaza
Fort Worth, Texas  76102
(817) 332-8143
Attorney for Applicant

# EXHIBIT U

Serial No. 475,137                                    -2-

Art. Unit   262

1.    The use of the trademark "TOUCH-TONE" has been noted in this

application.   It should be capitalized wherever it appears and be

accompanied by the generic terminology.

    Although the use of trademarks is permissible in patent
applications, the proprietary nature of the marks should be
respected and every effort made to prevent their use in any
manner which might adversely affect their validity as trademarks.

2.    Claim s 25-32 are rejected under 35 U.S.C. § 112, first and

second paragraphs, as the claimed invention is not described in

such full, clear, concise and exact terms as to enable any person

skilled in the art to make and use the same, and/or for failing

to particularly point out and distinctly claim the subject matter

which applicant regards as the invention.

    In (newly-drafted) independent claims 25 and 30, applicant

recites that the transmission rate of compressed video programs

(downloading) is faster than real-time.

    This comparison is ambiguous and seems improper since a rate

here is compared to the regular passage of time.

    Applicant likely intended the comparison to be to the real-

time (i.e. standard) <u>display rate</u>, as recited in independent

claim 33.

    Reciting claims 25 and 30 this way also sums to lack

enablement from ~~and~~ the specification, which only recites

"viewing time" for the programs (last paragraphs on pages 4, 12

and 16, and the top of page 17) relative to the downloading.

Moreover, "viewing time" is not a rate and differs according to

Serial No. 475,137                          -3-

Art Unit  262

program length and viewer's attentive capabilities.

3.    The following is a quotation of the first paragraph of 35
U.S.C. § 112:

> The specification shall contain a written description of the
> invention, and of the manner and process of making and using
> it, in such full, clear, concise, and exact terms as to
> enable any person skilled in the art to which it pertains,
> or with which it is most nearly connected, to make and use
> the same and shall set forth the best mode contemplated by
> the inventor of carrying out his invention.

The specification is objected to under 35 U.S.C. § 112,
first paragraph, ~~as ?~~ *because it does not provide support for the invention
now claimed, as originally filed.*
Claim 33 refers to real-time (i.e. standard) display rate
(line 17 on page 6 of the remarks).  Such is not recited in the
original specification, as noted in the discussion and reference
thereto above.

Claim 33 is accordingly rejected under 35 U.S.C. § 112,
first paragraph, for the reasons set forth in the objection to
the specification.

4.    Claim 33 is allowable over the prior art, and claims 25-32
would be if amended to recite the display rate as well, if the
original specification had support therefor.

5.    Applicant's amendment necessitated the new grounds of
rejection.  Accordingly, **THIS ACTION IS MADE FINAL.**  See M.P.E.P.
§ 706.07(a).  Applicant is reminded of the extension of time
policy as set forth in 37 C.F.R. § 1.136(a).

Serial No. 475,137                                    -4-

Art Unit   262

    A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS FINAL
ACTION IS SET TO EXPIRE THREE MONTHS FROM THE DATE OF THIS
ACTION.   IN THE EVENT A FIRST RESPONSE IS FILED WITHIN TWO MONTHS
OF THE MAILING DATE OF THIS FINAL ACTION AND THE ADVISORY ACTION
IS NOT MAILED UNTIL AFTER THE END OF THE THREE-MONTH SHORTENED
STATUTORY PERIOD, THEN THE SHORTENED STATUTORY PERIOD WILL EXPIRE
ON THE DATE THE ADVISORY ACTION IS MAILED, AND ANY EXTENSION FEE
PURSUANT TO 37 C.F.R. § 1.136(a) WILL BE CALCULATED FROM THE
MAILING DATE OF THE ADVISORY ACTION.   IN NO EVENT WILL THE
STATUTORY PERIOD FOR RESPONSE EXPIRE LATER THAN SIX MONTHS FROM
THE DATE OF THIS FINAL ACTION.

6.    Any inquiry concerning this communication or earlier
communications from the examiner should be directed to Victor R.
Kostak whose telephone number is (703) 308-1248.

    Any inquiry of a general nature or relating to the status of
this application should be directed to the Group receptionist
whose telephone number is (703) 308-0962.

VICTOR R. KOSTAK
PRIMARY EXAMINER
ART UNIT 262

V. Kostak:st
July 30, 1991

# EXHIBIT V



AMENDMENT AFTER FINAL
EXPEDITED HANDLING REQUESTED

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE #63

Rose
11-27-91

In Re Application of:

**ELBERT GENE TINDELL et al**                    Examiner:  V. Kostak

Serial No.  07/475,137                           Art Unit:  262

Filed:  **February 1, 1990**

For:  **VIDEO COMMUNICATION SYSTEMS**


**AMENDMENT**


Hon. Commissioner of Patents
      and Trademarks
Washington, D.C.  20231


Sir:

please
11-27-91
mu

     In response to the Office Action mailed July 31,
1991, please amend the above identified application as
follows.    Please    charge    any    fees    necessary    for
prosecution of the present application to deposit account
no. 06-0580.


> **CERTIFICATE OF MAILING**
> **37 CFR 1.8(a)**
> I hereby certify that this correspondence is being deposited with the United
> States Postal Service as First Class Mail in an envelope addressed to:
> Commissioner of Patents and Trademarks, Washington, D. C.  20231 on
> November 7, 1991.
>
>                    _Christine Fkerbach_
>                         Signature

## IN THE SPECIFICATION

Page 7, line 25, change "touch-tone" to -- TOUCH-
TONE (DTMF) --.

Page 14, line 20, change "touch-tone" to -- TOUCH-
TONE (DTMF) --.

## IN THE CLAIMS

25. (amended) A system for transmitting video programs
to remote locations over a switched telephone network,
comprising:

a central data facility having means for storing
digital compressed versions of video programs;

a request interface connected to said central data
facility and to the telephone network, wherein said
request interface receives requests for video programs
made over the telephone network and communicates them to
said central data facility;

a distribution interface connected to said central
data facility and to the telephone network, wherein said
distribution interface initiates connections over the
telephone network with remote locations in response to
requests received by said request interface, and
transmits thereto compressed versions of video programs
previously requested through said request interface, such
compressed versions being transmitted in less time than
is required to view the programs in real time [at a rate
faster than real time];

-2-

a receiver at each remote location for connecting to the telephone network and receiving compressed video programs transmitted from said distribution interface [at the faster than real time rate], for storing the received programs, and for subsequently playing the video programs at a real time rate on a video display.

Claim 26, line 3, change "touch-tone" to --DTMF --.

29. (amended) The system of Claim 25, further comprising:

means for inputting video programs [in real time]; and

conversion means connected to said inputting means and to said central data facility for digitizing and compressing video programs read in to said inputting means, and for transmitting such compressed video programs to said central data facility for storage and subsequent transmission to remote locations.

30. (amended) A method for viewing video programs at a location remote from a central data facility, comprising the steps of:

receiving at the central data facility a request for a selected program over a switched telephone network, such request identifying a preregistered requester;

determining whether the selected program is available;

-3-

if the selected program is available, initiating a connection over the telephone network to a remote receiving unit previously associated with the preregistered requester;

transmitting a previously stored compressed version of the selected program over the initiated connection in less time than is required to view the program in real time [at a rate which is faster than real time];

receiving the selected program at the remote receiving unit and storing it on a mass storage device; and

after all of the selected program has been stored on the mass storage device, decompressing the selected program and playing it back in real time on a video display.

Claim 31, line 3, change "touch-tone" to --DTMF --.

31. (amended) A system for transmission of video programs over a switched telephone network, comprising:

a central data facility for storing a plurality of video programs in a digital, compressed format;

means connected to said central data facility for digitizing and compressing video programs, and communicating them to said central data facility for storage;

a request interface connected to the telephone network and to said central data facility for receiving

—4—

requests for desired video programs over the telephone network, such requests being communicated to said request interface by sequences of tones generated by a [touch tone] DTMF telephone in response to a user pressing buttons thereon in selected patterns, such patterns identifying the user and the desired video program, wherein said request interface communicates to the user a confirmation of availability if a desired video program is available for the communication to the user;

a distribution interface connected to said central data facility and to the telephone network, said distribution interface containing a plurality of converters for converting compressed digital data to a form suitable for transmission over the telephone network, wherein said distribution interface initiates a connection with a receiving unit at a preselected remote location in response to the user's request and transmits the digitized, compressed video program to such remote unit over such connection in less time than is required to view the program in real time [at a rate which is faster than real time display rate];

a plurality of receiving units at a plurality of remote locations, each of said receiving units connected to the telephone network and being capable of completing a connection initiated by said distribution interface and receiving digitized, compressed video programs over such connections, wherein each of said receiving units includes a mass storage subsystem for storing a received video program in compressed format, and a decompression subsystem for reading a stored video program from the mass storage subsystem at the user's convenience and converting it to a decompressed form suitable for display in real time; and

a video display device connected to each receiving unit for displaying the converted video program.--

-5-

**REMARKS**

In response to the Office Action dated July 31, 1991, Applicant has amended CLaims 25, 26, 29, 30, 31, and 33. Claims 25 - 33 are currently pending in the application.

The references to TOUCH-TONE have been corrected as required by the Examiner.

The claims were rejected as not being supported by the Specification. The language "at a rate faster than real time" has been cancelled from the claims, and the language "in less time than is required to view the program in real time" has been substituted. This language finds support in the Specification at Page 12, Lines 26 and 27. Real time viewing, as called for in several claims, is supported in the Specification at Page 13, Line 10.

No claims were rejected over the prior art of record. Applicant therefore believes that all claims are now in condition for allowance. If the Examiner has any objection to the claims as amended, Applicant would appreciate a call to its attorney at the phone number set forth below.

Respectfully submitted,

Kenneth C. Hill
Reg. No. 29,650
Felsman, Bradley,
    Gunter & Dillon
777 Main Street
2600 Continental Plaza
Fort Worth, Texas 76102
(817)332-8143
Attorney for Applicant

# EXHIBIT W

US005130792A

# United States Patent [19]

Tindell et al.

| | |
|---|---|
| [11] | Patent Number: | 5,130,792 |
| [45] | Date of Patent: | Jul. 14, 1992 |

[54] **STORE AND FORWARD VIDEO SYSTEM**

[75] Inventors: **Elbert G. Tindell**, Dallas; **Kyle Crawford**, Grand Prarie, both of Tex.

[73] Assignee: **USA Video Inc.**, Dallas, Tex.

[21] Appl. No.: **475,137**

[22] Filed: **Feb. 1, 1990**

[51] Int. Cl.⁵ .............................. H04N 7/14
[52] U.S. Cl. ................... 358/85; 358/86; 358/102; 358/134; 379/100
[58] Field of Search ........ 358/86, 133, 85, 134, 358/102; 379/53, 100

[56] **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,028,733 | 6/1977 | Ulicki | 358/102 X |
| 4,506,387 | 3/1985 | Walter | 455/612 |
| 4,513,390 | 4/1985 | Walter et al. | 358/102 X |
| 4,703,348 | 10/1987 | Yuasa | 358/133 |
| 4,769,833 | 9/1988 | Farleigh et al. | 358/86 X |
| 4,772,956 | 9/1988 | Roche et al. | 358/134 X |
| 4,782,397 | 11/1988 | Kimoto | 358/102 X |
| 4,816,901 | 3/1989 | Music et al. | 358/85 X |
| 4,890,320 | 12/1989 | Monslow | 380/10 |
| 4,890,321 | 12/1989 | Seth-Smith et al. | 358/86 X |
| 4,918,523 | 4/1990 | Simon | 358/133 |
| 4,924,311 | 5/1990 | Ohki et al. | 358/133 X |
| 4,947,244 | 8/1990 | Fenwick | 358/86 |
| 4,949,187 | 8/1990 | Cohen | 358/102 X |
| 4,953,196 | 8/1990 | Ishiwaka et al. | 358/85 X |

Primary Examiner—Victor R. Kostak
Attorney, Agent, or Firm—Kenneth C. Hill

[57] **ABSTRACT**

A system and method for transferring video programs from a first location to a remote location provides for communication of the programs over selected commercial telephone networks. The program signals are digitized, compressed, and stored at the first location, and transferred to the remote location on request of a viewer. Due to the compression of the program, the time required for electronically transferring the program to the remote location is much less than the viewing time for such program. The compressed program is reconstructed at the remote location for viewing on available video display devices.

**9 Claims, 4 Drawing Sheets**





Fig. 1

Fig. 2

Fig. 3



Fig. 4



*Fig. 5*



Fig. 6

Fig. 7

5,130,792

**1**

### STORE AND FORWARD VIDEO SYSTEM

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to video systems and more specifically to a system and method for transferring a video program for display at a remote location.

2. Description of the Prior Art

Viewing of various types of video programs has become increasingly popular. These programs are generally viewed on standard television sets. Typical video programs include motion pictures, entertainment produced for television, and educational and training programs. An extremely wide variety of programs have been designed or adapted for television viewing.

In order to transfer the video programs to a remote location where they can be viewed, programs can be broadcast using radio waves, transferred to the remote location by means of a specially installed dedicated cable, or transfer of a physical copy on video tape or video disk can be made. Each method of distributing video programs has drawbacks for certain applications.

When video programs are transferred using radio waves, there is little or no control over who receives and views the program. This method of transferring video programs is not suitable for limited distribution of pay programs. In addition, the number of channels for transferring programs is not unlimited, and picture quality of the program can be degraded by atmospheric conditions.

Barring technical problems, programs transferred to a remote location along a specially installed, dedicated cable generally have a reliably good picture quality. However, the cable must be installed at each remote location, and controlled through a centralized facility. Although many video channels can be carried over some cable systems, the number of channels is, again, not unlimited. As is the case with broadcast systems, transmitting equipment must be made available at the time any particular program is to be viewed. The selection of programs and times for viewing are made centrally, as is the case with broadcast systems, and are not under the control of a viewer at a remote location.

Physical transport of video tapes to a remote location allows the viewer to select the program to be viewed and the time for viewing. However, such tapes must be physically transported to the remote location. This takes time, and is often not convenient for the viewer. In addition, the physical video tape or disk containing the programming is subject to loss, theft, and deterioration.

It would be desirable to provide a system and method for transmitting video programs to remote locations which overcomes various drawbacks as described above.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a system and method for transferring video programs from a first location to a remote location.

It is another object of the present invention to provide such a system and method wherein the programs are electronically transferred in a short period of time relative to the viewing time of the programs.

It is a further object of the present invention to provide such system and method which does not require

**2**

that special, dedicated cables be connected to the remote location.

Therefore, according to the present invention, a system and method for transferring video programs from a first location to a remote location provides for communication of the programs over selected commercial telephone networks. The program signals are digitized, compressed, and stored at the first location, and transferred to the remote location on request of a viewer. Due to the compression of the program, the time required for electronically transferring the program to the remote location is much less than the viewing time for such program. The compressed program is reconstructed at the remote location for viewing on available video display devices.

### BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the invention are set forth in the appended claims. The invention itself however, as well as a preferred mode of use, and further objects and advantages thereof, will best be understood by reference to the following detailed description of an illustrative embodiment when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is a high level block diagram of a system for transferring video programs to a remote location;

FIG. 2 is a block diagram of a central data facility;

FIG. 3 is a block diagram of a system for digitizing and compressing video programs;

FIG. 4 is a block diagram of a distribution interface for use with the system of FIG. 1;

FIG. 5 is a block diagram of a receiver for use at a remote location;

FIG. 6 is a flowchart describing a method for making video programs available for transfer to a remote location; and

FIG. 7 is a flowchart illustrating a method for requesting, receiving, and displaying video programs at a remote location.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a system for transferring video programs to a remote location includes a central data facility 10 connected to a commercial telephone network 12. The central data facility 10 will be described in further detail in connection with the following figures. Telephone network 12 preferably includes optical fiber connections capable of transferring digital data at very high rates. Such optical fiber systems are currently being installed in selected locations in the United States, and are expected to be widely available in the future.

At a remote location, a telephone 14 and receiving unit 16 are connected to the telephone network 12. A video display device 18, such as a television conforming to the NTSC standard, is connected to the receiving unit 16 for displaying video programs which have been transferred from the central data facility 10 to the receiving unit 16. A viewer who wishes to down load a program from the central data facility 10 into his receiving unit 16 calls the central data facility 10 using the normal telephone 14. After the program has been ordered, the user places the telephone 14 on-hook and switches the receiving unit 16 to standby. The central data facility 10 then returns the call and down loads the requested program into the receiving unit 16 for viewing at a time selected by the viewer.

5,130,792

3

A keyboard or other input device is preferably provided on the receiving unit 16 for the viewer to identify the requested program. Identifying information for the receiving unit, used for billing and call-back, can be stored in the receiving unit.

A block diagram of the central data facility 10 is shown in FIG. 2. The central data facility 10 includes a central processor 20 connected to one or more mass storage devices 22. Mass storage devices 22 are preferably high density devices such as optical disks. Programs which are to be handled by the central data facility 10 are originally provided from one or several different types of video source 22 as known in the art. The video programs are digitized and compressed in a digitizing processor 26, and transferred to the central processor 20 for retention in mass storage devices 22.

Incoming requests for programs are connected to a request interface 28, which is in turn connected to the central processor 20. Outgoing programs being transmitted to remote receiving units are routed through a distribution interface 30.

In a preferred embodiment, a user connects to the central data facility 10 through the request interface 28 by means of a standard TOUCH-TONE (DTMF) telephone. Once a connection has been made, the viewer can identify himself and request any available program by entering a proper set of codes. The DTMF tones transferred to the request interface 28 are converted to characters and transmitted to the central processor 20. Central processor 20 identifies the caller and determines whether the requested selection is available. Desired information, such as the availability of a selection, any delay which may be incurred prior to down loading the selected program, or an indication of the charges incurred in the transaction, can be returned to the viewer through a request interface 28 by means of DTMF tones or recorded or synthesized spoken messages.

Once a request has been made and acknowledged, central processor 20 selects an available output channel to distribution interface 30, and requests a telephone switching network connection. Since each viewer must identify himself when the request is made, central processor 20 is able to call an authorized number at a known location corresponding to such user. Once the connection is established, the requested program can be transferred from mass storage 22 through the distribution interface 30 to the remote location. Accounting data regarding the transaction is logged by the central processor 20 for administrative purposes.

Referring to FIG. 3, a block diagram of the digitizing and compression processor 26 is shown. Source 24 provides separate video and audio signals to processor 26. The video signal is applied to a sync and blanking stripper circuit 32. The various sync signals and blanking intervals contained in the video signal are necessary only for display of the program, and can be recreated in the receiving unit 16. The output from sync and blanking stripper 32 is connected to a signal separator 34, which breaks the video signal into its various basic elements. The number of separate channels into which the video signal is separated at this point will depend upon system implementation, with signals such as luminance and chromanence being likely candidates for separate handling.

The separated signals are then converted to digital signals in analog to digital converters 36, and stored in a buffer 38. As shown in FIG. 3, three separate video signals are digitized, but one, two, or more than three

4

signals may be used. If the video signal is not split into two or more parts, the output of the sync and blanking stripper 32 can be input directly to an analog to digital converter 36.

Since the audio signal is frequency modulated instead of amplitude modulated, it is preferably handled separately from the video signal. The audio signal is demodulated and filtered in filter 40, and digitized in analog to digital converter 42. The audio signal is also stored in buffer 38.

Digital data from buffer 38 is input to a data compression circuit 44. Compressed data is input to an encoder 46, which encrypts the data in order to preserve privacy. From the encoder 46, the digital data representing the program originally provided by the source 24 is transferred to the central processor 20.

Buffer 38 can be a relatively small buffer, which requires that data be extracted therefrom and compressed in data compression circuit 44 as it is being generated by the source 24. In the alternative, buffer 38 can include mass storage capable of holding an entire program. In this event, the compression and encoding of the data can be performed after the entire program has been digitized, if desired.

Referring to FIG. 4, a block diagram of a preferred embodiment for the distribution interface 30 is shown. Central processor 20 is connected to a high speed bus 48, which is in turn connected to several gateways 50. Although two gateways 50 are shown in FIG. 4, the number actually used depends upon details of the system implementation, especially with reference to the data throughput capabilities of the central processor 20 and the gateways 50.

Each gateway 50 is connected to a low speed bus 52. Each low speed bus 52 is preferably a commercially available local area network. A plurality of optical converters 54 are connected to each low speed bus 52. In FIG. 4, only two converters 54 are shown connected to each low speed bus 52, but more are preferably connected in an actual implementation. The number of converters 54 connected each low speed bus 52 depends on the data transfer rate of the converters 54 and data handling capability of the buses 52.

Data transferred to a converter 54 is placed into an internal buffer 56. Control circuitry 58 controls operation of the converter 54 and communicates with the gateway 50 over low speed bus 52. Control circuitry 58 also controls operation of optical drivers 60, 62. Each optical driver 60, 62 transmits the data from buffer 56 via a modulated light signal as known in the art. Each optical driver 60, 62 is connected to an optical coupler 64, which combines the different light signals onto a single optical fiber. In a preferred embodiment, optical drivers 60, 62 generate light having different wavelengths, which is multiplexed onto a single optical fiber by coupler 64. Particular system designs can utilize only a single optical driver 60, or more than the two optical drivers 60, 62 shown in FIG. 4.

The distribution interface 30 shown in FIG. 4 allows a single central processor 20 to drive a relatively large number of converters 54 at one time. Various alternative designs to that shown in FIG. 4 can, of course, be utilized if desired.

FIG. 5 shows a preferred embodiment of receiving unit 16. The receiving unit 16 shown in FIG. 5 is used only as a stand alone receiver, and does not incorporate the automatic program request facilities described in connection with FIG. 1.

5,130,792

5

The incoming optical signals are filtered by wavelength and split in optical splitter 64, and converted to digital electrical signals. In the embodiment shown in FIG. 5, two different wavelengths of light were used to transmit information over the optical fiber connection, so two separate channels of digital information are generated by splitter 64. The number of optical drivers 60, 62 as described in connection with FIG. 4 determines the number of channels into which the incoming data is split by splitter 64.

Each channel of digital data is connected from splitter 64 to a serial to parallel converter 66, which converts the serial data to byte-wide data. As is known in the art, the serial transmission of the program data preferably includes redundant error correcting code (ECC), allowing for correction of errors within the receiving unit 16. Error correction is performed in error correction units 68, and the data is temporarily stored in buffer 70.

Under control of control unit 72, data is removed from buffer 70 and transferred to decoder 74. Decoder 74 decrypts the compressed data, undoing the encryption effects of encoder 46 described in connection with FIG. 3. Decoded data is then transferred through storage interface 76 and stored into mass storage device 78. Mass storage device 78 is preferably an erasable optical disk, or other similar relatively low cost, high density storage medium.

Data is stored onto mass storage device 78 until the entire requested program has been down loaded from the central data facility 10. Due to the removal of unnecessary information, compression of the remaining data, and high speed transfer, this down loading can be accomplished in much less time than is required to view the program in real time. Once transfer has been completed, control unit 72 communicates such fact to user interface 80, which indicates through visual or audible means to a viewer that the down loaded program is now available for viewing. User interface 80 provides basic functions for the viewer, such as setup for down loading a program, play a program, and pause during play of a down loaded program.

Once a viewer selects the play mode, control unit 72 causes the data stored in mass storage device 78 to be transferred through storage interface 76 to a data decompression unit 82. Data decompression unit 82 restores the compressed data to its raw, uncompressed form, and transfers it to buffer 84. Data is extracted from buffer 84 in real time as needed for viewing, and converted to analog form in digital to analog converter 86. The original video and audio signals are then restored in signal reconstruction circuit 88, which restores blanking intervals, sync signals, and the like which were removed in the digitizing and compression processor 26. The output of signal reconstruction circuitry 88 is a composite video signal or a modulated RF signal suitable for input to a standard television set. If desired, the program signal can alternatively be recreated as a digital signal suitable for display on a digital monitor as known in the art.

Referring to FIG. 6, a preferred method for making a video program available for transmission to a remote location is shown. The program is first digitized 90 and compressed 92 as described in connection with FIG. 3. The program is also preferably encoded 94, and stored 96 in a non-volatile mass storage device. If desired, the encoding step 94 may be left out.

6

At this point, the program is compressed and stored in condition to be transferred. The number of programs which can be stored at one time is limited only by the capabilities of the central processor 20, and the storage available in mass storage devices 22. When a request is received for a particular program 98, a check is made to see whether that program is available 100. If the requested program is not available, perhaps because the viewer made a mistake when entering his selection, such fact is indicated to the viewer 102. If the program is available for down loading, that fact is confirmed to the viewer 104 and the central data facility 10 sets up a telephone connection with the remote location 106. Transfer of the program 108 is then performed as described above.

Referring to FIG. 7, a preferred method is shown by which the receiving unit 16 at the remote location receives and displays a requested program. First, a connection is made to the central data facility 110. As described above in connection with FIG. 1 this is preferably done by utilizing a standard TOUCH-TONE (DTMF) telephone handset to dial the central facility and enter a selection.

The viewer then requests the desired program 112, and waits to see if it is available 114. If not, the process is complete. If the requested selection is available, the viewer hangs up the telephone handset and switches the receiving unit 16 to standby. The program is then received by the receiving unit 118, decoded, and stored into mass storage 122. When the viewer is ready to view the program, it is decompressed 124 and played back 126 for viewing on a video display. The viewer may preferably pause display of the program at any time by entering a command at the user interface 80, and may view the program multiple times.

The convenience and usefulness of the system described above depends in large part on the ability to be able to quickly down load a video program to the receiving unit 16. In order to illustrate the convenience of the system described above, an example illustrating the numbers involved will now be described.

A single television channel has a 6 megahertz bandwidth. By stripping unnecessary signals as described above, a video signal can be sampled at a rate of 16 megahertz and retain a good signal quality. Samples having a resolution of 8 bits provide sufficient video fidelity for television purposes. This results in a raw data rate of 16 megabytes per second of video data.

Assuming a desired program, such as a motion picture, to have a length of two hours, 7200 seconds of data must be digitized and stored. At a rate of 16 megabytes per second, this results in 115.2 gigabytes of raw data. As is known in the art, video information is highly redundant, so that large compression factors are obtainable. This means that a total data storage requirement of approximately 2–4 gigabytes is expected to be sufficient for a two hour video program. This is the storage requirement for a single program both in the central data facility 10 and the receiving unit 16. This amount of data is well within the capability of optical disks which are presently becoming available.

Assuming 2.3 gigabytes are required for a compressed program, and that a 50% overhead is required for serial transmission of the program data, for error correcting code, blocking, and the like, 3.45 gigabytes of serial data must be transmitted between the central data facility 10 and the receiving unit 16. At eight bits per byte, this results in 27.6 gigabits to be transferred.

5,130,792

7

Optical fiber connections currently planned for installation to residential customers will have a maximum data transfer rate of 144 megabits per second. At this rate, the required 27.6 gigabits can be transferred to the receiving unit 16 in 192 seconds, which is just over three minutes. Thus, approximately three minutes is required to transfer a typical video program to the receiving unit 16.

Note that the numbers described above do not require the use of more than one wavelength of light on a single optical fiber. If it is necessary to increase the sampling rate, or the magnitude of each sample, two or more wavelengths of light can be multiplexed on a single cable as described in connection with FIGS. 4 and 5. This would allow better resolution of the video signal with no increase in transmission time.

If a video camera and compression circuitry is available at a remote location, it is possible to use the system described above to transfer video information between two remote locations. A call to the central data facility can be used to initialize the connection between two remote locations, and the central data facility is no longer involved once the connection is setup. Near real-time video signals obtained at one location are compressed and transferred to the second remote location over the phone lines. Instead of storing the signals onto the mass storage device 78, they are transferred directly to the data decompression circuitry 82 and displayed at the second remote location. Near real-time video communication can be accomplished by providing cameras and compression circuitry at each end of a conversation.

While the invention has been particularly shown and described with reference to a preferred embodiment, it will be understood by those skilled in the art that various changes in form and detail may be made therein without departing from the spirit and scope of the invention.

What is claimed is:

1. A system for transmitting video programs to remote locations over a switched telephone network, comprising:

a central data facility having means for storing digital compressed versions of video programs;

a request interface connected to said central data facility and to the telephone network, wherein said request interface receives requests for video programs made over the telephone network and communicates them to said central data facility;

a distribution interface connected to said central data facility and to the telephone network, wherein said distribution interface initiates connections over the telephone network with remote locations in response to requests received by said request interface, and transmits thereto compressed versions of video programs previously requested through said request interface, such compressed versions being transmitted in less time than is required to view the programs in real time;

a receiver at each remote location for connecting to the telephone network and receiving compressed video programs transmitted from said distribution interface, for storing the received programs, and for subsequently playing the video programs at a real time rate on a video display.

2. The system of claim 1, wherein requests are made to said request interface through preselected sequences

8

of DTMF transmissions made from a telephone transceiver.

3. The system of claim 1, wherein said distribution interface comprises:

a plurality of converters for converting digital video programs to a format suitable for transmission over a telephone line; and

a controller for simultaneously providing data representative of digital compressed video programs to each of said converters, wherein a plurality of the remote receivers can be simultaneously receiving such programs.

4. The system of claim 3, wherein said controller comprises:

a high speed central processor for providing processing and data transfer functions;

at least one gateway connected to said central processor by a high speed communications bus; and

a communications network having a lower data carrying capacity than the high speed communications bus connected to each of said gateways, wherein a plurality of converters are connected to each communications network, and wherein said central processor controls the transfer of data to said converters through said gateways over the high speed communications bus and said communications network.

5. The system of claim 1, further comprising:

means for inputting video programs; and

conversion means connected to said inputting means and to said central data facility for digitizing and compressing video programs read in to said inputting means, and for transmitting such compressed video programs to said central facility for storage and subsequent transmission to remote locations.

6. A method for viewing video programs at a location remote from a central data facility, comprising the steps of:

receiving at the central data facility a request for a selected program over a switched telephone network, such request identifying a preregistered requester;

determining whether the selected program is available;

if the selected program is available, initiating a connection over the telephone network to a remote receiving unit previously associated with the preregistered requester;

transmitting a previously stored compressed version of the selected program over the initiated connection in less time than is required to view the program in real time;

receiving the selected program at the remote receiving unit and storing it on a mass storage device; and

after all of the selected program has been stored on the mass storage device, decompressing the selected program and playing it back in real time on a video display.

7. The method of claim 6, wherein the request received at the central data facility comprises a sequence of tones generated by a DTMF telephone.

8. The method of claim 6 wherein, if the selected program is available, such availability is confirmed during a connection in which such request is made, followed by terminating such connection prior to said step of initiating a connection.

9. A system for transmission of video programs over a switched telephone network, comprising:

5,130,792

9

a central data facility for storing a plurality of video programs in a digital, compressed format;

means connected to said central data facility for digitizing and compressing video programs, and communicating them to said central data facility for storage;

a request interface connected to the telephone network and to said central data facility for receiving requests for desired video programs over the telephone network, such request being communicated to said request interface by sequences of tones generated by a DTMF telephone in response to a user pressing buttons thereon in selected patterns, such patterns identifying the user and the desired video program, wherein said request communicates to the user a confirmation of availability if a desired video program is available for the communication to the user;

a distribution interface connected to said central data facility and to the telephone network, said distribution interface containing a plurality of converters for converting compressed digital data to a form suitable for transmission over the telephone net-

10

work, wherein said distribution interface initiates a connection with a receiving unit at a preselected remote location in response to the user's request and transmits the digitized, compressed video program to such remote unit over such connection in less time than is required to view the program in real time;

a plurality of receiving units at a plurality of remote locations, each of said receiving units connected to the telephone network and being capable of completing a connection initiated by said distribution interface and receiving digitized, compressed video programs over such connections, wherein each of said receiving units includes a mass storage subsystem for storing a received video program in compressed format, and a decompression subsystem for reading a stored video program from the mass storage subsystem at the user's convenience and converting it to a decompressed form suitable for display in real time; and

a video display device connected to each receiving unit for displaying the converted video program.

*  *  *  *  *

# EXHIBIT X

# USA Video Interactive Corporation's Patent No. 5,130,792
## Additional Technical Information

United States Patent No. 5,130,792 covers, among other things, store-and-forward video and was filed in February 1990 and issued by the United States Patent and Trademark Office on July 14, 1992 (the "Patent"). The Patent is a pioneering patent in the field of video-on-demand and Internet video with little prior art. Indeed, the Patent has been cited by over 140 subsequent patents. In 1999, USA Video Interactive was awarded similar patents in England, France, Spain, Italy, and Germany, and has patents pending in Canada and Japan.

## Claim Components

Claim 1 of the Patent is the principal claim covering the services and products of most electronic video distribution enterprises. This claim describes a system or process for electronically transmitting video programs to remote locations over switched networks and comprises the following components:

> i.  A *central data facility* with stored digital compressed versions of video programs;
>
> ii. A *request interface* that receives requests for video programs from remote locations over the network and communicates them to the central data facility;
>
> iii. A *distribution interface* that initiates connections with remote locations over the network in response to requests received by the request interface, and transmits the compressed versions of video programs from the central data facility. Because the video programs are stored in digital compressed format, they can be transmitted in less time than is required to view the programs in real time; *and*
>
> iv. A *receiver* at the remote location for receiving, storing, and playing the video programs in real time on a video display.

## Patent Coverage

The video distribution models inherently covered by the scope of the Patent include:

- Live event broadcast or recording and broadcast over the Internet, commonly called webcasting.

- Video-streaming directly from a central server facility using the Internet or other connectivity medium.

- Video-streaming whereby the video is first downloaded from a central server to any intermediate device, such as an edge server or a cache server installed on a local area network, and then distributed.

- Video downloads to any end-user digital storage devices for later access, such as digital media recorders or computer hard drives.

© Copyright 2001 – USA Video Interactive Corp.

- TV broadcasts in which the source content comprises compressed digital video files that are transferred to a storage device for subsequent viewing.

All of these distribution models, with the exception of strictly live webcasting with no content archiving, involve video storage at a central data facility (*Component i* above). Requests for video content per *Component ii* can be initiated using a variety of common interfaces, including links within web pages, set-top box interfaces, or emails that initiate the video stream or download a video file. The distribution interface described in *Component iii* is the process for communicating the video request and responding to the request by transmitting the compressed video program. This process is normally transparent to the end user. Finally, with respect to *Component iv*, the receiver can include a variety of devices with internal storage such as edge servers, cache servers, computers, set-top boxes, and digital video recorders, while video displays can include computer monitors, television screens and large screen projectors.

Thorough analyses of the Patent and its file wrapper have validated its applicability to most video distribution models being employed today. While there may be technological differences between the switched telephone networks explicitly covered by the Patent and the various alternative means of transmission currently being employed—such as fiber optic, cable, and satellite networks—to the extent that these differences do not impact the fundamental process of video transmission, these alternative networks would likely be considered equivalent to the switched telephone network under the Doctrine of Equivalents.

Among the above video distribution models, therefore, only the following would be excluded from necessitating a license under the Patent:

a) Real-time live webcasting with no delays other than transmission latency, no store-and-forward processes, and no archiving of video for post-event distribution;

b) Video-streaming originating from a source located at a central facility, to a receiver with no intermediate downloads, progressive streaming functionality, or storage of video data on the destination device;

c) TV operations that involve only analog broadcast transmissions and do not entail processing or forwarding of digital compressed video files.

Hence, licensing of the Patent would be required by all businesses engaged in video distribution via the Internet or via transfer of video content in compressed form to network edge servers, servers located inside corporate or institutional intranets, or other storage devices located in commercial or consumer settings. These businesses include, but are not limited to:

- Content providers engaged in distribution of their content via the Internet;
- Content distribution networks;
- Video or media service providers;
- Internet broadcast companies;
- Internet service providers engaged in video distribution;
- Internet data centers;
- Telephone companies with central offices acting as video suppliers or conduits;
- Cable companies that distribute or facilitate distribution of digital video;

© Copyright 2001 – USA Video Interactive Corp.

- Manufacturers of video servers; and
- Organizations employing the above services as part of their business models.

## Licensing and Fee Structure

USA Video Interactive offers a flexible approach with regard to the terms and conditions of licensing agreements and fee structures. For example, fee structures may be tiered based on corporate parameters such as size, number of sites and assessable volume of digital video distribution business.

USA Video will also consider licensing agreements that advance its ongoing business initiatives, such as referrals or partnerships for its end-to-end StreamHQ™ services; preferential pricing on hardware, software and bandwidth; and/or reciprocal technology licensing. Licensing agreements, however, will not be transferable or assignable.

## About USA Video Interactive

USA Video Interactive is an international designer and supplier of high-tech Internet streaming video and video-on demand systems, services and innovative end-to-end solutions and features its StreamHQ™ suite of media delivery services. These services encompass the entire media experience from source to viewing, including content production, content encoding under the banner EncodeHQ™, asset management, media and application hosting, multi-mode content distribution, transaction data capture and reporting, and e-commerce. StreamHQ™ services leverage the capabilities of the Internet while bypassing its latencies and are designed to be highly available, reliable, flexible, scalable and cost-effective. USA Video Interactive's pioneering patent for store-and-forward video was filed in 1990 and was issued by the United States Patent and Trademark Office on July 14, 1992. It has been cited by at least 141 other patents. USA Video Interactive holds similar patents in England, France, Spain, Italy and Germany, and has patents pending in Canada and Japan. The USA Video Interactive patented video technology gives users full-motion video; the flexibility of standard, VCR-like controls; and the convenience of a standard internet-browser format for access. It provides video images significantly faster and at a higher degree of resolution than with previously available methods; significantly overcomes bandwith restrictions; and eliminates the blockiness and slowness of current technologies — all at a lower cost and at or near broadcast quality. USA Video Interactive is nearing completion of a patented Wavelet compression technology that will further enhance the company's ability to deliver Internet video to home modem users and reduce storage and download-time requirements for all users, including those with broadband connections. For more information, visit www.usvo.com

- 3 -

© Copyright 2001 – USA Video Interactive Corp.

# EXHIBIT Y

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TIME WARNER CABLE INC., | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-387-KAJ |
| v. | ) | |
| | ) | |
| USA VIDEO TECHNOLOGY CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF GLEN HARDIN IN OPPOSITION TO

## USA VIDEO TECHNOLOGY CORPORATION'S

## MOTION TO DISMISS, STAY OR TRANSFER

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

Jeffrey M. Olson
Samuel N. Tiu
Matthew S. Jorgenson
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
(213) 896-6000

Dated: September 14, 2006

LA1 828575v.1

I, Glen Hardin, hereby declare and state as follows:

1.      Unless otherwise stated, I have personal knowledge of the facts stated herein and if called to testify, I could and would be able to testify to the statements made herein.

2.      I am Senior Director of Video Systems in the Advanced Technology Group of Time Warner Cable Inc.  I oversee product development and testing with respect to a variety of the components of Time Warner Cable Inc.'s cable systems, including core control systems, video-on-demand servers, set-top boxes and video-on-demand applications.  I have worked in the interactive cable and video-on-demand industry for more than 15 years, and joined Time Warner Cable Inc. in 2002.

3.      Time Warner Cable Inc. (hereinafter "TWC") operates cable systems in a number of markets throughout the United States.  TWC offers a variety of services through its cable broadcast systems, including cable television, On-Demand, and Internet-access services.

4.      I have personal knowledge of the design and operation TWC's cable systems, including the set-top boxes used by customers to receive content, including video-on-demand content.  I work at TWC's facility in Charlotte, North Carolina, where TWC houses its corporate research and development facilities for cable delivery systems.  Most of the documents related to the general system design of TWC's video-on-demand service are located in North Carolina.  Documents relating to the deployed implementation of video-on-demand systems are located  both in Charlotte and at the relevant local system facility.  Likewise, most of the TWC engineers who worked on the general system design of TWC's video-on-demand systems are located in North Carolina.

The engineers with knowledge of specific implementations are located both in North Carolina and at the relevant local system facility.

5.     Below I will briefly describe TWC's cable infrastructure and how video-on-demand is incorporated into TWC's broadcast cable system.

6.     TWC's cable system has several parts, including headends, hubs, nodes, fiber optic cables, coaxial cables and set-top boxes.  A headend includes broadcast equipment and software that reside at a TWC physical site.  The headends are connected to hubs through fiber optic cables.  The hubs in turn are connected to nodes, also via fiber optic cables.  At the node, the broadcast signal originating from the headend is converted from an optical signal to an electrical signal that is carried on coaxial cables into customers' homes.  Although the numbers vary widely in different implementations, in an "average" or "model" implementation, a hub facility serves approximately 20,000 homes, and 40 nodes are usually served from a hub.  Each node serves approximately 500 homes.

7.     Set-top boxes in the homes of customers are connected to the node by a coaxial cable.  The set-top box is the customer's point of contact with the TWC system.  It receives analog and digital broadcast services, including video-on-demand, and provides the mechanism for two-way interaction with the video servers that contain the video-on-demand programs.  It consists of a hardware platform (the physical set-top box and its remote control), and software including an operating system and a user interface.

8.

# REDACTED

9.

**REDACTED**

10.

**REDACTED**

11.

**REDACTED**

12.

**REDACTED**

13.

# REDACTED

14.     The MPEG-2 Transport Stream format is a standard format used in digital broadcast applications over cable systems. It is decoded and processed by the set-top box and the resulting output is sent to the customer's television for viewing.

15.

# REDACTED

16.

# REDACTED

17.     None of TWC's set-top boxes allow for storage of video-on-demand programs. The majority of TWC set-top boxes do not contain a hard drive or similar

device and cannot store video programs. Instead, a video-on-demand program is transmitted and processed in real time, as described above.

18. Those TWC set-top boxes that do contain a hard drive are those that contain a built-in Digital Video Recorder, or "DVR." A DVR set-top box has the ability to record and store television programs and contains a hard drive for storing recorded programs. However, the software on TWC's DVR set-top boxes is designed to prevent customers from recording video-on-demand programs. Thus, while scheduled cable television programs can be recorded using the DVR feature, video-on-demand programs cannot be recorded.

19. To provide VCR-like capabilities, TWC's video-on-demand service allows the customer to "pause," "fast-forward," and "rewind" a video-on-demand program using the remote control. To accomplish this, the set-top box receives a particular command from the remote control and transmits that command back to the video server at the headend or hub. The video server then performs the desired function (i.e., pause, fast-forward, rewind) and the output of the video server is transmitted, received, and decoded in real time, requiring no storage of the video program at the set-top box.

20. I have reviewed the document attached to this declaration as Exhibit A, entitled "USA Video Interactive Corporation's Patent No. 5,130,792 Additional Technical Information." Page 2 of that document states that "the following would be excluded from necessitating a license under the Patent: ... Video-streaming originating from a source located at a central facility, to a receiver with no intermediate downloads, progressive streaming functionality, or storage of video data on the destination device."

21.    TWC's video-on-demand system does not facilitate or allow intermediate downloads or progressive streaming functionality. Furthermore, as discussed above, TWC's set-top boxes do not permit storage of video-on-demand programs.

I declare under penalty of perjury that to the best of my knowledge, information and belief, the foregoing statements are true and correct.

Executed this ___ day of September, 2006 in _____, _____.

_____
Glen Hardin

# EXHIBIT Z

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TIME WARNER CABLE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-387-KAJ |
| v. | ) | |
| | ) | |
| USA VIDEO TECHNOLOGY CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>DECLARATION OF ANDREW T. BLOCK IN OPPOSITION TO USA VIDEO
TECHNOLOGY CORPORATION'S MOTION TO DISMISS, STAY OR TRANSFER</u>**

I, Andrew T. Block, hereby declare and state as follows:

1.      Unless otherwise stated, I have personal knowledge of the facts stated herein and if called to testify, I could and would be able to testify to the statements made herein.

2.      I am Vice President and Chief Counsel, IP, of Time Warner Cable Inc. (hereafter "TWC"). I have personal knowledge of the corporate structure and operations of TWC. I have been an attorney with TWC since September 2001.

3.      TWC is a Delaware corporation having its corporate headquarters at 290 Harbor Drive, Stamford, Connecticut. TWC also has significant corporate operations in Charlotte, North Carolina; Herndon, Virginia; and Westminster, Colorado. TWC's has a corporate marketing function located in Stamford, and its corporate finance function is located in both Stamford and Charlotte. Additionally, TWC's corporate research and development and engineering groups are located in Charlotte and in Westminster. Substantially all of the personnel and documents relating to each of those corporate functions are located in the respective locations where the function is located. Each of the TWC divisions also has marketing, finance and engineering personnel as well.

4.      TWC is a separate and distinct corporate entity from Time Warner Inc. and is not a wholly-owned subsidiary of Time Warner Inc.

5.      None of the senior executive officers of TWC responsible for the management of TWC's business operation are officers or directors of Time Warner Inc. None of the directors of TWC are directors of Time Warner Inc.

6.      Based on the attached letter (Exhibit A), I understand that USA Video asserted in December 2000 that TWC "may require a license from USA Video" for U.S. Patent No. 5,130,792 (hereafter the "'792 patent") and that the '792 patent allegedly covers "a system and

method for electronically transferring video programs on demand from a central location to a remote location over standard commercial telephone networks, including fiber optics."

7.     Prior to June of 2006 and since December 2000, to my knowledge USA Video did not further pursue its assertion that TWC somehow infringes the '792 patent.

8.     Since 2000, TWC has continued to provide On-Demand services to its customers through its cable systems.


I declare under penalty of perjury that to the best of my knowledge, information and belief, the foregoing statements are true and correct.

Executed this ____ day of September, 2006 in _____, _____.


_____
Andrew T. Block

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 14th day of September, 2006, the attached **REDACTED**

**PUBLIC VERSION OF DECLARATION OF MATTHEW S. JORGENSON IN**

**OPPOSITION TO USA VIDEO TECHNOLOGY CORPORATION'S MOTION TO**

**DISMISS, STAY OR TRANSFER** was served upon the below-named counsel of record at the

addresses and in the manner indicated:

Richard K. Herrmann, Esquire                          <u>HAND DELIVERY</u>
Morris James Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801


Edward W. Goldstein, Esquire                          <u>VIA FEDERAL EXPRESS</u>
Goldstein, Faucett & Prebeg, L.L.P.
1177 West Loop South, Fourth Floor
Houston, TX  77027


                                        */s/ John G. Day*
                                        _____

                                        John G. Day


172633.1